UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

                Plaintiff,                CASE NO.: 21-CR-20566-GRAHAM

v.

JAROSLAVA RUIZ,

                Defendant.

_____/

### DEFENDANT JAROSLAVA RUIZ' OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT, SENTENCING MEMORANDUM, AND REQUEST FOR DOWNWARD DEPARTURE/VARIANCE[1]

The Defendant, **JAROSLAVA RUIZ**, by and through her undersigned counsel, and pursuant to Fed. R. Crim. P. 32 (d), (e)(2) and (f), the Fifth Amendment to the United States Constitution, *18 U.S.C. § 3553(a),* and *U.S.S.G. 5K2.0* of the *Sentencing Guidelines* respectfully files her objections to the Presentence Investigation Report (hereinafter "PSR"), Sentencing Memorandum, and Request for Downward Departure and/or Variance. In support thereof, Defendant states as follows:

### I. FACTUAL OBJECTIONS

1. Ms. Ruiz objects to PSR paragraphs 17, 21, 27, 28, 30, 31, 37, 38, 45, 47, 52, 60, 61, 80 and 89.

2. As to paragraphs 17, 21, 27 and 28, Ms. Ruiz asserts that her employment at the clinics was as a medical assistant and not as an office manager or administrator. Ms. Ruiz was initially employed

_____

[1] On or about October 27th, 2022, this Honorable Court entered an order granting the Defendant's Motion for Extension of Time until December 23rd, 2022, to file objections to the PSR and to file a motion for downward departure/variance (D.E. 157). The defendant reserves the right to supplement/amend these objections and motion prior to the sentencing date. The Defendant incorporates by reference the transcripts of trial testimony of witnesses on August 1st, 2nd, and 3rd, 2022 as if attached as exhibits hereto.

in November of 2017 as a medical assistant and her starting salary was initially $400 per week. Later, her salary was increased to $600 per week, and that pay rate remained in place until she left the employment in approximately December 2018. *(See Trial Transcript of 8/3/22 at page 47).* Furthermore, Ms. Ruiz asserts that she did not prepare or submit any of the fraudulent billing submitted by the clinics.

3. As to paragraphs 30, 31, 38, and 47, Ms. Ruiz asserts that she did not recruit witness, Jean Lago. In fact, witness Lago may have perjured herself when she testified at trial in this case. The transcript of the trial testimony of witness Lago together with the cross-examination is attached hereto as ***Composite Exhibit "1"***. At trial Ms. Lago testified that she was recruited by Ms. Ruiz when she went to the clinic to complain about being billed for too many claims without payment and then, allegedly, reached an agreement with Ms. Ruiz whereby Lago would get paid $3500 ($2000 for the patients she recruited and the remaining $1500 would be kept by Lago). (*See **Id.** at pages 68-71[2]*). She further claimed to have been paid by Ms. Ruiz and only Ms. Ruiz. ***Id.** at pages 77 Ln: 24-25 and 78 Ln: 2-3.*

However, the statement that Ms. Lago gave to FBI S/A Kristin Chandler and S/A Phillippe Lara, on July 7th, 2021, belies her trial testimony. Attached as ***Composite Exhibit "2"*** is the FBI 302 Report of Investigation (ROI) concerning the interview of Jean Lago on or about July 7th, 2021. On that date, Ms. Lago told FBI agents that she (Lago) was introduced to the owner of La O, Daglia Oquendo, by Ms. Ruiz. She further stated that she initially met Ms. Ruiz at other clinics where she (Lago) was recruiting patients. Lago told the FBI that Ruiz advised her that she (Lago)

---

[2] Lago had already been recruited into this conspiracy by Nelson Rodriguez, and she went to the clinic, where she met Ms. Ruiz for the first time, to ask for **her** money. (*See, Composite Exhibit "1" at page 68 Ln: 6-23 and Composite Exhibit "2" at page 5*). Therefore, Ms. Ruiz did not recruit Lago into this conspiracy, per Lago's own statement to FBI agents on July 7th, 2021.

should get out because things were "heating up" at the clinics. (*See **Id.** at page 1*). Lago further stated to the FBI that after she (Lago) was introduced to Oquendo, she (Lago) and Oquendo reached an agreement. Lago further stated that she "always received the money from Oquendo". Lago stated that she did not speak to anyone at the clinic, other than Oquendo, regarding patients or money. ***Id. at page 2.***

As to Lago's involvement with Ms. Ruiz at Ramirez Rehab Center Inc./AA Ortiz Medical Center Inc., Lago clearly stated to the FBI agents on July 7th, 2021, **that she was originally recruited by Nelson Rodriguez**. *(See **Composite Exhibit "2" at page 5**)*. Therefore, Lago was already a member of the conspiracy, as a patient accepting kickbacks, and recruited by Rodriguez, before she ever met Ms. Ruiz. The fact that Lago agreed to undertake additional criminal activity within the conspiracy after she met with Ms. Ruiz does not mean that Ms. Ruiz recruited her into the conspiracy.[3]

The enhancement for leadership role for Ms. Ruiz is further unwarranted and improper given how similarly situated co-defendant Anisley Gomez Anuez, who worked alongside Ms. Ruiz, held the same job duties at the clinic and committed the identical criminal acts as Ms. Ruiz,

---

[3] There are several legal and ethical issues with the trial testimony in light of the statement to the FBI by Lago. Defense counsel's performance in cross-examining Lago and other government witnesses "fell below an objective standard of reasonableness", and the deficient performance prejudiced Ruiz' defense. *Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984)*. Counsel failed to impeach Lago and the other government witnesses and/or failed to call any FBI Special Agents to impeach these witnesses with their prior inconsistent statements to the FBI agents. In fact, Defense counsel's cross-examination consisted of only a few questions and never sought to impeach any of the government witnesses with their prior inconsistent statements in order to show that the trial testimony was false. Based on the undersigned's initial review of the trial transcripts and the FBI 302 ROI's of interviews of witnesses, the undersigned advises the Court that a Petition to Vacate the Defendant's Conviction, pursuant to *28 USC § 2255*, based on Ineffective Assistance of Counsel will be filed at the appropriate time. *(Compare Trial Testimony of cooperating government witnesses with Composite Exhibits 2, and 4, cooperating witnesses' statements to FBI agents in FBI 302 ROI's).*

**did not** receive a leadership role enhancement. *(**Compare PSR paragraphs 35 & 37**).* Co-defendant Anuez received a sentence of 28 months imprisonment. *(See PSR at page 2).*

4. As to paragraph 37 and 45, Ms. Ruiz objects to the statement that she "caused the submission of at least $34,689,712.00 in false and fraudulent claims for reimbursement". It is undisputed that the clinics involved were submitting fraudulent claims for reimbursement since at least 2016 until 2020. *(See Indictment, D.E. 3).* It is also undisputed that Ms. Ruiz entered the conspiracy on November 17th, 2017 and left the conspiracy on December 18th, 2018. *(See PSR at paragraph 27 and Trial Transcript of 8/3/22 at pages 47, 56 Ln. 25-57 Ln. 1)).* Furthermore, it is undisputed that Ms. Ruiz profited, in total, $25,300.00 (which was her employment salary) while involved in this conspiracy. (*See **Composite Exhibit "3"**, Government's Trial Exhibit 113, D.E. 107-2).* Therefore, Ms. Ruiz cannot be held responsible for the total intended loss of the conspiracy from 2016-2020 because she was not involved during the entire period of the conspiracy. The loss amount as to Ms. Ruiz should be calculated based on what was billed from November 2017 to December 2018.[4]

5. As to paragraphs 60, 61, 80 and 89, Ms. Ruiz asserts that her and her brother's last name is "Garin" not "Garrin". Her paternal half-brother's complete name is Rainier Garin Alarcon. Regarding paragraph 80, Ms. Ruiz was paid $450 weekly not bi-weekly. The other two employees were paid

---

[4] The undersigned and the probation officer have asked the government for this figure/calculation since October 2022.The Government disclosed claims data, which consists of sixty-seven files on December 21, 2022.  The material is so voluminous that it is virtually impossible to review the data and determine what was billed between November 2017 and December 2018 prior to the filing of these objections. Moreover, it is the Government's burden to establish the loss amount by a preponderance of the evidence. *United States v. Liss,* 265 F.3d 1220, 1230 (11th Cir. 2001); *United States v. Cabrera,* 172 F.3d 1287, 1292 (11th Cir.1999); *United States v. Lawrence,* 47 F.3d 1559, 1566 (11th Cir.1995) ("When a defendant challenges one of the bases of his sentence as set forth in the PS[I], the government has  the burden of establishing the disputed fact by a preponderance of the evidence."). Accordingly, Ms. Ruiz requests an evidentiary hearing on the loss amount attributable to her for guideline calculations purposes.

$110 each weekly. As to paragraph 89, the 2017 Hyundai Tucson was returned to the dealer, even though it was a lease, because Ms. Ruiz could no longer afford to make the payments.

6. While some of these factual objections will not affect the sentencing guideline calculations, some will affect the guideline calculations should this Honorable Court sustain or overrule them or any of the objections below.

## II. DEFENDANT'S OBJECTIONS TO THE PSR'S GUIDELINES CALCULATIONS

Ms. Ruiz objects to the Presentence Report and Recommendation as it relates to the guideline calculations, i.e., paragraphs 31, 37, 38, 45, 47, and 52.

### (i) OBJECTIONS TO PSR PARAGRAPHS 31, 37 & 45: THE LOSS AMOUNT PURSUANT TO *U.S.S.G. § 2B1.1(b)(1)(L)*

Ms. Ruiz objects to the loss amount set out in paragraphs 31, 37 and 45 in the PSR pursuant to *U.S.S.G. § 2B1.1(b)(1)(L).* Ms. Ruiz is being assessed a twenty-two (22) level loss amount adjustment pursuant to *U.S.S.G. § 2B1.1(b)(1)(L)* based on the information set out in paragraph 37 of the PSR. As stated above in paragraph 4, the enhancement for the loss amount is not appropriate in this case. Here, the loss amounts attributable to Ms. Ruiz should be the actual amount of payment made by the insurance plans from November 2017 to December 2018. (*See also paragraph 4 and footnote 4).*

*Defendant can establish common knowledge that insurers do not pay the full amount billed*

The amount fraudulently billed to health care insurers is prima facie evidence of the "intended loss." However, a defendant may introduce further evidence to show that this amount overestimates or underestimates the defendant's actual intent. *See United States v. Moran*, 778 F.3d 942, 974 (11th Cir. 2015) (recognizing that Defendants "demonstrate[ed] that they had been aware of Medicare's lower reimbursement rate and had projected future revenue in accordance with that

rate. Based on that evidence, the district court concluded that defendants . . . had intended to receive only the amounts paid by Medicare over the course of the conspiracy."*)*; *United States v. Popov*, 742 F.3d 911 (9th Cir. 2014); *United States v. Miller*, 316 F.3d 495, 503-504 (4th Cir. 2003) (holding that parties may introduce additional evidence to support their positions that the amount billed either exaggerates or understates the defendant's intent. "As anyone who has received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid." The amount billed is not conclusive evidence of intended loss); *United States v. Singh*, 390 F.3d 168, 194 (2d Cir. 2004); *E.g., United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011) (adopting the approach taken in *Miller*, and remanding for resentencing on the loss issue based on the lack of clarity regarding the standard for determining loss and the evidence in the record suggesting that the defendant intended to receive only the capped amount).

In *United States v. Singh*, the court noted that "'[i]t is common knowledge that Medicare and private insurers pay fixed rates for medical procedures.' Even patients know that the amounts billed to insurance companies and Medicare by health care providers are higher than the fixed amounts paid. Because of Singh's status as a physician and one familiar with the billings and receipts of his medical practice, an inference surely can be drawn here." *390 F.3d at 193 (citing United States v. Nachamie, 121 F. Supp. 2d 285, 293 n. 6 (S.D.N.Y.2000))*.

Payers, such as Medicare and Medicaid, commonly pay only a fraction of any billed amount, depending upon factors such as fee schedules, deductibles, co-pays, and other adjustments to payable amounts. Given Ms. Ruiz's role and experience in working at the clinics, it can be inferred that the intended loss is the amount the insurer would pay, and not the amount billed. *See United States v. Semrau*, 2011 WL 9258, at *4 (W.D. Tenn. Jan. 3, 2011) ("This loss amount more accurately reflects the loss a defendant intended to cause through is fraudulent scheme."); *Singh*,

6

390 F.3d at 193–94; *Miller*, 316 F.3d at 504–05. Accordingly, the intended loss for sentencing purposes should be the reimbursement amounts. *Id.*

*Defendant is not responsible for the amount of losses accrued during the time periods that she was not part of the conspiracy*

The amount of loss attributed to Ms. Ruiz must be further reduced to reflect the period from when she joined the conspiracy in November 2017 until she left in December 2018. A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct. *United States v. Word*, 129 F.3d 1209, 1213 (11th Cir. 1997); *See U.S.S.G. § 1B1.3, application note 2*. In *United States v. Isaacson*, 752 F.3d 1291, 1305 (11th Cir. 2014), the court stressed that the limits of sentencing accountability are not coextensive with the scope of criminal activity. A defendant may be found guilty of substantive offenses based on foreseeable acts of coconspirators, but for sentencing purposes, only conduct the defendant agreed to jointly undertake can be factored into the guideline calculations, even if the conduct of others was foreseeable. *Id.* In *United States v. Presendieu*, the court held that, for sentencing purposes, one fraud co-conspirator was not responsible for the conduct of another conspirator that occurred after the defendant terminated her joint activity with the other conspirator. 880 F.3d 1228, 1245-46 (11th Cir. 2018).

*Recent decisions support a finding that the loss amount is the actual amount received from the insurers*

In further support of Ms. Ruiz's position to reduce the loss amount attributed to her, recent federal decisions concerning deference afforded to agency commentary and interpretation, following the U.S. Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), are instructive. The Third Circuit recently rejected the commentary to § 2B1.1 that defined "loss" to

include intended loss. *United States v. Banks*, 2022 WL 17333797 (3rd Cir. 2022). Specifically,

*Banks* held:

> Our review of common dictionary definitions of "loss" point to an ordinary meaning of "actual loss." None of these definitions suggest an ordinary understanding that "loss" means "intended loss." To be sure, in context, "loss" could mean pecuniary or non-pecuniary loss and could mean actual or intended loss. We need not decide, however, whether one clear meaning of the word "loss" emerges broadly, covering every application of the word. Rather, we must decide whether, in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word "loss" is the loss the victim actually suffered. We conclude it is.

> Because the commentary expands the definition of "loss" by explaining that generally "loss is the greater of actual loss or intended loss," we accord the commentary no weight. Banks is thus entitled to be resentenced without the 12-point intended-loss enhancement in § 2B1.1.

*United States v. Banks*, 2022 WL 17333797 (3rd Cir. 2022).[5]

---------------------------

[5] In *Banks*, the appellant was convicted of wire fraud and other crimes related to his attempt to defraud a foreign currency exchange broker. Banks was convicted of making fraudulent electronic deposits into Gain accounts from other accounts that had insufficient funds. Banks then tried to withdraw the "deposited" funds before Gain realized the funds were not actually there. In all, Banks purported to deposit $324,000 in Gain accounts and attempted 70 withdrawals totaling $264,000. But Banks' attempted withdrawals were not successful and Gain never actually transferred any funds to Banks.

At sentencing, the district court calculated an advisory Guidelines range under U.S. Sentencing Guidelines § 2B1.1 based on Banks' intended loss. The Third Circuit rejected the commentary to § 2B1.1 that defined "loss" to include intended loss. The *Banks* Court was guided by a prior Third Circuit decision that held that the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) narrowing *Auer* deference applied to the Sentencing Commission's commentary. *Section 2B1*.1 provides for a base offense level of seven and additional increases based upon the amount of "loss." *Section 2B1.1* does not itself define loss, but the Sentencing Commission's commentary states that "loss" is "the greater of actual or intended loss," with "intended loss" being "pecuniary harm that the defendant purposely sought to inflict," regardless of whether the loss "would have been impossible or unlikely to occur." *Id.* at cmt. 3(A); (ii). Using Banks' intended loss of greater than $250,000 and less than $550,000, the court increased the offense level by 12. See *U.S.S.G. § 2B1.1(b)(1)(G)*. The court ultimately sentenced Banks to 104 months in prison.

In the Third Circuit's view, "[i]f the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer." The court of

The _Banks_ Court was guided by a prior Third Circuit decision that held the Supreme Court's decision in _Kisor v. Wilkie_, 139 S. Ct. 2400 (2019), narrowing _Auer_[6] deference applied to the Sentencing Commission's commentary. That absence alone indicates that the Guideline does not include intended loss. _Banks, 2022 WL 17333797, n. 47_ (citing _United States v. Nasir, 17 F.4th 459 (3rd Cir. 2021)_). The _Kisor_ Court articulated that _Auer_ deference to an agency's reasonable interpretation of its own genuinely ambiguous regulations is only appropriate after exhausting all "traditional tools" of interpretation, so long as the "character and context of the agency interpretation entitles it to controlling weight." _Kisor_, 139 U.S. at 2416 (citing _Christensen v. Harris County_, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); _Bowles v. Seminole Rock & Sand Co._, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

For decades, federal courts, including the Eleventh Circuit, have looked to _Stinson v. United States_, 508 U.S. 36 (1993) when determining whether commentary to the Sentencing Guidelines is binding. _United States v. Cingari_, 952 F.3d 1301, 1308 (11th Cir. 2020); _United States v. Ridling_, No. 21-10777, 2022 WL 4137723, at *3 (11th Cir. Sept. 13, 2022); _United States v. Cruz_, 713 F.3d 600, 607 (11th Cir. 2013); _United States v. Maxwell_, 579 F.3d 1282, 1306 (11th Cir. 2009); _United States v. Torrealba_, 339 F.3d 1238, 1242 (11th Cir. 2003). _Stinson_ instructs courts to follow commentary "that interprets or explains a Guideline . . . unless it violates the

---

appeals found no ambiguity in _§ 2B1.1's_ use of the word "loss," and held that the commentary's addition of "intended loss" swept beyond the word's plain language. The court remanded the case for resentencing.

[6] _Auer_ deference is the doctrine that courts should defer "to agencies' reasonable readings of genuinely ambiguous regulations." _Auer v. Robbins, 519 U.S. 452 (1997)._

Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that Guideline." _Stinson, 508 U.S._ at 38.

Several federal courts, however, have held that _Kisor_ reduced the _Auer_ deference given to the Guidelines' commentary. _See United States v. Lewis_, 963 F.3d 16 (1st Cir. 2020); _United States v. Nasir_, 17 F.4th 459 (3rd Cir. 2021) (en banc); _United States v. Campbell,_ 22 F.4th 438 (4th Cir. 2022)_; United States v. Riccardi_, 989 F.3d 476 (6th Cir. 2021); _United States v. Winstead_, 890 F.3d 1082 (D.C. Cir. 2018); _Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States_, 489 F. Supp. 3d 106, 129 (E.D.N.Y. 2020). Other courts refused to recede from _Stinson_. _See United States v. Richardson_, 958 F.3d 151 (2d Cir. 2020); _United States v. Broadway_, 815 Fed. Appx. 95, _n.2_ (8th Cir. 2020), cert. denied, 210 L. Ed. 2d 927, 141 S. Ct. 2792 (2021); _United States v. Moses_, 23 F.4th 347, 352-53 (4th Cir. 2022);[7] _United States v. Vargas_, 35 F4th 936, 939-40 (5th Cir. 2022) _rehg en banc granted, vacated by United States v. Vargas,_ 45 F.4th 1083 (5th Cir. 2022) _(Kisor_ did not address case law holding that commentary to the Sentencing Guidelines is authoritative. Therefore, "we cannot say here that _Kisor_ unequivocally overruled our precedent holding."); _United States v. Pratt_, No. 20-10328, 2021 WL 5918003, at *2 (9th Cir. Dec. 15, 2021) (unpublished).

---

[7] The Fourth Circuit, in _United States v. Moses_, 23 F.4th at 352-53, declined to extend _Kisor_ to the Sentencing Commission noting that "[t]he Commission was established as an independent commission _in the judicial branch_ of the United States."  In fact, the Sentencing Commissions is "an independent agency" in the judicial branch of government. United States Sentencing Commission,  https://www.ussc.gov/about-page.  Whether an "agency" is part of the executive, judicial, or legislative branch should be of no significance as to whether the agency should be given _Auer_ Deference.

While we recognize the Eleventh Circuit has consistently applied *Stinson,* given the Supreme Court's recent decision in <u>*Kisor*</u>, the Third Circuit's opinion in *Banks* is instructive to determining the proper enhancement in the instant case.

Based on the facts of this case and the case law presented, the loss amounts attributable to Ms. Ruiz can only be the amounts received from the fraudulent bills submitted between November 2017, the date Ruiz joined the conspiracy, and December 2018, the date she left/withdrew from the conspiracy, or should this Court accept the analysis and conclusions of the Third Circuit in <u>*Banks, supra*</u>, the amount actually paid by the insurance companies, between November 2017 and December 2018. The total paid out by the insurance companies during the entire period of the conspiracy was $7,707,627 *(see Indictment at pg. 13 paragraph 3).*

### (ii)   OBJECTIONS TO PARAGRAPHS 37, 38, AND 47: THE TWO (2) LEVEL AGGRAVATING ROLE ADJUSTMENT PURSUANT TO *U.S.S.G. § 3B1.1(c)*

Ms. Ruiz is being assessed a two (2) level managerial role adjustment pursuant to *U.S.S.G. § 3B1.1(c)* based on the information set out in paragraphs 37 and 47 of the PSR. The probation officer has recommended the two-level aggravating adjustment, per paragraphs 37 and 47 because:

(a)  Ms. Ruiz was an office administrator for the clinics; Ramirez Rehab, Long Life, AA Ortiz and Perez Medical;
(b)  Ms. Ruiz recruited patient recruiters, instructed officer administrators and patients on how to fabricate medical records, facilitated the submission of false and fraudulent claims to private insurance plans and ASO insurance plans, and paid the beneficiaries kickbacks for visiting the clinic in exchange for the use of their medical insurance information and their signatures on stacks of undated forms.
(c)  Ms. Ruiz knowingly and willingly submitted and caused the submission of at least $34,689,712.00 in false and fraudulent claims for reimbursement.
(d)  Because Ruiz was an organizer, leader manager, or supervisor in any criminal activity, a two-level aggravating role adjustment is recommended.[8]

---

[8] In paragraph 38, the PSR states Lago was recruited by Ruiz.

However, it should be noted that the probation officer **did not** recommend an aggravating role adjustment for co-defendant, Anisley Gomez Anuez, who was the one that recruited Ms. Ruiz, worked along-side Ms. Ruiz, and was involved in the same, if not more, criminal conduct as Ms. Ruiz. *(See PSR paragraph 35)*. The Role Assessment of Ms. Gomez Anuez, by the probation officer, per paragraph 35, is as follows:

(a) Anisley Gomez Anuez was employed an office administrator for Ramirez Rehab, Long Life, AA Ortiz and Perez Medical.

(b) In this capacity, Gomez Anuez fabricated medical records, facilitated the submission of false and fraudulent claims to private insurance plans and ASO insurance plans, and paid beneficiaries kickbacks for visiting the clinic in exchange for the use of their medical insurance information and their signatures on stacks of undated forms.

(c) Gomez Anuez knowingly and willfully submitted and caused the submission of at least $34,689,712.00 in false and fraudulent claims for reimbursement.

(d) **Neither an aggravating or mitigating role was recommended for Gomez Anuez.**[9]

Contrary to the PSR's conclusions in paragraphs 37, 38, and 47, Defendant did not "manage," "supervise," "control," or "direct" any of the participants in the alleged conspiracy at issue herein. *(See PSR at paragraph 37)*.

Government witness, Clarissa Azar, who worked at Simply Health Care with Jean Lago testified that she was **recruited by Jean Lago** at her desk at Simply Health Care and told by Lago to go to the clinic to get money *(See Trial Tran. of 8/1/22 at pages 93-94)*. Azar went to the clinic one time for fifteen minutes and identified Ruiz as one of the people working there. *Id. at pages 96-97*. She stated that Ms. Ruiz instructed her to sign the blank forms *(Id. at page 98)* and was paid $1000 by Jean Lago who placed the cash in her purse at Simply Health Care *(Id. at page 100)*.

---

[9] Curiously missing from the role assessment for Gomez Anuez is the fact that she, along with Ms. Lidia Diaz, recruited Ms. Ruiz to work at the clinic. *(See Trial Testimony of Ms. Ruiz on 8/3/22)*.

She did not testify that she was recruited by Ms. Ruiz or that she was managed, supervised, and/or controlled by Ms. Ruiz.

Government witness, Anisley Gomez Anuez, worked at the clinics, Long Life - Clinic on Flagler and 82nd and AA Ortiz – Clinic on Flagler and 80th. *(See, Trial Transcript of 8/1/22 at page 104 and continuation of testimony on 8/2/22*). She testified she worked with Jaroslava Ruiz, Kyrenia Maqueira (PT), Aurelio Ortiz (Doctor), and Jesus Porras (Owner). Ms. Gomez Anuez testified about what the Defendant did at the clinic, including filling out blank forms and dealing with the billing. She stated that she had conversations with Ruiz about how they were doing things in the office that were not "right" *(See, Trial Transcript of 8/2/22 at page 17-18).* **The owner would decide whether or not a service would be given, which really wouldn't be given because everything was a fraud**. *(See, Trial Transcript of 8/1/22 at page 109).* She did not testify that she was recruited by Ms. Ruiz or that she was managed, supervised, and/or controlled by Ms. Ruiz. She intentionally omitted from her testimony that she was working at the clinic in August or September 2017, several months before Ms. Ruiz was hired at the clinic. *See Trial Testimony of Ms. Ruiz on 8/3/22 at pages 44-48 and Composite Exhibit "4", FBI 302 of Anuez interview on January 11, 2022.*

Government witness, Jiliannette Gavarette, was employed at Simply Health Care and was a Patient at clinic on Flagler. Ms. Gavarette testified that she was fired from Simply Health Care because they found out she accepted cash in exchange for helping clinics defraud the insurance companies *(See Trial Transcript of 8/2/22 at page 45).* Ms. Gavarette was approached by a co-worker (did not remember the name of the person who sent her). (*Id. at page 46) (***probably Jean Lago who also worked at Simply Health Care, see Trial Transcript of 8/1/22 at page 62***) to go to the physical therapy clinic, have them bill her insurance but not receive physical therapy. *Id. at*

*page 45.* She went to the Clinic on Flagler in 2017, one time. *Id. at page 46.* One woman asked her to create a login on the computer and a different woman had her sign some paperwork without dates. *Id. at pages 47-48.* Ms. Gavarette's co-worker gave her $1,000 in cash. *Id. at pg. 48.* **(Probably Jean Lago)**. Ms. Gavarette did not identify Ms. Ruiz by name nor did she even identify her in the courtroom – she just stated that one woman was curvier and the other was thinner. *Id. at page 49.* She did not testify that she was recruited by Ms. Ruiz or that she was managed, supervised, and/or controlled by Ms. Ruiz.

Government witness, Dalgi Oquendo, owner and operator of De La O Clinic, testified that she operated the clinic from 2017 to 2021 *(See, Trial Transcript of 8/2/22 at page 100)* and billed insurance for treatments that were not provided. *Id. at page 101.* She met Ruiz in late 2018 or early 2019 through one of her clinic workers that is a friend of Ruiz, Francisco Anguelo, a therapist. *Id. at page 102.* Francisco Anguelo introduced Oquendo to Ruiz as someone who could help her by referring patients. *(Id. at pages 102-103).* Ruiz met Oquendo at Oquendo's office and gave her the name of someone that she knew was going to refer patients. *Id. at page 103-104.* Oquendo stated she offered Ruiz $3,000 for introducing her to Jean Lago. *Id. at page 105.* She testified she did not know what Ruiz did for work but said Anguelo knew Ruiz from their time working together at a medical office. *Id. at page 105.* She paid Ruiz $3000 in cash a few weeks later at Oquendo's office. *Id. at page 106.* Lago ended up sending Oquendo patients and the patients were billed by the clinic. *Id. at page 107.* The recruited patients worked for Simply Health Care. *Id. at page 107.* Lago and Ruiz referred a total of 15 patients. *Id. at page 108-109.*[10] The Clinic made $313,000 from the

_____

[10] This statement appears to be an outright falsehood. Ms. Ruiz didn't know any of those employees of Simply Health that later became patients of De La O Clinic. They were only known to Lago, recruited by Lago because they were her co-workers at Simply Health. Ms. Ruiz

patients referred by Lago and Ruiz, and none of the patients received treatment. *Id. at page 109*. She did not testify that she was recruited by Ms. Ruiz or that she was managed, supervised, and/or controlled by Ms. Ruiz.

Government witness, Kyrenia Maqueira Rodriguez, Physical Therapy Assistant at Ramirez Rehab and Long Life Clinics, testified that she knew Ruiz from working with her in two clinics *(See, Trial Transcript of 8/2/22 at page 115)*. She worked with Ruiz in the clinic from 2017 to 2018. *Id. at page 117*. **She identifies Ruiz' position in the clinic as a "secretary"**. *Id. at page 117*. Ruiz would give Rodriguez the therapy forms to sign and would pay her for the signed therapies. *Id. at page 117*. She never treated a patient while working at the clinic. *Id. at page 117*. **Maldis Gonzalez recruited Rodriguez to work in the clinic.** *Id. at page 119*. She was paid by check and made $300/week. *Id. at page 120.* She worked with Ruiz, Maldis Gonzalez, Ms. Ainsley (Anuez), and the owner, Jesus Porras. *Id. at page 120*. She worked at both clinics simultaneously from 2017 to 2018. *Id. at page 122.* Ainsley (Anuez) and Ruiz were the main points of contact while working at Long Life. *Id. at page 123*. She would complete the forms and hand them to Jari or Ainsley (Anuez). *Id. at page 127*. She did not testify that she was recruited by Ms. Ruiz or that she was managed, supervised, and/or controlled by Ms. Ruiz.

No government witness testified that they were recruited, managed, supervised and/or controlled by Ms. Ruiz except Jean Lago, who upon review of the FBI 302, attached as ***Exhibit "2",*** was already a member of the conspiracy because she was receiving kickbacks from the clinic for being a professional patient before she ever met Ms. Ruiz. Actually, Ms. Lago went to the

---

never worked at Simply Health. *See, Trial Transcript of 8/3/22 at pg. 53 and Composite Exhibit "2" FBI 302 ROI of Interview of Jean Lago on 7/15/22 at pgs. 1-5).*

clinic to collect her kickback payment and that is when she met Ms. Ruiz for the first time. Recruiting is not defined in *U.S.S.G. § 3B1.2*. However, Webster's On-Line Dictionary defines "Recruit" as "to fill up the number with **new members**". *Emphasis added. (See, https://www.merriam-webster.com/dictionary/recruit)*. Courts must assume that Congress intended the ordinary meaning of the words it used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Furthermore, in gauging the applicability of *§ 3B1.1,* recruitment is not about the intensity or direction of pursuit, but the demonstration of individual authority **to bring a new member into the fold**. *United States v. Savarese*, 686 F.3d 1 (1st Cir. 2012) (emphasis added); *See also, United States v. Rivera*, 429 Fed. Appx. 938, 942 (11th Cir. 2011). The simple fact that **a defendant recruits new members into a conspiracy** supports a finding of the defendant being a manager or supervisor. *United States v. Payton*, 636 F.3d 1027, 1048 (8th Cir, 2011) (emphasis added). Ms. Lago could not have been "recruited" by Ms. Ruiz because she was already a member of the conspiracy when she met Ms. Ruiz.

Ms. Ruiz testified that she was hired in November 2017 as a medical assistant with a CNA license, which allowed her to draw blood from patients. She testified that she was recruited by Gomez Anuiz and Lidia Diaz. *(See, Trial Testimony of Ms. Ruiz on 8/3/22 at page 45)*. She further testified that she did not supervise anyone while employed at the clinics. *Id. at pages 44-49.* She testified that she was hired as a medical assistant, and she never supervised anyone. *Id. at page 49.* The trial testimony of Ms. Ruiz' as to these issues, has never been rebutted.

Further supporting Ms. Ruiz's position that an aggravating role enhancement is unwarranted is *§ 3B1.1(c),* which provides: a defendant's offense level is increased by 2-levels if

he/she was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b).

The Guidelines provide seven factors that courts may consider in applying the enhancement: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. *U.S.S.G. § 3B1.1, cmt., n. 4.* The government has the burden to prove Ms. Ruiz's aggravating role by a preponderance of the evidence. *United States v. Offord*, 579 Fed. Appx. 834, 836 (11th Cir. 2014); *See also, United States v. Martinez*, 584 F.3d 1022 (11th Cir. 2009) (facts that defendant "orchestrated" drug shipments, that the defendant was directly involved in the wire transfer of drug proceeds, and that defendant along with his co-conspirators, "utilized other individuals" to mail and receive drug shipments, was insufficient for imposing a leadership role enhancement).

**"The key factors in determining management or supervisory authority are control over other participants and organization of the criminal activity."** *United States v. McSmith*, 968 F.3d 731 (8th Cir. 2020); *United States v. Abney*, 710 F.Appx. 375 (11th Cir. 2017); *United States v. Pena*, 67 F.3d 153, 156-57 (8th Cir. 1995); *United States v. DeCicco*, 899 F.2d 1531, 1535 (7th Cir.1990) ("Sentencing Commission intended *§ 3B1.1* to apply only to situations where the offender organizes or leads criminally responsible individuals.").

The PSR unfairly treats Ms. Ruiz differently from Gomez Anuez, a similarly situated co-defendant who did not receive an aggravating role adjustment even though she recruited Ms. Ruiz,

performed the same job duties as Ms. Ruiz, committed the same criminal acts as Ms. Ruiz, and was involved in the criminal conspiracy before Ms. Ruiz and for a longer time period than Ms. Ruiz. Ms. Ruiz had no control, authority, or supervision over any of the participants within it nor regarding the assets derived by the fraud scheme. This was a scheme that was unequivocally controlled and dominated by Porras, whereby Ms. Ruiz assisted him by undertaking a bevy of run of the mill tasks directed by Porras in exchange for compensation that pales in comparison to the benefits derived by Porras and others. The PSR contains a blanket representation that Defendant purportedly held a managerial position without referring to any evidentiary support for such contention.  The PSR makes this leap despite the extent of Ms. Ruiz' conduct being within the realm of serving as a medical assistant, or a secretary or a phlebotomist at Porras' direction, and who assisted Porras and others in carrying out the subject scheme. Ms. Ruiz' conduct is devoid of anything that could constitute supervisory authority over the actual criminal conduct of any other person involved in this scheme. All such authority rested with Porras. *See United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997) ("the mere fact that DeGovanni was their workplace supervisor, is not enough to render him more culpable for purposes of the conspiracy than the other 'rank and file' participants. We find that the enhancement contained in *U.S.S.G. § 3B1.1(c)* does not apply absent such heightened culpability, and that one must therefore have an active supervisory role in the actual criminal conduct of others to justify the enhancements contained in this section of the Guidelines").

Furthermore, as set forth above, Ms. Ruiz did not exercise any autonomy or exclusive authority regarding any aspect of the fraud scheme at issue. She did not control any accounts or entities involved, she had no decision-making or supervisory authority over any of the other participants in the scheme, and her conduct and involvement were all directed by Porras. Here,

Defendant was not entitled to a larger share of the profits, and as evidenced by the financial records, was compensated with weekly payroll checks of $400-$600, which totaled approximately $25,000 over a thirteen (13) month employment period, and never had any signature authority over any accounts.[11]

As set forth in <u>*DeGovanni,*</u> "the Guidelines (in each of its three sub-sections) call for a determination of whether the defendant was a supervisor in the criminal activity. Courts which have addressed the issue of supervision to require some degree of control over others involved in the commission of the offense." <u>*Id*</u>. at 45-46. ("Here, DeGovanni's sergeant-status in the police department as an overall supervisor of other police officers in the discharge of general police functions, was not enough to substantiate an enhancement for active supervision of other members of the conspiracy") (citations omitted). *See DeGovanni, supra; See also* <u>United States v. Burgos</u>, 324 F.3d 88, 93 (2d Cir. 2003)("we have never upheld such an adjustment [under *§3B1.1*] solely on the basis that the business premises were the location of some of the criminal activity, or that one of the company's employees also participated in the illicit business"); <u>United States v. Ramos-Paulino</u>, 488 F.3d 459, 464 (1st Cir. 2007) ("the court based the enhancement primarily on the defendant's control over the activities of the criminal enterprise rather than over any participants in it . . . Elaborating, the court observed that the defendant was the principal contact for the smuggled aliens, that she was apparently responsible for determining fees and accepting payments, that she procured the false identification documents, and that she had some influence over the scheduling of the transports…we are constrained by the unambiguous case law holding that

---

[11] While Anuez received approximately $46,012.00 and Oviedo $442,439.00 through her company and $48,925.00 personally. Ms. Ruiz netted $25,300.00; an amount substantially lower than her codefendants.

management of criminal activities, standing alone, does not constitute a basis for a role-in-the-offense enhancement under section 3B1.1.") (emphasis added); _United States v. Mares-Molina_, 913 F.2d 770, 773-74 (9th Cir. 1990) ("For section 3B1.1(c) to apply, the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime . . . We cannot conclude that Mares organized or controlled his coconspirators within the meaning of section 3B1.1(c) merely because he was the owner of the trucking business which leased the warehouse in which the cocaine was off-loaded."); _United States v. Litchfield_, 959 F.2d 1514, 1523 (10th Cir. 1992)("Although defendant might be termed an organizer or leader of the mining operation, that operation was not itself criminal activity. The fraudulent marketing scheme and the conspiracy are the relevant criminal activity under U.S.S.G. § 3B1.1(a)"); _United States v. Glover_, 179 F.3d 1300, 1303 (11th Cir. 1999) ("we now squarely decide that a section 3B1.1 enhancement cannot be based solely on a finding that a defendant managed the assets of a conspiracy").

As a result of the foregoing, it would create an absurd result to impose a 2-level role enhancement upon Ms. Ruiz, while a more culpable co-conspirator, (i.e., Anisley Gomez Anuez), who recruited Ms. Ruiz, over whom Ms. Ruiz had no authority, has been glaringly spared from the same enhancement. Here, Ms. Ruiz did not possess actual decision-making authority over her co-conspirators; most, if not all, of the scheme participants were actually recruited by Parros. Ms. Ruiz did not share in the fraud proceeds nor did she have a right to any share of the fraud proceeds. Ms. Ruiz was a salaried employee. _See United States v. Martinez_, 584 F.3d 1022, 1026 (11th Cir. 2009) (no evidence that defendant exercised decision-making authority over anyone in the conspiracy); _See also United States v. Dominguez_, 616 Fed. Appx. 905, 909 (11th Cir. 2015) (finding that role enhancement was inapplicable, noting that "the determination as to whether the

20

leadership role enhancement applies should be based on Dominguez's actual conduct rather than her job title as administrator...The agreed upon facts actually indicated that it was the other coconspirators that decided and negotiated which patients and recruiters would be utilized, what amount of kickbacks and percentages would be paid, which employees would be hired and fired, and what services would be billed") (emphasis added). Based on the foregoing, this Court should find that under *§3B1.1*(c), a two (2) level aggravating role enhancement is not warranted for Ms. Ruiz.[12]

_____

[12] *See* *United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) (finding that district court did not abuse its discretion in refusing to impose four-level sentencing enhancement, as defendant, who was attorney, ***was in no position to coerce any of codefendant judges into rendering favorable decisions, often playing the role of errand boy, and there was evidence that pattern developed into corrupt enterprise with all of parties more or less equally involved***, even though there was evidence that defendant was scheme's central actor, bankrolled it, profited from it, involved other participants, and exercised control over co-conspirators); *See also* *Burgos,* 324 F.3d at 91-92 (finding that an aggravating role enhancement did not apply to defendant who conducted a check-cashing operation for stolen checks at his business, where defendants did not exhibit control over others,  noting that "a demand that a debtor pay up, or make an advance, does not support an inference that the debtor is a subordinate. If anything, Infanti's nonpayment suggests independence"); *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) (finding that district court did not clearly err in declining to impose a leadership role enhancement under §3B1.1 despite fact that **defendant held the position of acting boss of New York crime family** whose members had been prosecuted; district court found that guidelines place an emphasis on the individual's "actual decision making authority"); *United States v. Katora*, 981 F.2d 1398, 1402 (3d Cir. 1992) (because co-conspirators equally shared responsibility for creating and carrying out their wire fraud scheme and directed non-culpable participants, neither could be called an organizer); *United States v. Yates*, 990 F.2d 1179 (11th Cir. 1993) (finding that defendant's role as supplier of drugs to head of extensive retail distribution conspiracy was not sufficient to render defendant a "leader or organizer" of the group, and, thus, defendant could not have offense level adjusted upward four levels on basis of being leader or organizer); *United States v. Martinez*, 584 F.3d 1022, 1029 (11th Cir. 2009) (finding that court clearly erred in imposing a leadership role enhancement noting "There is no suggestion...that Martinez had any position of leadership or authority over his co-conspirators or that it was his idea to undertake any of the criminal activities").

**(iii)**   **OBJECTION TO PARAGRAPH 47: A MINOR ROLE ADJUSTMENT IS WARRANTED PURSUANT TO *U.S.S.G. § 3B1.2(b)* APPLICATION NOTE 3(A)**

Ms. Ruiz objects to paragraph 47, for the failure to give her a Minor Adjustment for Role in the Offense. The PSR, at paragraph 47, states that a leadership aggravating role adjustment is warranted. Ms. Ruiz asserts, as pointed out above, that a leadership role enhancement is unwarranted and, in fact, a Mitigating Role Adjustment of two (2) levels under U.S.S.G. §3B1.2(a) (minor participant) is warranted.

*Application Note 5 in U.S.S.G. §3B1.2* states:

5.   Minor Participant-Subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal.

*Application Note 3(A) in U.S.S.G. §3B1.2* states in pertinent part:

This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity. .... Likewise, a defendant who is accountable under §1B1.3 for a loss amount under §2B1.1 (Theft, Property Destruction and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline. **For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline.**

*U.S.S.G. §3B1.2, Application Note 3(A) (emphasis added).*

The Offense Conduct set out in paragraphs 7-34 describe a five (5) year conspiracy which caused over thirty-four million ($34,000,000) dollars in losses. *(See paragraph 21 of PSR).* Defendant's involvement in the conspiracy began in November 2017 and ended in December 2018 (a total of 13 months of involvement in at least 60 months of overall criminal conspiracy activity). *(See paragraph 27 of PSR).* Ms. Ruiz' role was that of a full-time office administrator for three (3) clinics, (defendant disputes that she worked as an administrator and asserts that she was only hired

as a medical assistant), she paid cash bribes (kick-backs) to patients, created false medical records, paid a medical provider to sign the false medical records for patients that never received services and then sent these false records to a billing company, who in turn, submitted them to the insurance companies. She is alleged to have taken steps along the way to conceal her activities. *Id.* Of the thirty-four million dollars ($34,000,000.00) in fraudulent billing and the $7.7 million paid out by the insurance companies, Ms. Ruiz profited a total of $25,300.00. *(see PSR paragraphs 21, 28 and 31).* In fact, Ms. Ruiz's gain from the conspiracy was substantially less than the other codefendants. (*See fn 12*).

> *Application Note 3(C) in U.S.S.G. §3B1.2* states:
>
> Fact-Based Determination.-The determination whether to apply subsection (a) or subsection (b), or an alternative adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.
>
> In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> (i)      the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)     the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)     the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v)      the degree to which the defendant stood to benefit from the criminal activity.
>
> **For example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.**

*U.S.S.G. §3B1.2, Application Note 3(C)(emphasis added).*

A review of each factor, set above, clearly shows that each factor weighs in Ms. Ruiz's favor: (i) Ms. Ruiz had little to no understanding of the scope and structure of the criminal activity. This was an over 34 million dollar health care fraud billing scheme where the insurance companies paid over 7 million dollars in fraudulent billing claims; (ii) Ms. Ruiz had no involvement in planning or organizing the criminal activity; (iii) Ms. Ruiz exercised absolutely no decision-making authority nor did she have any influence on the decision making authority; (iv) Ms. Ruiz's participation in the commission of the criminal activity is that she paid patient recruiters and falsified medical forms; (v) The degree Ms. Ruiz stood to benefit was a weekly salary check of between $400-$600 over a thirteen month period for a total benefit of approximately $25,000.00.

A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group". _United States v. Jimenez_, 756 Fed. Appx. 909 (11th Cir. 2018). A "defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role a minimal participant". _Id._ In _Jimenez_, the defendant was given a minor role reduction even though she was the nominal owner of a pharmacy, who cashed checks, opened bank accounts, and participated in an intended loss of $750,000 and an actual loss of $340,000 that was paid to the pharmacy that she controlled. She appealed her sentence claiming that she deserved a minimal role reduction instead of a minor role reduction. The appellate court affirmed the district court's denial of her minimal role request and affirmed the minor role adjustment. _Id._ at 912. ("we cannot say that as the nominal owner, cashing checks, and opening bank accounts in furtherance of the fraud scheme Jimenez was plainly among the least involve."). If the conduct of Jimenez warranted a minor role adjustment, Ms. Ruiz similarly warrants a minor role adjustment.

In _United States v. Fleitas et. al.,_ 766 Fed.Appx. 805 (11th Cir. 2019), defendant Rodriguez Hernandez appealed the district's sentence wherein he was granted a minor role reduction but denied a minimal role reduction. The appellate court in affirming the district court's finding stated: "Here, the district court did not clearly err in granting Rodriguez Hernandez a minor role reduction instead of a minimal role reduction." _Id._ at 809. The court further noted that had "Rodriguez Hernandez' role been limited solely to acting as a lookout, it would consider him a minimal participant. The court added, however, that because Rodriguez Hernandez was in possession of credit card numbers, 16 counterfeit credit or gift cards, and a magnetic strip encoder, and had exchanged text messages with Fleitas about which account numbers he could take, the evidence indicated his role was more than only a lookout."

In _United States v. Rodriguez_, 44 F.4th 1229 (9th Cir. 2022), the court vacated and remanded a case because the district court failed to properly consider the factors in _U.S.S.G. § 3B1.2(c)_. The court held that the district court erred in treating each factor in the commentary for the minor role sentencing guideline as presenting a binary choice. The court stated: "We have recently held that district courts must consider _all_ of these factors when determining whether to grant a mitigating-role adjustment. Thus, gone are the days when district courts had virtually unlimited discretion to simply deem a defendant to be of above average, average or below average culpability." _Id._ at 1233.  The court went on to hold: "We recently clarified that the mitigating-role commentary's reference to the 'average participant' refers to the 'mathematical average', and that to calculate that average '_all_ likely participants in the criminal scheme must be included.'" _Id._ at 1234. This means that even "those that the district court believes were leaders or organizers or who were otherwise highly culpable" must be included in the calculation. _Id._ Therefore, each co-

participant's culpability affects the minor role analysis, and the district court erred by holding that Gordo's culpability was not relevant. *Id.*

Clearly, the conduct of Ms. Ruiz pales by comparison to the conduct of the defendants in *Jimenez*, *Fleitas*, and *Rodriguez,* supra. If it was proper for those defendants to receive minor role adjustments for their conduct, the conduct of Mr. Ruiz in this case clearly warrants a minor role adjustment. Furthermore, Ms. Ruiz meets the criteria and the factors set out in *U.S.S.G. § 3B1.2* and thus, a minor role adjustment is warranted.

## III.   CONSIDERATION OF *18 U.S.C. § 3553* FACTORS

Ms. Ruiz pursuant to *18 U.S.C. § 3553(a)* moves for a variance/departure from the Advisory Guidelines range. According to the offense level computations set forth in the PSR, the advisory sentencing guidelines, per paragraphs 52 & 100,  is a Level 31, Criminal History Category I (108 to 135 months incarceration). The guideline range is far in excess of any sentence that is "sufficient but not greater than necessary" for punishment under *18 U.S.C. §3553(a).*

### SENTENCING AFTER BOOKER

`In *Booker*, the Supreme Court held that the Sentencing Guidelines are no longer mandatory and constitute only one of the sentencing factors that the Court must consider under *18 U.S.C. §3553(a)*. *United States v. Booker*, 125 S.Ct. 738, 757 (2005). Under *Booker,* sentencing decisions are subject to a "reasonableness" standard of review which must be measured against the factors outlined by Congress in *§3553(a)*. *Booker*, 125 S. Ct. at 761. A sentence outside the advisory guideline range does not need to be justified by "extraordinary circumstances." *Gall v. United States*, 128 S. Ct. 586 (2007). Indeed, the Supreme Court has specifically rejected any presumption of unreasonableness for sentences outside the guideline range. *Gall*, 128 S. Ct. at 595.

Under *Gall,* the district court must impose a sentence that is both procedurally and

substantively reasonable. _Gall_, 128 S. Ct. at 597; _United States v Ireke_, 2008 WL 862694 (11th Cir.). In order to impose a sentence that is procedurally reasonable, the district court must correctly calculate the advisory guideline level, treat the guidelines as advisory and not mandatory, consider all of the statutory factors contained in _18 U.S.C. § 3553(a)_, make correct factual findings and provide an adequate explanation for the sentence imposed. _Gall_, 128 S. Ct. at 597. If a sentence is procedurally sound, it may only be overturned if an appellate court determines that it is substantively unreasonable after considering the totality of the circumstances under an abuse of discretion standard. _Gall_, 128 S. Ct. at 597; _United States v. Pugh_, 515 F. 3d 1179, 1191 (11th Cir. 2008).

In fashioning a sentence that is substantially reasonable, the district court has considerable discretion as to the weight it decides to give to each of the _3553(a)_ factors. _See United States v. McBride_, 511 F. 3d 1293, 1297-98 (11th Cir. 2008) (noting that disagreement with how the sentencing court weighs certain factors is insufficient to reverse a procedurally reasonable sentence). Under _Gall,_ the Court must consider all of the _§3553(a)_ factors and "_make an individualized assessment based on the facts presented._" _Gall_, 128 S. Ct. at 597 (emphasis added). The Eleventh Circuit has advised that "_after it makes [its] guideline calculation, the District Court may impose a more severe or more lenient sentence as long as the sentence is reasonable._" _See United States v. Crawford_, 407 F.3d 1174, 1179 (11th Cir. 2005); _See also United States v. Williams_, 456 F.3d 1353, 1363 (11th Cir. 2006). The sentence imposed must be "sufficient but not greater than necessary" to achieve the four purposes of sentencing outlined in _§3553(a)(2)_. _See United States v. Adelson_, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (finding the mechanical application of the advisory sentencing guidelines in a fraud case where losses totaled $260 million would produce a sentence far greater than necessary for punishment under _§3553(a)_).

In the Eleventh Circuit, a guideline sentence is not presumptively reasonable. *See United States v. Campbell*, 491 F.3d 1306, 1313 (11th Cir. 2007); *United States v. Talley*, 431 F.3d 784 (11th Cir. 2005). Instead, district courts must determine on a case-by-case basis the weight to be given the guidelines, so long as that determination is made with reference to the remaining *§3553(a)* factors. *See United States v. Hunt*, 459 F.3d 1180, 1185 (11th. Cir. 2006) ("[t]here are . . . many instances where the Guideline range will not yield a reasonable sentence").[13] Now that the guidelines are advisory only, they are simply "one sentencing factor among many." *United States v. Reinhart*, 442 F.3d 857, 864 (5th Cir. 2006); *United States v. Duhon*, 440 F.3d 711, 715-16 (5th Cir. 2006). Accordingly, the Court has full discretion to sentence below the advisory guideline range without a motion for downward departure as long as the resulting sentence is reasonable. *Williams*, 456 F.3d at 1363.

Here, the strict application of the advisory sentencing guidelines produces a sentence far greater than necessary for punishment under *§ 3553(a)*. Taking into account the *18 U.S.C. § 3553(a)* factors, Ms. Ruiz warrants a sentence well below the guideline sentence she would receive if the Court simply followed the advisory guideline range set forth in Ms. Ruiz's PSR. As set out below, *each* of the applicable sentencing factors set forth in *18 U.S.C. § 3553(a)* amply justify a reasonable departure/variance from the advisory guideline sentence.

---

[13] In application, the Eleventh Circuit has affirmed numerous below guideline sentences since *Booker* even without cooperation. *See, e.g., United States v. Montgomery*, Case No. 05-13935 (11th Cir. February 7, 2006) (8 month sentence for bank fraud)(unpublished); *See also United States v. Gray*, 2006 WL 1752372 (11th Cir. June 28th, 2006) (affirming 72 month sentence even though low end of guidelines was 151 months); *United States v. Halsema*, 2006 WL 1229005 (11th Cir. May 9th, 2006) (unpublished) (affirming 24 months sentence even though guidelines were 57-71 months and even though grounds for variance would not have supported departure); *United States v. Williams*, 435 F.3d 1350 (11th Cir. 2006) (90 months imprisonment was sufficient, but not greater than necessary to punish, deter and rehabilitate defendant even though low end of guidelines was 188 months).

## ANALYSIS OF  *18 U.S.C. § 3553(a)* FACTORS

1.    **FACTOR 1: NATURE OF THE OFFENSE AND HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

The offense conduct is set out, along with the role assessments, in PSR paragraphs 7-39. In summary, this health care fraud conspiracy began sometime in June 2016 and lasted until approximately October 2020. Ms. Ruiz was recruited into the conspiracy in November 2017 and voluntarily withdrew from the conspiracy in December 2018. Thus, out of the 4 ½ years that this conspiracy was ongoing, Ms. Ruiz' involvement lasted only a 13-month period. The trial testimony and the FBI 302 ROI's provide a conflicting picture of the criminal conduct of not just this Defendant but also of many of the participants that testified at trial. It is undisputed that this is a serious health care fraud offense that resulted in falsely/fraudulently billing insurance companies approximately over $34 million dollars and the insurance companies paying out over $7 million dollars from that billing. Having said that, it is also undisputed that Ms. Ruiz profited approximately $25,000.00 over the 13 months she participated in the conspiracy.

2.    **History and Characteristics of the Defendant:**

Ms. Ruiz is a 51-year-old woman who is currently unemployable due to her federal felony conviction. Her education would be deemed post-graduate as she has a nursing degree from Cuba and was employed as medical assistant and a licensed CNA technician. She has raised two (2) daughters who are both medical professionals.

Ms. Ruiz's personal, family, employment and medical history are as set out in paragraphs 59-97 in Part C of the PSR. Ms. Ruiz has no prior criminal history other than this case. She has been diagnosed with depression and insomnia and is currently under treatment and medications. Ms. Ruiz does not appear to have an alcohol or a substance abuse problem. She has always been gainfully employed except for the time period after her conviction in this case.

**FACTOR 2: THE PURPOSES OF SENTENCING - (RETRIBUTION, SPECIFIC DETERENCE, GENERAL DETERRENCE AND REHABILITATION)**

**1.    Rehabilitation:**

A sentence consisting of incarceration for 108 to 135 months is far from necessary for Ms. Ruiz' rehabilitation. As this Court is well aware, there are few rehabilitation programs within the Federal Bureau of Prisons. While Congress has initiated some programs that will reduce imprisonment capacity and assist in the rehabilitation process of inmates, there is nothing that will ensure that Ms. Ruiz will be allowed to participate in any such programs. Ms. Ruiz started her rehabilitation when she withdrew from the conspiracy in December 2018. There is no evidence that she has engaged in a criminal activity since then.

**2.    Specific Deterrence:**

A lengthy term of imprisonment is not necessary to protect society from Ms. Ruiz, given that a below guidelines sentence, as requested herein, will adequately ensure that she does not pose any danger of recidivism. Since her arrest, Ms. Ruiz has complied with all conditions of her release and even travelled from North Carolina to Miami for her sentencing hearing knowing that her guideline range, as set out in the PSR, exposes her to a lengthy prison sentence.

**3.    General Deterrence:**

"General Deterrence" aims to deter *others* from committing crimes. While the Government may correctly point out that paying patients and falsifying medical records is a serious offense, sentencing Ms. Ruiz to a lengthy prison term is not necessary for purposes of general deterrence. Ms. Ruiz is not a high-profile defendant who lived a lavish lifestyle based on criminal activity whom the public is likely to see as treated leniently unless she goes to prison for a lengthy period of time. This Court can accomplish the goal of "General Deterrence" by sentencing Ms. Ruiz in-line with the sentence impose on co-defendant Gomez Anuez (i.e., 28 months incarceration).

**4.    Retribution (Just Punishment):**

While retribution is an important statutory factor under *§3553(a),* the overriding command of the law is for the Court to achieve a sentence "sufficient but not greater than necessary." <u>*See*</u> <u>*United States v. Adelson*</u>, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("We are aware of no empirical evidence or studies indicating that a long prison sentence is necessary to achieve the retributive and general deterrence objectives applicable to a case like this one.").

<strong>FACTOR 3: THE KINDS OF SENTENCES AVAILABLE</strong>

*Title 18 U.S.C. § 3553(a)* expressly dictates that "[t]he Court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in ¶ (2) of this subsection" (*emphasis supplied*). As Judge Rakoff pointed out in <u>*Adelson,*</u> the operative word in this congressional mandate, is "necessary." 441 F. Supp. 2d at 515. Under Factor 3 in *§ 3553(a),* the Congress directs the Court to consider a wide range of alternatives to imprisonment if the availability of those alternatives would render a prison sentence "unnecessary."

Here, Ms. Ruiz is asking that this court impose a sentence below the advisory guidelines range. Specifically, Ms. Ruiz is requesting that this Court impose a sentence of twenty-eight (28) months incarceration. Based on the relevant sentencing factors present in Ms. Ruiz's circumstances, and detailed herein, it is clear, that a below guidelines sentence herein would be "sufficient, but not greater than necessary", for punishment under *18 U.S.C. §3553(a)*. Indeed, numerous courts have agreed that the imposition of a below guidelines sentence, to the extent of sentencing defendants to probationary sentences, are warranted in situations similar, or worse, than that of Ms. Ruiz.[14]

---

14 <u>*See United States v. Anderson*</u>, 267 Fed. App'x 847 (11th Cir. 2008) (affirming sentence of probation with home-confinement for white collar defendant where Guidelines were 18 to 24 months and prosecutor was requesting 18 month sentence, explaining

In the present instance, Ms. Ruiz is asking the Court to impose a sentence that would restrict her liberty for a longer time period than if the Court were to grant all the defendant's objections and sentence her to a period of incarceration at low end of resulting advisory guidelines sentence. Ms. Ruiz is merely requesting this Court sentence him to a below-guidelines sentence that will punish him by restricting his freedom, but which adequately accounts for his personal circumstances, the ongoing pandemic, as well as his efforts to correct his prior wrongdoing.

---

that under _Gall_, district courts had wide discretion at sentencing); _United States v. Decora_, 177 F.3d 676 (8th Cir. 1999) (upholding as reasonable a downward departure from 37-46 months, for assault with a dangerous weapon, to a term three years of probation, with requirement of participating in substance abuse treatment program); _United States v. One Star_, 9 F.3d 60, 61-62 (8th Cir. 1993) (upholding as reasonable a downward departure to a term of probation where guideline range is 33-41 months); _United States v. Sclamo_, 997 F. 2d 970, 972 (1st Cir. 1993)(upholding as reasonable a downward departure to a term of probation where guideline range was 24 -30 months); _United States v. Jagmohan_, 909 F. 2d 61, 65 (2nd Cir. 1990)(affirming district court's downward departure to a term of probation where guideline range was 15-21 months); _United States v. Tomko_, 562 F. 3d 558 (3rd Cir. 2009) (en banc) (district court did not abuse its discretion in sentencing defendant to probation with a year of home detention, community service, restitution, and fine for tax evasion, rather than a term of imprisonment where guideline range was 12 to 18 months, in part because of defendant's negligible criminal history, employment record, community ties, and extensive charitable works); _United States v. Rowan_, 530 F. 3d 379 (5th Cir. 2008) (where defendant convicted of possession of child pornography and Guidelines were 46 to 57 months, sentence of five years supervised release not unreasonable under _Gall_); _United States v. Bueno_, 549 F.3d 1176 (8th Cir. 2008) (where defendant possessed more than 70 kilograms of cocaine, and Guidelines were 108-135 months, sentence of probation with house arrest for five years not unreasonable noting that "offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty,...and the district court observed in this case, Bueno is subject to house arrest during the entire five-year period of probation"); _United States v. Whitehead_, 532 F.3d 991 (9th Cir. 2008) (district court did not abuse discretion when it sentenced the defendant to probation with "substantial amount of community service and house arrest" where defendant was convicted of supplying counterfeit access cards causing loss of $1 million dollars and guideline range was 41-51 months); _United States v. Ruff_, 535 F.3d 999 (9th Cir. 2008) (defendant sentenced to three years supervised release (one-day in jail) where guideline range was 30-37 months and defendant had pled guilty to embezzling $650,000 from non-profit organization over the course of three years); _United States v. Coughlin_, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) (where defendant embezzled money and evaded taxes and Guidelines were 33-41 months, sentence of probation with home detention for 27 months was imposed in part because "home detention and probation can be severe punishments...hugely restrictive of liberty, highly effective in the determent of crime and amply retributive").

**FACTORS 4-5: THE ADVISORY SENTENCING GUIDELINES AND POLICY STATEMENTS**

The PSR finds Ms. Ruiz' total offense at level 31, with a Criminal History Category of I, resulting in a sentencing range of 108 to 135 months. This is the advisory guideline range resulting from the PSR, however Ms. Ruiz is requesting a re-calculation based on her objections herein.

**FACTOR 6: AVOIDING DISPARITY WITH SIMILAR OFFENDERS**

This case involves multiple co-defendants; however, the offender which has similar criminal conduct and received twice as much in proceeds of fraudulent activity is Ainsley Gomez Anuez *(see page 2 of PSR and paragraphs 22-23)*. She **did not** get a leadership role adjustment and was sentenced to 28 months plus 2 years supervised release, and she profited $46,012.00 (almost twice the amount profited by Ms. Ruiz) from the fraudulent activity. She is also the individual that recruited Ms. Ruiz into this conspiracy.

**FACTOR 7: RESTITUTION**

Ms. Ruiz' relevant conduct herein and offense of conviction do carry a restitution obligation. Ms. Ruiz will have an outstanding restitution judgment in this case of **what was paid** by the insurance companies from November 2017 to December 2018. However, the only way for Ms. Ruiz to pay any restitution is for her to be gainfully employed as soon as possible, thus supporting Defendant's request for a below guidelines sentence.

**REQUEST FOR DEPARTURE/VARIANCE PURSUANT TO *GALL v. UNITED STATES, 128 S. Ct. 586 (2007), U.S.S.G.§ 2B1.1 APPLICATION NOTE 21(C) AND UNITED STATES v. WILLIAMS, 435 F.3d 1350 (11th Cir. 2006)***

Ms. Ruiz respectfully requests that this Court grant a downward departure and/or variance from the advisory guidelines range recommended herein, as any sentence within the advisory guidelines range would fail to account for Ms. Ruiz's withdrawal from the conspiracy pursuant to

_Gall v. United States,_ 128 S. Ct. 586 (2007); the intended loss amount (i.e., over $34 million) and Ms. Ruiz's profit from the criminal activity (i.e., approximately $25 Thousand Dollars), would overstate Ms. Ruiz's criminal conduct herein; and the guideline calculations produce an absurd result in contravention to _United States v. Williams_, 435 F.3d 1350 (11th Cir. 2006).

A sentence in the range of 108 to 135 months' imprisonment is far in excess of any sentence that is "sufficient, but not greater than necessary". Pursuant to _§ 3553(a),_ "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed, shall consider" the factors in subsections (a) (1) – (7). _See U.S. v. Crawford_, 407 F.3d 1174, 1178 (11th Cir.2005) (noting "the district court remains obliged to 'consult' and 'take into account' the Guidelines in sentencing"). "After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable." _Id_. at 1179.

The _§ 3553_ factors as applied to Ms. Ruiz were addressed individually and in detail in the preceding section of the present filing. The factors all weigh in favor of Ms. Ruiz' position herein that this Court should depart downward from the proposed guideline sentence herein (i.e., 108 to 135 months) and sentence her to a below-guidelines sentence of 28 months incarceration. The departure herein is especially warranted in light of Ms. Ruiz' withdrawal from the conspiracy, that the loss amount overstates Ms. Ruiz's criminal conduct herein and that the guideline calculations produce an absurd result.

**(i)     MS. RUIZ'S WITHDRAWAL FROM THE CONSPIRACY WARRANTS A DOWNWARD DEPARTURE/VARIANCE**

It is undisputed that Ms. Ruiz was recruited into the conspiracy in November 2017 and withdrew, voluntarily, from the conspiracy in December 2018. The conspiracy lasted 4 ½ years

and she was involved for 13 months. She did not engage in any further criminal activity after she voluntarily withdrew from the conspiracy.

In <u>Gall v. United States</u>, 126 S. Ct. 586 (2007), the defendant-petitioner joined an ongoing enterprise distributing the controlled substance "ecstasy" while in college but withdrew from the conspiracy after seven (7) months. After withdrawing from the conspiracy, he did not engage in any further criminal activity, completed his college education, and became legally and steadily employed after his graduation. Three and a half years after withdrawing from the conspiracy, Gall pleaded guilty to his participation. A presentence report recommended a sentence of 30-37 months in prison, but the District Court sentenced Gall to 36 months' probation, finding that the probation reflected the seriousness of his offense and that imprisonment was unnecessary because his voluntary withdrawal from the conspiracy and post offense conduct showed that he would not return to criminal behavior and was not a danger to society. The Eighth Circuit reversed on the ground that a sentence outside the Federal Sentencing Guidelines range must be-and was not in this case-supported by extraordinary circumstances. The Supreme Court reversed the Eighth Circuit and affirmed the District Court's sentence of Gall.

The Court found that the District Judge regarded Gall's voluntary withdrawal as a reasonable basis for giving him a less severe sentence than the three codefendants who never withdrew from the conspiracy. <u>Id</u>. at 599-600. The Court also pointed out that *18 USC § 3553(a)(3)* directs the judge to consider sentences other than imprisonment. <u>Id</u>. at 602. The Court went even further and stated, "The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to

protect the public from his criminal acts. See 18 USC § 3553(a)(2)(B), (C)." *(See also United States v. Penaloza*, 648 Fed. Appx. 508, 519-522 (6th Cir. 2016) (District Court departed downward from a Guidelines Level of 27, Criminal History III (135-168 months' imprisonment) to 106 months based on the defendant's withdrawal from the conspiracy. Defendant appealed and sought a greater reduction, but the Sixth Circuit rejected the defendant's argument finding that no authority was cited for the proposition that a decision to vary more modestly is substantially unreasonable.); *See also United States v. Sanchez Soria*, 21-20218-CR-SINGHAL (S.D. Fla. need year) (granting Defendant's Motion for downward departure/variance in part due to the defendant's participation of 18 days, and selling ½ kilo of methamphetamine during a conspiracy that lasted 5 years and the defendant's withdrawal from the conspiracy. Departure/variance granted from 72-87 months to 46 months).

In the instant case, in addition to the voluntary withdrawal from the conspiracy, Ms. Ruiz' participation in the conspiracy, which lasted 4 ½ years, comprised a total of 13 months.

    **(ii)**    **A DOWNWARD DEPARTURE/VARIANCE PURSUANT TO *U.S.S.G. § 2B1.1 APPLICATION NOTE 21(C)* AND *§ 5K2.0* IS WARRANTED BECAUSE THE LOSS AMOUNT OVERSTATES THE SERIOUENESS OF THE MS. RUIZ'S CONDUCT; AND ALSO PURSUANT TO *UNITED STATES V. WILLIAMS*, 435 F.3d 1350 (11th Cir. 2006)**

*Application Note 21 (C)* in *U.S.S.G. § 2B1.1* states in pertinent part:

**Downward Departure Consideration-**There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.

Courts interpreting this provision have applied it to situations where the offense level under the Guidelines has overstated the defendant's conduct in the case. This application has usually resulted in cases where the courts have found that the defendant's pecuniary gain has been

minimal or not at all in relation to the overall loss amount. (*See United States v. Kushner*, 305 F.3d 194 (3d Cir. 2002) (the amount of intended loss can overstate the seriousness of the offense); *United States v. Walters*, 87 F.3d 663 (5th Cir. 1996); (*U.S.S.G. § 5K2.0* provides a statutory basis for the desired departure); *United States v. Forchette*, 220 F. Supp. 2d 914 (E.D. Wis. 2002); *United States v. Costello*, 16 F. Supp. 2d 36 (D. Mass. 1998); *United States v. Connors*, 2007 WL 2955612 (E.D. Pa. need year); *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) (where the Commission has assigned a rather low base offense level and increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence).

Pursuant to *§3553(a)*, "[t]he Court shall impose a sentence sufficient, ***but not greater than necessary***, to comply with the purposes set forth in paragraph (2) of this subsection. The Court, in determining the particular sentence to be imposed, shall consider" the factors in subsections (a) (1) – (7). *See U.S. v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (noting "the district court remains obliged to 'consult' and 'take into account' the Guidelines in sentencing"). "After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable." *Id.* at 1179. The *§3553* factors as applied to Ms. Ruiz were addressed individually and in detail in the preceding section of the present filing. The factors all weigh in favor of Ms. Ruiz' position herein that this Court should depart downward from the proposed guideline sentence herein (i.e., 108 to 137 months) and sentence her to a below-guidelines sentence of 28 months.

In a case where the defendant's criminal history was substantially more severe than Ms. Ruiz' the sentencing court departed from a guideline range of 188 to 235 months to only a ninety (90) month term of imprisonment, based solely on an analysis of the §3553 factors. *See U.S. v.*

_Williams_, 435 F.3d 1350 (11th Cir. 2006) (holding that court did not act unreasonably in sentencing career offender convicted of selling $350 of crack cocaine to only a 90-month term, which was less than half of lowest sentence within advisory Guidelines range of 188 to 235 months, where district court correctly calculated the Guidelines range, weighed statutory factors, and gave specific, valid reasons for sentencing lower than this advisory range).

In _Williams_, the defendant was designated as a career offender due to a felony possession of cocaine with intent to sell or deliver, and a felony carrying a concealed firearm. _Id_. at 1352. Furthermore, the defendant's criminal history category, prior to the career offender enhancement, was V. _Id_. After the career offender enhancement, the defendant in _Williams_ was subject to a level VI criminal history category.

In departing downward from a guideline range of 188 to 235 months imprisonment, the court stated:

> I think, in light of _Booker_,…the Court is still required-and I give considerable deference and weight to the [G]uidelines because a great deal of thought and research and time has gone into developing them, and I think it's a worthy goal to try to obtain some degree of consistency throughout the country. On the other hand, there are occasions when the [G]uidelines simply produce an unjust result; and, in my view…188 months in prison for selling $350 worth of cocaine is akin to the life sentence for the guy that stole a loaf of bread in California. To me, that…does not promote respect for the law and is way out of proportion to the seriousness of the offense and to [Williams'] prior criminal conduct…The court also found a criminal history category of V sufficiently accounted for Williams' previous crimes. The court stated in this instance, 'the **[G]uidelines…do not produce a just and reasonable result.**' It found the difference between sentences within the Guidelines range with the enhancement and without the enhancement **was too disparate to ignore**. Specifically, a base offense level of 23 (26 minus 3 points for acceptance of responsibility) with a criminal history category of V resulted in a Guidelines range of 84 to 105 months' imprisonment without the enhancement, while a base offense level of 31 (34 minus 3 points for acceptance of responsibility) with a criminal history category of VI resulted in a Guidelines range of 188 to 235 months' imprisonment with the enhancement….[the court] could not "in good conscience" sentence Williams to 188 months' imprisonment because it was unreasonable. _Id. at 1352-53 (emphasis added)._

Ultimately, the _Williams_ Court sentenced the defendant to 90 months imprisonment, which it found "was '**sufficient, but not greater than necessary**' to punish, deter, and rehabilitate Williams." _Id_. at 1355. Here, Ms. Ruiz' situation is immeasurably less severe than that of the defendant in _Williams_.

Here, a departure, as in _Williams_, would be reasonable in light of an analysis of the _§3553_ factors, as set forth in detail herein. Specifically, a sentence below the guidelines range to a sentence of 28 months, would result in a sentence that is "sufficient, but not greater than necessary." _See Williams_, 435 F.3d at 1355; _See also United States v. Winingear_, 422 F.3d 1241, 1246 (11th Cir. 2005) (holding a sentence 1/10 the length of the 20-year statutory maximum sentence was reasonable); _United States v. Crawford_, Case No.: 14-CR-20206-Bloom (S.D. Fla. need year) (finding that an 84 months sentence of imprisonment was "sufficient, but not greater than necessary" where advisory guidelines range was 188 to 235 months imprisonment). _See also United States v. Ferguson_, 942 F. Supp. 2d 1186 (M.D. Ala. 2013) (granting a downward variance from an advisory guidelines range of 10 to 16 months imprisonment to a sentence of four (4) years' probation with a special condition of eight (8) months home confinement, based on defendant's schizoaffective disorder, post-traumatic stress disorder (PTSD) and neurocognitive limitations, which left defendant particularly vulnerable to manipulation and coercion of more sophisticated criminal actors).

## IV.      CONCLUSION

**WHEREFORE**, for the reasons detailed herein, the Defendant, JAROSLAVA RUIZ, respectfully prays that this Court sustain her objections and grant her a departure and/or variance from the advisory guideline range and impose a sentence of 28 months. Ms. Ruiz and Counsel thank this Court for considering her objections to the Presentence Investigation Report (PSR),

Sentencing Memorandum, and Request for a Downward Departure and/or Variance. Counsel will have further remarks at the time of sentencing.

Respectfully submitted,

By: /s/ *Frank Quintero, Jr.*
FRANK QUINTERO, JR.
Florida Bar No.: 399167

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was filed via **CM/ECF** this 23rd day of December, 2022.

Respectfully submitted,

**QUINTERO BROCHE, P.A.**
Attorneys for the Defendant
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel.: 305-446-0303
Fax: 305-446-4503

By: /s/ *Frank Quintero, Jr.*
FRANK QUINTERO, JR.
Florida Bar No.: 399167

# COMPOSITE

# EXHIBIT 1

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                    CASE NO 21-cr-20566-Graham
 3

 4    UNITED STATES OF AMERICA,            Miami, Florida

 5        Plaintiff,                       August 1, 2022

 6            vs.                          9:30 a.m. - 4:03 p.m.

 7    JAROSLAVA RUIZ

 8        Defendant.                       Pages 1 to 122
      _____
 9

10                          JURY TRIAL
                        BEFORE THE HONORABLE
11          UNITED STATES DISTRICT JUDGE DONALD GRAHAM

12
      APPEARANCES:
13
      FOR THE PLAINTIFF:       EMILY GURSKIS, ESQ.
14                             U.S. Department of Justice
                               1400 New York Avenue, NW
15                             Washington, DC  2005
                               Emily.gurskis@usdoj.gov
16

17                             PATRICK QUEENAN, ESQ.
                               U.S. Department of Justice
18                             1400 New York Avenue, NW
                               Washington, DC  2005
19                             Patrick.queenan@usdoj.gov

20

21
      FOR THE DEFENDANT:       BENJAMIN WALDO BUCK, ESQ.
22                             503 E. Jackson Street #260
                               Tampa, FL, 33607
23                             Eservice@benbuck.law

24

25
```

2

```
 1
       STENOGRAPHICALLY REPORTED BY:
 2
                           SHARON VELAZCO, RPR, FPR
 3                         Official Court Reporter
                           United States District Court
 4                         400 North Miami Avenue
                           Miami, Florida 33128
 5

 6                        I N D E X

 7                                    Direct  Cross   Red.

 8     WITNESSES FOR THE PLAINTIFF:

 9     DANIEL McCURDY
       By Mr. Queenan                   34
10     By Mr. Buck                               57

11     JEAN LAGO
       By Ms. Gurskis                   62
12     By Mr. Buck                               86

13     CLARISSA AZAR

14     By Mr. Queenan                   89
       By Mr. Buck                              103
15
       ANISLEY GOMEZ ANUEZ
16     By Ms. Gurskis                           105

17

18

19
       EXHIBITS RECEIVED IN EVIDENCE              PAGE
20

21     Government's Exhibits 1, and subsections thereof, through 124
       was received in Evidence                  29
22

23

24

25
```

1          Please have a seat.  Just adjust the microphone in

2     front of you.  Loudly, speak your full -- say your full name

3     for the record and spell your last name for us, please.

4          THE WITNESS:  Jean Lago, and the last name is spelled

5     L-A-G-O.

6                         DIRECT EXAMINATION

7     BY MS. GURSKIS:

8     Q.   Good afternoon.

9     A.   Good afternoon.

10    Q.   Where are you from, Ms. Lago?

11    A.   Miami, Florida.

12    Q.   How far did you get in school?

13    A.   GED.

14    Q.   What is the job that you most recently had?

15    A.   I was a manager at Simply Health Care Plans.

16    Q.   Other than your work at Simply Health Care Plans, did you

17    earn money in any other way?

18    A.   Yes.  Yes, I did.

19    Q.   What was that?

20    A.   I was illegally participating in a health care scheme.

21    Q.   What did you do as part of that health care scheme?

22    A.   I would recruit patients to come to clinics and pay them

23    off for not, even though they were not receiving the services.

24    Q.   Where did you find the patients you recruited?

25    A.   Through my job, they were associates of mine that I worked

1   with, coworkers.

2   Q.  Coworkers at Simply Health Care?

3   A.  Yes.

4   Q.  Where do you currently reside, ma'am?

5   A.  At FDC Miami, Federal Detention Center.

6   Q.  Did you plead guilty to a crime?

7   A.  Yes.

8   Q.  What crime did you plead guilty to?

9   A.  Health care fraud.

10  Q.  Can you tell us in a few sentences what you did to violate

11  the law?

12  A.  I would recruit, I was a manager there.  I would recruit

13  patients to come to solicit them to come to a clinic and pay

14  them off for going there.

15  Q.  Did they receive services?

16  A.  No.

17  Q.  What was the clinic that was involved in your guilty plea?

18  A.  My guilty plea was that at the De La O.

19  Q.  Other than the De La O Clinic, did you recruit patients for

20  other clinics?

21  A.  Yes.

22  Q.  Do you remember where those clinics were located?

23  A.  Yes.

24  Q.  Where?

25  A.  Near my job by 87th Street and West Flagler.

1   Q.   Do you remember the names of any of these clinics on 87th

2   Street and West Flagler?

3   A.   Yes, AA Ortiz.

4   Q.   Do you see anyone in the courtroom today who participated

5   in the scheme with you involving AA Ortiz?

6   A.   Yes.

7   Q.   Can you identify that person based on an article clothing

8   that he or she is wearing?

9   A.   Yes.

10   Q.   Please do so, ma'am?

11   A.   Her, over there with the white shirt.

12         MS. GURSKIS:   Please let the record reflect the witness

13   has identified the defendant.

14   BY MS. GURSKIS:

15   Q.   Can you give us a two or three sentence description of what

16   the defendant did to further this scheme?

17   A.   We both came to an agreement.  She was working at a clinic

18   where I went to visit and we both were in agreement that I

19   would bring patients to the clinic.  She assisted in basically

20   doing the paperwork or the process that they did at the clinic,

21   and then I would go and pick up the money and I would pay off

22   the patients or the people.

23   Q.   Did those patients get treatment?

24   A.   No.

25   Q.   Are you testifying today pursuant to a plea agreement,

1   Ms. Lago?

2   A.   Sorry?

3   Q.   Are you testifying today pursuant to your plea agreement?

4   A.   Yes.

5   Q.   Have you promised to tell the truth if you are called to

6   testify?

7   A.   Yes.

8   Q.   Have you been sentenced?

9   A.   Yes.

10  Q.   Have you received a reduction in your sentence in exchange

11  for cooperating with the United States?

12  A.   No.

13  Q.   Speaking not about this case in particular, in connection

14  with your case, did you receive a reduction in your sentence in

15  exchange for cooperation with the United States?

16  A.   When I -- the time I am incarcerated, yes.

17  Q.   Are you hoping to receive additional reduction,

18  potentially, in exchange for your testimony?

19  A.   Yes.

20  Q.   Who will ultimately decide whether you receive any

21  additional reduction in your sentence?

22  A.   The judge.

23  Q.   A moment ago, you told the jury that you earned extra money

24  by recruiting patients.

25  A.   Yes.

1  Q.   Can you explain to the jury exactly how that came about?

2  A.   At first, I was a patient, myself, of one of the clinics.

3       I was recruited by someone else.  I went ahead and the way

4  it worked was that every six months, it was time to go and

5  renew or redo that again.  When it was the time for me to do it

6  again, close to the six months, I looked at my claims to make

7  sure that I was eligible again to go again for the second time.

8  When I went into my claims, I realized that there was a clinic

9  there that had billed me for services that I didn't agree to

10 and I didn't have any knowledge of.

11      So, I went on Google and searched the clinic.  When I went

12 to the clinic and I went I -- Googled it, I went looking for

13 the address that the Google gave me.  That address, when I went

14 there to that clinic, no longer exists.  So, a security guard

15 in that location told me that you might want to go to a clinic

16 that was across the street.

17 Q.   Okay.  Ms. Lago, I am just going to stop you right there.

18 You referenced a clinic that you visited whose address you

19 found on Google.  Do you remember the approximate cross-streets

20 of that clinic?

21 A.   It was very close by, about 80 -- between 87 and 83rd

22 Street and West Flagler.

23      MS. GURSKIS:  Would it be possible to use the ELMO to

24 show a document to the jury?

25 BY MS. GURSKIS:

1    Q.   I am showing you, Ms. Lago, what has previously been

2    admitted as Government's Exhibit 22.   Do you recognize this

3    building?

4    A.   Yes.

5    Q.   Why do you recognize it?

6    A.   That parking lot was the parking lot where is the clinic --

7    that clinic parking lot is the parking lot of the building that

8    I went searching for, the clinic that had billed me.

9    Q.   Okay.   And you said you had a conversation with the

10   security guard, and then you went to a different location?

11   A.   Yes.

12   Q.   What, where was the other clinic located?

13   A.   I would say literally just a few buildings down from that

14   one.

15   Q.   Was it also on Flagler?

16   A.   Yes.

17   Q.   I am showing you what has previously admitted as

18   Government's Exhibit 26.

19        Does that building look familiar to you?

20   A.   Yes.

21   Q.   Why does that building look familiar to you, Ms. Lago?

22   A.   That is the building where AA Ortiz was located.

23   Q.   Okay.   So, you go to the clinic.   Can you tell the jury

24   what happened when you went to this clinic?

25   A.   In that clinic, I looked into the building directory.   I

1    went, I had -- went into the third floor.  I knocked, and

2    that's where Jari opened the door.

3    Q.   When you say Jari, do you mean the defendant, Ms. Ruiz?

4    A.   Yes.

5    Q.   Okay.

6    A.   When she opened the door, basically, I told her why I was

7    there.  I was upset.  I told her that I was there because I was

8    billed too many claims -- I never received any money, and I

9    basically told her if I didn't get the money that I was

10   promised for, or that I need to get, that I should be getting,

11   that I was going to call my health insurance to report it to

12   them.

13   Q.   Who is your health insurance?

14   A.   Blue Cross/Blue Shield.

15   Q.   What happened after you threatened that you were going to

16   report this as fraud to Blue Cross/Blue Shield to Ms. Ruiz?

17   A.   Basically, Ms. Ruiz told me that they didn't have nothing

18   to do with their clinic.  It wasn't their clinic that had

19   billed me.

20        However, she did explain to me that whoever recruited me

21   was known to be selling patients' information to all different

22   types of clinics without paying them the money that they were

23   promised.

24   Q.   So, what happened after that?

25   A.   She basically proposed how about she -- she asked me where

1    I worked at.  I told her that I was a manager at Simply, and

2    she basically proposed to me how would I like to go into

3    business with her, and their clinic.  And to become a patient

4    recruiter for them.

5    Q.  What were the terms of that agreement or arrangement with

6    Ms. Ruiz?

7    A.  Basically, she told me what the -- what her clinic or that

8    clinic paid would be $3,500.  She strongly suggested I give the

9    patient that I recruited $2,000, and that I keep the rest for

10   me.

11   Q.  Did she tell you why she recommended that you give a cut of

12   $2,000 to the patient you were recruited?

13   A.  Basically, so that way, it would not -- if the patients

14   would find out, it would cause them not to call the health

15   insurance, and that they were one of the highest paid ones.

16   Q.  Did you end up entering into that business agreement with

17   Ms. Ruiz that you just described?

18   A.  Yes, I did.

19   Q.  Was there some type of contract you had with her for that?

20   A.  There was no contract.  It is a verbal agreement.

21   Q.  Do you remember approximately when you had this

22   conversation with Ms. Ruiz?

23   A.  I think it was approximately 2018.

24   Q.  And this was the first time you met Ms. Ruiz at this

25   building that we are seeing in Exhibit 26?

1   A.   Yes.

2   Q.   Did Ms. Ruiz give you any other instructions at the first

3   meeting other than recommending that pay cut for the patients

4   so they wouldn't report the clinic?

5   A.   Basically, she just gave me -- other than that, she told me

6   pretty, much you, know how this works; that I wouldn't be

7   speaking with anybody else except you, only you and I would be

8   doing business.  She told me basically things that I would have

9   to tell the patients or the people that I recruited, for what

10  to say, or what to do if they had -- when they go to the

11  clinic.

12  Q.   Do you remember anything in particular about what she said

13  in that conversation?

14  A.   Basically, they were to sign some paperwork, if the

15  insurance would call them, they would have to make sure that

16  they agreed that yes, they got the services, depending on

17  different body parts, or whatever therapy sessions they were

18  getting.

19  Q.   Did you have any conversations about whether these

20  treatments were actually going to happen?

21  A.   We didn't have any conversations whether the treatment

22  wasn't going to happen.  But, we knew that the treatments did

23  not happen.

24  Q.   How many patients did you think you sent to Ms. Ruiz over

25  the course of that business arrangement?

1   A.   To the best of my knowledge, about 15 to 20 patients, that

2   I can remember.

3   Q.   I am showing you what has previously been admitted as

4   Government's Exhibit 52.

5        Do you see your name on this list, Ms. Lago?

6   A.   Yes.

7   Q.   Is the text big enough?  Can you read it?

8   A.   Yes.

9   Q.   Okay.  Do you recognize any of the names on this list, from

10  what we can see on the screen, leading up to your name?

11  A.   Yes.

12  Q.   Why do you recognize those names?

13  A.   These are names of people that I recruited.

14  Q.   Okay.  Can you tell me which names you recognize as people

15  being that you recruited?

16  A.   I would say Frank Waldo, Jana Jamison, Stefani Gonzalez,

17  Rafael De Vega, Justy Alvarez, Melba Hernandez, Hillian Ortega,

18  Claudia Ramirez, Katherine Deniso, Madalia Perez, Suny Medina,

19  Clarissa Azar.

20  Q.   Okay.  Moving down this list -- any of these names that you

21  recognize?

22  A.   Sarah Larry, Shahira Castillo, and that's it.

23  Q.   Okay.  How about in this section?

24  A.   Jacqueline Hernandez, Maria Genaro.

25       Joel Urra.

1        That is it - about it.

2   Q.   Last section here, Ms. Lago, any on this section you

3   recognize?

4   A.   Rosemary Martinez, Emmanuel Urra.

5        Valentina Grijalza.

6        Danaliz Ardila, Ruben Galindo, Carlos Villatorio.

7   Q.   And these last three names, do you recognize any of these?

8   A.   Michael Rodriguez.

9   Q.   Can you tell the jury why you recognize all these names?

10  A.   Because I recruited them myself.

11  Q.   Okay.  Are they patients who you sent to Ms. Ruiz?

12  A.   Yes.

13  Q.   How did you typically communicate with Ms. Ruiz?

14  A.   Through texts, through the phone.

15  Q.   Did you have any conversations with Ms. Ruiz about using

16  texts to communicate with each other?

17  A.   Yes.  That is in our original conversation.  At the

18  beginning, that's how we agreed that we would basically

19  communicate.

20  Q.   What kind of information would you share in those text

21  messages?

22  A.   I would send her the names, the insurance card, and the ID

23  of the patient.  I would ask them to send it to me, and I would

24  send it to them.

25  Q.   Okay.  And then other than the conversation about arranging

1  for those messages to be sent over texts, did you have any

2  other conversations with her about using text message

3  communication?

4  A.  Once, I -- the conversation, once it was done, it would

5  always -- she would always remind me, make sure we erased

6  everything, that there is nothing in the cell phone or in the

7  pass-through What's App.

8  Q.  Did make sure that you erased everything?

9  A.  Yes.

10  Q.  And what did you understand "make sure to erase everything"

11  meant?

12  A.  To delete every proof of what was going on in the evidence.

13  Q.  I think you said you first met Ms. Ruiz around early 2018,

14  is that what you said?

15  A.  Yes.

16  Q.  How often were you going to that building on West Flagler

17  when you first met Ms. Ruiz?

18  A.  Daily.

19  Q.  Why would you be going there every day?

20  A.  Once the patients -- we would set up patients to go into

21  the office, into their clinic, and once they finished doing

22  their appointment, then I would come in later to collect the

23  money.

24  Q.  To collect money from whom?

25  A.  From Jari.

1    Q.   From Ms. Ruiz?

2    A.   From Ms. Ruiz, yes.

3    Q.   And how would you know when to come in to get the money?

4    A.   I would either call her or text her, and I would make sure

5    that it was okay to go into the office.  She would let me know

6    when it was good to come in, when I could come in.

7    Q.   For how long were you going to Ms. Ruiz's clinic every day,

8    would you say?

9    A.   I would say maybe about two to three months.

10   Q.   In those two to three months, did you have any

11   conversations with her about the number of patients you were

12   sending her?

13   A.   Yes.  At the very beginning, we just had conversations or

14   comments with regard to business being good, that there was a

15   lot of patients coming in.

16   Q.   Who said that business was good?

17   A.   Jari and me, and Jari and me conversating.

18   Q.   What did you understand business was good to mean?

19   A.   Well, basically, that I was recruiting a lot of patients,

20   and that there was a lot of patients that I was bringing in to

21   the clinic.

22   Q.   You said that the first couple of months or first few

23   months in 2018, you were going to the clinic every day?

24   A.   Yes.

25   Q.   At some point, did that change?

1  A.  Yes.

2  Q.  How often were you going to the clinic after that two or

3  three month period at the beginning of the year?

4  A.  I would say maybe about two to three times a week.

5  Q.  Did you go to the same building each time during that six

6  month period?

7  A.  For the most part, yes.

8  Q.  Okay. Sorry, during the three-month period when you first

9  were going, often?

10  A.  Yes.

11  Q.  And then the second period of time, when you were going for

12  just a few times a week, how long was that period of time?

13  A.  Sorry, can you repeat the question again?

14  Q.  Sure.  I think you said -- earlier said that the first --

15  for the first few months of 2018, you were going to the clinic

16  every day?

17  A.  Right.

18  Q.  But then after a couple of months, I think you said it

19  shifted to where you were going less?

20  A.  Yes.

21  Q.  For how many months were you going to the clinic, but not

22  every day?

23  A.  For like another two to three months.

24  Q.  And you -- each time you went, what was the purpose of

25  those visits?

1   A.   To collect the money.

2   Q.   To collect money from whom?

3   A.   From Ms. Ruiz.

4   Q.   What format would she pay you the money in?

5   A.   Cash.

6   Q.   Would she just hand you dollar bills?

7   A.   No.  In an envelope.

8   Q.   When you went to the clinic to pick up the cash, how long

9   were you typically there?

10   A.   No more than 10, 15 minutes.

11   Q.   Did you always need to tell somebody in advance before you

12   went to the clinic?

13   A.   Yes.  I would always tell Ms. Ruiz.  I would always send

14   her a text message saying, "I am on my way."

15   Q.   Was there any reason for that?

16   A.   One, I was during my lunchtime, and two, that's just how

17   she always would be -- we were both capable of letting her know

18   when I was going.

19   Q.   Did you ever see a patient at the clinic?

20   A.   No.

21   Q.   What staff, other than Ms. Ruiz, did you see at the clinic?

22   A.   There was another lady in the clinic that I -- had

23   interacted with sometimes, a skinny -- and outside of that,

24   there was only two other times that I saw who I was -- told to

25   me that was the owner.

1  Q.  What made you think that was the owner?

2  A.  Well, those two, one or two of those times that I went, I

3  had to pick up the money, Ms. Ruiz told me that I was waiting

4  in the parking lot, and she told me to wait before coming out

5  because the owner was there at the clinic.

6  Q.  Did you follow those instructions from Ms. Ruiz and wait in

7  the parking lot?

8  A.  Yes.

9  Q.  And then what happened?

10  A.  Then I was told I had to get back because my lunch break

11  was about to be over, and she told me, "Okay.  You go ahead and

12  come up," and that's when I came up and I seen her.

13  Q.  Did you ever see a doctor at the clinic?

14  A.  No.

15  Q.  Did you ever see a physical therapist at the clinic?

16  A.  No.

17  Q.  Did you ever see a massage therapist at the clinic?

18  A.  No.

19  Q.  Did you ever get any treatment at the clinic?

20  A.  No.

21  Q.  But I think you said earlier, you went to the clinic as a

22  patient?

23  A.  Yes.

24  Q.  Were you paid for going to the clinic as a patient in

25  addition to going as a recruiter?

1    A.   Yes.

2    Q.   Who paid you?

3    A.   Ms. Ruiz.

4    Q.   When you went as a patient, did you ever receive any of the

5    following treatments:   Nystagmus test, or eye movement tests?

6    A.   No.

7    Q.   Ear irrigation?

8    A.   No.

9    Q.   Nerve conduction studies?

10   A.   No.

11   Q.   Any type of test using electrodes?

12   A.   No.

13   Q.   Did the people you are referred to on the Government's

14   Exhibit 52 who you referred to the clinic, did any of them get

15   treatment?

16   A.   No.

17   Q.   How sure are you about that?

18   A.   Well, some of them, for example, when they would come back

19   from lunch, I would ask them, "Hey, how did it go?"

20        And some of them would make like, "That was the easiest

21   money," because they didn't have to do anything.

22   Q.   That was the easiest money?

23   A.   Yes.

24   Q.   When you went to the clinic as a patient versus as a

25   patient recruiter, how did that process work?

1   A.   The only difference was that when I went as a patient, I

2   had to sign some physical therapy forms, and basically, then I

3   just got my own personal envelope that was mine.

4   Q.   Okay.  And the personal envelope that was yours, what was

5   in the envelope?

6   A.   Cash.

7   Q.   And who gave you that envelope.

8   A.   Ms. Ruiz.

9   Q.   And the physical therapy forms you had to sign, how many

10  would you get each time you would go with a patient?

11  A.   30 sheets.

12  Q.   Who gave you the papers to sign?

13  A.   Ms. Ruiz.

14  Q.   Did she give you any instructions on when she would hand

15  you those papers?

16  A.   No. Just physically, I just had to sign, no date or

17  anything.

18  Q.   Okay.  And you mentioned a minute ago that you would send

19  Ms. Ruiz a text message in advance of some information about a

20  patient before you would send the person in?

21  A.   Yes.

22  Q.   Can you explain that process of sending the patient to

23  Ms. Ruiz, in a little more detail?

24  A.   So, I had to -- I would ask the patient to send me their

25  state ID and their health insurance card.  Once I received it

1    in my phone, I would send it off to her.  The reason why was

2    for her to verify to make sure that there was eligible, that it

3    was okay for them to come into the clinic.  Once she would do

4    that verification, she would let me know if they were okay to

5    come.  If I get the green light from her that the yes, they

6    were okay to come, I would then ask the patient to try to

7    coordinate when was the best time for them to go to the clinic.

8    Q.  And how would you coordinate that next step of getting the

9    patient to the clinic?

10   A.  I would coordinate it with Ms. Ruiz.  So, for example, if

11   most of them would go during their lunch time, if their lunch

12   time was like at 12 o'clock, I would let her know, "Hey, such

13   patient can go at 12 o'clock."

14         She would let me know if she was available at that time.

15   If she said yes, then I would let them know, hey, your

16   appointment is at 12.  When they go to the clinic, once they

17   finished, they could come back to the office.  They would let

18   me know they was finished.  And basically, that's when I would

19   meet her and like after five o'clock, most of the time, the

20   same day, and go and pick up the money.

21   Q.  And how much money would you be collecting when you would

22   go?

23   A.  For the amount of patients that went.  So, for each patient

24   was $3,500, that I would go, depending on, so three patients

25   went that day, it would be three envelopes.

1   Q.   Did you follow the instructions that Ms. Ruiz gave you

2   about giving a cut of that money to the patient?

3   A.   Yes.

4   Q.   Do you know how much Ms. Ruiz was paid?

5   A.   In conversations, she once mentioned that all she made was

6   five hundred dollars out of each patient.

7   Q.   So, she told you she was paid per patient who came in?

8   A.   Right.

9   Q.   Did she tell you the format she was paid for that?

10  A.   No.

11  Q.   You said you would typically go to the clinic to get cash.

12  Did you ever go anywhere else to collect cash?

13  A.   There was maybe a few times one or twice maybe that I went

14  across the street from the clinic, which was at a bank.

15  Q.   Do you remember what type of bank it was?

16  A.   Regions Bank.

17  Q.   And that was on Flagler, as well?

18  A.   Yes.

19  Q.   Do you remember anything else about kind of the area

20  surrounding that Regions Bank?

21  A.   It was a shopping plaza.

22  Q.   I am showing the witness had has been previously admitted

23  as Government's Exhibit 25.

24       Does this look familiar to you, Ms. Lago?

25  A.   Yes.

1    Q.   Why does it look familiar?

2    A.   That would be the Regions Bank that I met with her.

3    Q.   How many times did you meet Ms. Ruiz at that bank?

4    A.   It was a few times meeting, maybe once or twice.  I don't

5    remember.

6    Q.   What do you mean, inside the bank, or outside?

7    A.   Outside in the parking lot.

8    Q.   Would she be waiting for you outside?

9    A.   Yes.

10   Q.   I think you have a touch screen.  If you are able to, can

11   you circle on the screen where you would meet her?

12   A.   (Indicating)

13   Q.   Other than meeting Ms. Ruiz at the clinic building on

14   Flagler and this parking lot on Flagler, is there anywhere else

15   you met Ms. Ruiz to collect cash?

16   A.   There was one other time that it was in a gas station.

17   Q.   Do you remember where that gas station was?

18   A.   No. I do not.

19   Q.   In addition to paying you for bringing in patients to the

20   clinic, for being a patient, yourself, were you aware of any

21   other tasks or jobs that Ms. Ruiz performed at the clinic on

22   Flagler?

23   A.   No.

24   Q.   Have you been interviewed by law enforcement as part of

25   your cooperation agreement?

1   A.   Yes.

2   Q.   Does that include meetings relating to the clinic's

3   affiliated with Ms. Ruiz, as well as meetings relating to your

4   case?

5   A.   Yes.

6   Q.   Before you were charged, did agents come talk to you?

7   A.   Yes.

8   Q.   Do you remember approximately when that was?

9   A.   I believe in 2019.

10   Q.   Were you truthful when law enforcement agents first

11   approached you?

12   A.   No.

13   Q.   Why not?

14   A.   I was scared.  I was stupid and naive at the time.

15   Q.   Has things changed between 2019 and today, in August of

16   2022?

17   A.   Yes.  I want the truth to be out and I want this to just

18   stop biting me and haunting me.

19   Q.   Approximately how long did you work with Ms. Ruiz

20   recruiting patients for her?

21   A.   Approximately, to the best, four or six months, to the best

22   of my ability I can remember.

23   Q.   Why did you stop bringing her patients?

24   A.   The clinic -- not the clinic, but she told me that things

25   were getting hot, things were getting bad, that the clinic was

1   -- needed to -- was being under investigation.

2   Q.   When did Ms. Ruiz first tell you that things were getting

3   hot?

4   A.   I would say maybe about one to two months before I

5   completely stopped doing business with her.

6   Q.   You said something about being under investigation?

7   A.   Yes.  She basically told me that she had found out some

8   information about the clinic, about that the clinic was being

9   -- it got opened.  The reason why they even changed names was

10   because the clinic was opened under a deceased doctor, and

11   basically, that the owner was trying to -- she found out the

12   owner was trying to flee to Cuba.  So, she was going to -- she

13   basically was going to get out, but couldn't.  And, she was

14   recommending me to -- recommending me to stop working or doing

15   business at that clinic because she was going to leave the

16   clinic, herself, as well.

17   Q.   How many times do you think Ms. Ruiz discussed those

18   concerns with you?

19   A.   I would say maybe about twice, two times before she

20   officially quit the clinic.

21   Q.   Where were those conversations?

22   A.   One was over the phone, and the very last one was on, she

23   asked me to meet her at a park.

24   Q.   You said at a park?

25   A.   At a park.

```
 1   Q.   What park?
 2   A.   I don't remember the name of the park.  I only know it was
 3   by Sunset Drive.
 4   Q.   Did you go to the park when she asked you to meet her at
 5   the park?
 6   A.   Yes.
 7   Q.   Did she say why she wanted to meet you at a park rather
 8   than anywhere else?
 9   A.   Basically, she just told me for her safety and for mine,
10   and that she knew it was a park that was close by her home and
11   she exercised there every day.
12   Q.   So, did you end up going to the park?
13   A.   Yes.
14   Q.   Do you remember what time of day it was?
15   A.   It was after work, after five P.M.
16   Q.   Did you meet her on a bench, at a table, where in the park
17   did you meet her?
18   A.   We were just basically walking around the walk path.
19   Q.   Did you make any observations about her demeanor when you
20   were walking with her around the walk path?
21   A.   I mean, she basically was -- you could tell she was
22   worried, she was fidgeting, just very concerned, anxious.
23   Q.   What did you talk about when you were walking around the
24   park on the walk path?
25   A.   That's when she told me the conversation about the things
```

1    that she had found out about the clinic, that a friend of the

2    owner had told her that that clinic was running under a

3    deceased doctor; that the reason why business was slowing down

4    was because that the owner was trying to flee to Cuba.  That's

5    why, most of the time, he was coming in and out.  So, after her

6    hearing all these things, she was basically just going to quit.

7    Q.  What was wrong with the scheme?

8    A.  The fact that we were billing the health insurance and the

9    patients were not receiving the services.

10            MS. GURSKIS:  One moment, your Honor.

11            Nothing further, your Honor.

12            Thank you.

13            THE COURT:  Cross-examination?

14            MR. BUCK:  Yes, your Honor.

15                       CROSS-EXAMINATION

16   BY MR. BUCK:

17   Q.  Good afternoon, Ms. Lago.

18   A.  Good afternoon.

19   Q.  So, you are currently incarcerated?

20   A.  Yes.

21   Q.  And you pled guilty because you were guilty?

22   A.  Yes.

23   Q.  Would you classify your crime as dishonest that you

24   described, your crime?

25   A.  Yes.

1  Q.  In exchange for your plea, you received a reduced sentence?

2  A.  Yes.

3  Q.  What was your sentence?

4  A.  18 months.

5  Q.  Okay.  Do you recall getting a presentencing report

6  completed?

7  A.  I think so, yes.

8  Q.  And you represented to them that you were suffering from

9  anxiety and depression?

10  A.  Yes.

11  Q.  Are you currently receiving mental health treatment?

12  A.  I am receiving medication.

13  Q.  Yes, and what medications are you taking?

14  A.  Mirta- something, 45 milligrams.

15  Q.  And you reported past daily marijuana use?

16  A.  Yes.

17  Q.  And you reported past cocaine use?

18  A.  Yes.

19  Q.  And you reported previous suicide attempts?

20  A.  Yes.

21  Q.  And then you met with the Government to go over your

22  testimony?

23  A.  Yes.

24  Q.  And you rehearsed that testimony today?

25  A.  Yes.

1   Q.  And, in exchange for that, you hoped that you will receive

2   a reduced sentence by telling them what they want to hear?

3   A.  I hope to do what is right and to get a reduced sentence,

4   because to tell them what they want to hear, I think I am here

5   to say what is the truth.

6           MR. BUCK:  Nothing further, your Honor.

7           MS. GURSKIS:  Nothing from the Government, Your Honor.

8   Thank you.

9           THE COURT:  May the witness be permanently excused?

10          MS. GURSKIS:  Yes, your Honor.

11          THE COURT:  Okay.

12          May the witness be permanently excused?

13          MR. BUCK:  Yes, your Honor.

14          THE COURT:  Okay.

15          Ladies and gentlemen, I will have you to step back into

16   the deliberation room, and I will have you come right back out.

17   Just a moment.

18          [Whereupon, the jury left the courtroom, and the

19   following proceedings were had at 2:55:]

20          The witness may be excused, and let's bring in the next

21   witness who is incarcerated.

22          The name, Government, is?

23          MS. GURSKIS:  Clarissa Azar.

24          THE COURT:  All exhibits one through 124 have been

25   received, without objection.

# COMPOSITE EXHIBIT 2

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry ___07/15/2021___

       JEAN LAGO (LAGO), Social Security Account Number (SSAN) ████████, date
of birth (DOB) ███████████, was interviewed at the Federal Bureau of
Investigation (FBI) office located in Miramar, FL. Present for the interview
were FBI Special Agents Kristin Chandler and Lara Phillippe, along with DOJ
Attorney Emily Gurskis. LAGO's defense attorney, Jason Kreiss, was also
present. After being advised of the identities of the interviewing Agents
and the nature of the interview, LAGO provided the following information:

**LA O MEDICAL WELLNESS CENTER INC**

       LAGO admitted to her role as a patient recruiter for LA O MEDICAL
WELLNESS CENTER INC (LA O). LAGO was shown exterior photographs of the
building in which LA O is located (9600 SW 8th Street, Suite #32, Miami,
Florida 33174). LAGO identified the building as LA O, the location where she
recruited patients. She recalled that the clinic was located on 8th Street
and 90 something, on the second floor of the building. LAGO also stated that
the clinic was initially located at another address, near 82nd or 84th. LAGO
was then shown a photograph of a building located at 934 SW 82nd Avenue,
Miami, FL 33144. LAGO identified this as LA O's original location. LAGO
explained that when she started recruiting patients, it was to the location
on 82 Avenue, but after about one month, the clinic moved to 8th Street.
Most of the patients LAGO recruited went to the 8th Street location.

       LAGO was introduced to the owner of LA O, DALGI OQUENDO (OQUENDO),
through JAROSLAVA RUIZ (JARI). LAGO initially met JARI at other clinics she
was recruiting patients to, RAMIREZ REHAB CENTER INC (RRCI) and AA
ORTIZ MEDICAL CENTER INC (AA ORTIZ). JARI told LAGO that things were
"heating up" at the clinics and that they were still billing using a
doctor's NPI who passed away. Thus, JARI told LAGO that since she has kids,
she should get out. JARI then introduced LAGO to OQUENDO. JARI told LAGO
that OQUENDO was trustworthy and that she knew her through a male friend.

Investigation on ___07/07/2021___ at ___Miramar, Florida, United States (In Person)___

File # ████████████████████                          Date drafted ___07/07/2021___

by  CHANDLER KRISTIN, PHILLIPPE LARA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

PORRAS_00074348

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of  (U) Debrief of JEAN LAGO                    , On  07/07/2021  , Page  2 of 9

LAGO then went to LA O and met OQUENDO. OQUENDO told LAGO that she was the
owner and that it would be the same process as RRCI and AA ORTIZ, with a few
exceptions.

OQUENDO told LAGO that unlike the other clinics, the patients have to
come to the sessions and sign all of the paperwork. OQUENDO also explained
that she wouldn't bill the patients until the end of the cycle, when the
sessions were complete and the paperwork was signed. OQUENDO believed that
if she did it this way, there were no problems. OQUENDO told LAGO she was
more organized than those at RRCI and AA ORTIZ. LAGO stated that OQUENDO
also required patients to come with a prescription for physical therapy (PT)
from their primary doctor. If they did not have a primary doctor, she told
LAGO that the clinic had a doctor located in the same building as LA O that
they could use. OQUENDO and LAGO agreed to payments of $3,000 cash. LAGO
would keep $1,000 for herself and pay the patients $2,000. LAGO usually paid
patients at work, following their initial visit to LA O. LAGO picked up the
money to pay the patients at LA O, typically during her lunch break.

LAGO always received the money from OQUENDO. OQUENDO was always present
at the clinic when LAGO went. If OQUENDO was running a few minutes late, she
would tell LAGO. LAGO did not speak to anyone else at the clinic regarding
patients or money. OQUENDO paid LAGO in a back room of the clinic. They
money was provided in an envelope. OQUENDO was careful not to speak to LAGO
or give her the money in front of anyone else. LAGO recalled that there was
a male receptionist at the clinic who she described as white, in this late
30's or early 40's, with black hair.

LAGO also recalled seeing a Physical Therapist at the clinic who just
performed evaluations. LAGO was shown a photograph of KARINA ANDREA
ANTONIONE (ANTONIONE), SSAN ████████, DOB ███████. LAGO identified the
woman in the photograph as the Physical Therapist who did her evaluation
when she was going to be a patient herself. LAGO advised that the day before
she was initially interviewed by the FBI at the office in Miramar, FL, she
provided her insurance information to OQUENDO to be billed by LA O and
received $3,000 cash. After this interview, LAGO went back to the clinic,
told OQUENDO not to bill her information, and gave the money back. OQUENDO
asked why, but LAGO didn't tell her. LAGO never spoke to OQUENDO again after
that.

FD-302a (Rev. 5-8-10)

████████████████

Continuation of FD-302 of  (U) Debrief of JEAN LAGO                    , On  07/07/2021 , Page  3 of 9

[*Agent Note: According to medical data provided by BLUE CROSS BLUE SHIELD, LAGO's medical insurance was billed by LA O for 27 PT sessions between 6/12/2019-07/25/2019. LAGO was interviewed by the FBI on 08/20/2019.*]

LAGO never received any PT at LA O and never saw a doctor. LAGO recruited approximately 10-12 patients from SIMPLY HEALTHCARE to the clinic. LAGO recalled recruiting APRIL JAMISON (JAMISON), SARA LARRY (LARRY), CLARISSA AZAR (AZAR), RENEE PRYOR (PRYOR), BEYLOR GARCIA (GARCIA), EMANUEL URRA (URRA), SUNEIRY MEDINA (MEDINA) and HANNY LUGO (LUGO). LAGO also offered a $500 referral fee to GARCIA, PRYOR and MEDINA for sending patients to her. All three co-workers sent her patients, but she could not remember their names. LAGO would give the money to GARCIA, PRYOR or MEDINA to pay the patient if it was referred to her. LAGO would pay the patients she recruited directly. She also recalled that a co-worker named RUBEN GALINDO sent her a patient named MICHAEL RODRIGUEZ.

LAGO would ask for patients to send her their insurance information and identification ahead of time. LAGO would then send the information, via text, to OQUENDO. LAGO communicated with OQUENDO and patients via text message and/or WHATSAPP. OQUENDO would then tell LAGO that the patients were good to go to the clinic. LAGO would send patients the address and they would go to the clinic alone, often during their lunch break. LA O was also open after work hours. During one instance, LAGO went to the clinic with AZAR and LUGO as she was going to the clinic to pick up money anyway. LAGO saw OQUENDO provide them with the paperwork to sign.

LAGO was surprised to learn that AZAR was recruiting patients to the clinic as OQUENDO never liked AZAR. OQUENDO told LAGO that AZAR was a problem as she was very demanding and "antsy" and asked too many questions. OQUENDO didn't like the fact that AZAR was asking when she could go to the clinic again for money. LAGO told OQUENDO that she would vouch for her and spoke to AZAR about the fact that she had to go to the clinic and do the sessions. OQUENDO often contacted LAGO and told her that AZAR had not been to the clinic in a while and needed to come.

LAGO stated that according to OQUENDO, the clinic could bill for 30 sessions per cycle and after six months, the patients could go to the clinic again for another cycle. OQUENDO would tell LAGO who to contact to return to

FD-302a (Rev. 5-8-10)

█████████████████

Continuation of FD-302 of (U) Debrief of JEAN LAGO                    , On 07/07/2021 , Page 4 of 9

the clinic. LAGO advised that some patients could not return for another cycle as they had gone to another clinic at the same time and thus, their insurance was no longer good. Additionally, when LA O moved to the new location on 8th Street, OQUENDO told LAGO that she was starting to bill Medicare with elderly patients. OQUENDO asked LAGO to recruit elderly patients for her as well but LAGO never did. LAGO saw elderly patients once or twice at the clinic. Other than that, she never saw patients at the clinic.

Further, OQUENDO told LAGO which patients needed to come to the clinic. LAGO then told the patients they needed to return to the clinic to sign paperwork. She never asked if they received any treatment and no one ever spoke to her about receiving PT there. Some patients, however, did complain about the fact that they had to keep going back just to sign paperwork. LAGO recalled one instance in which a patient did want to receive PT. OQUENDO told LAGO that it was up to the patient if they wanted treatment, but if they did, to let her know so she can have the therapist come in.

Finally, LAGO stated that on arrest day, while at the US MARSHALS, OQUENDO spoke to her while AZAR was speaking to the judge. OQUENDO asked her if she had a lawyer or needed help paying for one. OQUENDO also told LAGO that she trusted her and she wasn't worried about her talking, but was concerned about AZAR and she hasn't trusted her since their last fight. OQUENDO also stated that this was a nightmare and couldn't believe that this was happening.

LAGO was shown the following DAVID photographs and made the below identifications:

APRIL JAMISON, SSAN ████████, DOB ████████: Identified as APRIL JAMISON.

SARA LARRY, SSAN ████████, DOB ████████: Identified as SARA LARRY.

CLARISSA AZAR, SSAN ████████, DOB ████████: Identified as CLARISSA AZAR.

BEYLOR GARCIA, SSAN ████████, DOB ████████: Identified as BEYLOR GARCIA.

FD-302a (Rev. 5-8-10)

█████████████████

Continuation of FD-302 of (U) Debrief of JEAN LAGO _____ , On 07/07/2021 , Page 5 of 9

EMANUEL URRA, SSAN ████████, DOB ██████████: Identified as EMANUEL URRA.

RENEE PRYOR, SSAN ████████, DOB ██████████: Identified as RENEE PRYOR.

SUNEIRY MEDINA: SSAN █████████, DOB ████████: Identified as SUNEIRY MEDINA.

DALGI OQUENDO, SSAN █████████, DOB ██████████: Identified as DALGI.

MICHAEL RODRIGUEZ, SSAN █████████ DOB █████████: Identified as MICHAEL RODRIGUEZ.

RUBEN GALINDO, SSAN █████████, DOB ██████████: Identified as RUBEN GALINDO.

### RAMIREZ REHAB CENTER INC/AA ORTIZ MEDICAL CENTER INC

LAGO was originally recruited by NELSON RODRIGUEZ (RODRIGUEZ), her manager at Simply Healthcare, for a clinic located on 8th or 12th Avenue in Hialeah. When shown photographs of PAIN RELIEF REHAB MEDICAL CENTER CORP located at 3750 W 16th Avenue in Hialeah, LAGO did not identify it as the clinic location. The clinic only did allergy testing, no physical therapy. LAGO went to the clinic, had the allergy test done, and got paid.

[Agent's Note: PAIN RELIEF REHAB MEDICAL CENTER CORP was known to Agents as a fraudulent clinic. According to claims data for LAGO, Blue Cross Blue Shield (BCBS) was billed by PAIN RELIEF REHAB MEDICAL CENTER CORP for five visits between 6/19/2018 - 6/25/2018. Billing included claims for multiple allergy tests.]

LAGO kept track of her claims and later noticed that she was billed for physical therapy at a clinic called MEDIGLEZ WELLNESS CENTER INC located near 82nd and W Flagler Street in Miami, a place she had never visited. LAGO went to the clinic to confront them, intending to tell them that if they did not pay her, she would report them. However when she arrived, the security guard told her that the clinic no longer existed at that location.

[Agent's Note: MEDIGLEZ WELLNESS CENTER INC was known to Agents as a

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of  (U) Debrief of JEAN LAGO _____ , On  07/07/2021 , Page  6 of 9

*fraudulent clinic.  According to claims data for LAGO, BCBS was billed by*
*MEDIGLEZ WELLNESS CENTER INC for 18 visits between 3/22/2018 - 5/2/2018.*
*Billing included claims for electrical stimulation, ultrasound, manual*
*therapy, self-care/home management training, therapeutic procedures.*]

RODRIGUEZ then directed her to RRCI/AA ORTIZ.  When shown photographs of
RRCI located at 8260 W Flagler Street in Miami, LAGO confirmed that it was
the location of RRCI (the photographs are maintained in the case file as
1C1).  When shown photographs of AA ORTIZ located at 8080 W Flagler Street
in Miami, LAGO confirmed that it was the location of AA ORTIZ.

LAGO went to AA ORTIZ and met JARI and ANISLEY GOMEZ ANUEZ (ANI).
JARI told LAGO that RODRIGUEZ had "screwed them over" and was losing them
money by recruiting for other clinics and not them.  JARI offered LAGO
$3,500 to recruit for them.  LAGO could keep $1,000 and would give $2,500 to
each patient she recruited.  LAGO agreed.

LAGO worked exclusively with JARI and ANI.  LAGO's coworkers who she
recruited to go there mentioned a doctor who wore white, but LAGO never saw
the doctor at the clinic.  LAGO never saw anyone else working at AA ORTIZ,
with the exception of the owner.  LAGO only saw the owner once and it was so
brief that she would not recognize him if she saw him again.  LAGO knew it
was the owner because JARI told her he was the owner.  According the JARI,
the owner knew exactly what was going on at the clinic because he was
involved in a lot of schemes and it was "not his first rodeo."  ANI was best
friends with the owner.  JARI was not known or trusted as much by the
owner.

Unlike LA O, JARI and ANI did not require patients to return to the
clinic.  It was a one-time thing.  JARI and ANI were careful about over-
billing because they knew it would be a red flag so they kept to the 30
sessions that were permitted every 6 months.  In the beginning, they never
gave out Durable Medical Equipment (DME) but after the name and location
change from RRCI to AA ORTIZ, they started giving out back or knee braces to
patients.  JARI told her the owner wanted to do this to make it seem more
legitimate.

Although LAGO did not know JARI's official title, JARI wore scrubs as if
she was a nurse.  JARI's role and responsibilities at the clinic included

PORRAS_00074353

FD-302a (Rev. 5-8-10)

███████████

Continuation of FD-302 of <u>(U) Debrief of JEAN LAGO</u> , On <u>07/07/2021</u> , Page <u>7 of 9</u>

office work, assisting with recruiting patients, paperwork, getting patients to sign the paperwork, paying recruiters, and coaching patients. For example, JARI told patients that if their insurance called, they should tell them that they received therapy and DME. JARI also received $500 per patient.

Although LAGO did not know ANI's official title, ANI wore scrubs as if she was a nurse. ANI's role and responsibilities at the clinic were more direct and one-on-one with the owner. She made sure that the patients logged into the computer at the clinic to verify that their insurance benefits were available. If they did not have the physical therapy available, ANI would turn them away. ANI also occasionally went to the bank to take out cash for the owner. LAGO knew this because on one or two occasions, LAGO met ANI at Regions Bank to pick up her cash payments.

Although LAGO had her vitals taken, she never received any type of treatment at RRCI or AA ORTIZ. She did fill out and sign paperwork but did not receive any special instructions for filling out the paperwork. LAGO received $3,000 cash in an envelope from JARI for her visits.

[*Agent's Note: According to claims data for LAGO, BCBS was billed by RRCI for 38 visits between 1/2/2018 - 3/15/2018. BCBS was also billed by AA ORTIZ for 30 visits between 11/5/2018 - 12/28/2018. Billing for both clinics included claims for electrical stimulation, electrocardiogram, back brace, physical therapy, nerve conduction studies, x-rays, and ultrasounds.*]

LAGO sent the same people she recruited for LA O to RRCI/AA ORTIZ. They would text LAGO a photograph of their insurance and ID, which LAGO would forward on to JARI. JARI would let her know which day the patient could visit, and LAGO would relay the information. LAGO would visit the clinic on her lunch break or at the end of the day to pick up the cash and paid her coworkers either the same day or the next day. LAGO usually paid her coworkers somewhere at work - in the parking lot, in a car, at their desk or in the break room. If she paid a referral fee of $500 to one of her recruits, the money came out of her cut and it was the responsibility of the recruit to take their own cut and pay the patient.

LAGO recruited her daughter, DANALIZ ARDILA, to go to the allergy clinic with her. LAGO also referred her daughter to another clinic suggested by

PORRAS_00074354

FD-302a (Rev. 5-8-10)

███████████

Continuation of FD-302 of  (U) Debrief of JEAN LAGO _____ , On  07/07/2021 , Page  8 of 9

PRYOR.

LAGO trusted JAMISON, LARRY, PRYOR, GARCIA and URRA.  LAGO specifically asked GARCIA, PRYOR and MEDINA if they wanted to sub-recruit.  LAGO chose them not only because she trusted them but also to expand her network because they all worked in different departments.  LAGO told them not to tell their recruits that she was behind it all because she did not want it to be tied back to her.  LAGO and PRYOR joked that LAGO always knew who PRYOR recruited because they were all Black rather than Latino.

LAGO believed that PRYOR needed the money because she had two kids. MEDINA also had two kids, and GARCIA was getting married.  PRYOR and GARCIA were her top sub-recruiters, each bringing in about 7-8 people.  LAGO knew that PRYOR moved on to recruit for other clinics but that those seemed to fall through for PRYOR.

LAGO was aware of other recruiters at Simply Healthcare, including: MARIA LNU, MICHAEL MOGOLLON, MICHELLE LIZCANO, and MARIA RODRIGUEZ.

LAGO estimated that she was paid approximately $15,000 in total by JARI for her visits and recruiting efforts for RRCI/AA ORTIZ.

LAGO stopped recruiting for RRCI/AA ORTIZ and JARI for two reasons: they ran out of money and it became too risky.  One day, JARI asked LAGO to meet her at a park.  There she explained to LAGO that things got heated.  The doctor that RRCI was running under passed away but the NPI was still under his name.  The new owner went to Cuba and was trying to stay in Cuba.  The NPI was "hot" and it was too risky to continue, which was why they changed to AA ORTIZ.  Now there was no more money coming in.  JARI then directed LAGO to LA O.  JARI eventually quit and LAGO believed that she was working at another clinic on Sunset.

After LAGO's initial interview by the FBI, she was so scared that she cut all ties with the all clinics.  JARI and LAGO had developed a close relationship but LAGO stopped responding to her messages.  The last message she received from JARI was in approximately 2019.  JARI offered her work at another clinic but LAGO did not respond.

Agents showed LAGO of a list of the clinics that billed her insurance from 2016-2019 and asked LAGO to mark those which were fraudulent clinics.

PORRAS_00074355

FD-302a (Rev. 5-8-10)

████████████████

Continuation of FD-302 of  (U) Debrief of JEAN LAGO _____ , On  07/07/2021 ___ , Page   9 of 9

LAGO marked RRCI, AA ORTIZ, MEDIGLEZ WELLNESS CENTER INC, and FLORIDA HEALTH CARE FOR ALL INC (see attached 1A).

The following Florida state driver's license photographs were shown to LAGO:

- NELSON RODRIGUEZ (DOB ████████; SSAN ████████████) - positively identified
- JAROSLAVA RUIZ (DOB ████████; SSAN ████████) - positively identified
- ANISLEY GOMEZ ANUEZ (DOB ████████; SSAN ████████) - positively identified
- MICHAEL MOGOLLON - (DOB ████████; SSAN ████████) - positively identified
- MICHELLE LIZCANO (DOB ████████; SSAN ████████) - positively identified
- MARIA RODRIGUEZ (DOB ████████; SSAN ████████) - positively identified as a Simply Healthcare employee but not as a recruiter
- MARIA CHACON (DOB ████████; SSAN ████████) - positively identified as a Simply Healthcare employee but not as a recruiter
- MARIA MAGHELLA (DOB ████████; SSAN ████████) - positively identified as a Simply Healthcare employee but not as a recruiter

**MISCELLANEOUS**

LAGO advised that NELSON RODRIGUEZ first recruited her to visit FLORIDA HEALTHCARE FOR ALL INC.

[*Agent's Note: FLORIDA HEALTHCARE FOR ALL INC. was dismantled after the owners of the clinic pled guilty to one count of Conspiracy to Commit Health Care Fraud and were sentenced.*]

# COMPOSITE EXHIBIT 3

**Summary of Payments**

**Jaroslava Ruiz**

**Total $25,300**

**November 2017 – January 2019**

### DATA SUMMARY

| COUNT | DATES | NUMBER OF CHECKS | CHECK RECEIVED FROM | TOTAL AMOUNT |
|-------|-------|------------------|---------------------|--------------|
| 1 | November 2017 - June 2018 | 19 | Long Life Medical Services Inc | $11,000.00 |
| 2 | August 2018 - October 2018 | 9 | Ramirez Rehab Center Inc | $5,400.00 |
| 3 | October 2018 - January 2019 | 13 | AA Ortiz Medical Center Inc | $8,900.00 |
| | | | TOTAL AMOUNT RECEIVED | $25,300.00 |

### DATA DETAILS

| COUNT | DATE | CHECK RECEIVED FROM | PAID TO | AMOUNT |
|-------|------|---------------------|---------|--------|
| 1 | 11/22/2017 | Long Life Medical Services Inc | Jaroslava Ruiz | $400.00 |
| 2 | 11/28/2017 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 3 | 12/7/2017 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 4 | 12/14/2017 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 5 | 1/12/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $500.00 |
| 6 | 1/19/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $500.00 |
| 7 | 1/26/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 8 | 2/2/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 9 | 2/7/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 10 | 2/15/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 11 | 2/22/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 12 | 3/22/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 13 | 3/28/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 14 | 4/4/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 15 | 4/25/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 16 | 5/2/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 17 | 5/7/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 18 | 5/17/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 19 | 6/13/2018 | Long Life Medical Services Inc | Jaroslava Ruiz | $600.00 |
| 20 | 8/3/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 21 | 8/7/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 22 | 8/15/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 23 | 8/30/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 24 | 9/13/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 25 | 9/13/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 26 | 9/19/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 27 | 9/26/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 28 | 10/1/2018 | Ramirez Rehab Center Inc | Jaroslava Ruiz | $600.00 |
| 29 | 10/23/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 30 | 10/25/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $1,200.00 |
| 31 | 10/31/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 32 | 11/6/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 33 | 11/14/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 34 | 11/19/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 35 | 11/27/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 36 | 11/28/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $500.00 |
| 37 | 12/5/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |

GOVERNMENT
EXHIBIT
113
21-CR-20566-DLG

| 38 | 12/11/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 39 | 12/27/2018 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 40 | 1/3/2019 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $600.00 |
| 41 | 1/7/2019 | AA Ortiz Medical Center Inc | Jaroslava Ruiz | $1,200.00 |
| | | | TOTAL | $25,300.00 |

# COMPOSITE EXHIBIT 4

# COMPOSITE EXHIBIT 4(a)

FD-302 (Rev. 5-8-10)                                                          - 1 of 6 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/11/2022

    ANISLEY GOMEZ ANUEZ (ANUEZ), Social Security Account Number (SSAN) ████
████, date of birth (DOB) ████████████, was interviewed at the Federal
Bureau of Investigation (FBI) offices in Miramar, Florida.  Her attorney,
Arturo Taquechel, as well as Department of Justice Attorney Emily
Gurskis were also present for the interview.  After being advised of the
identities of the interviewing Agents, Carlos Torres, Lara Phillippe and
Mark George, and the nature of the interview, ANUEZ provided the following
information:

    ANUEZ's attorney began the interview by clarifying that the information
previously provided by ANUEZ in the post-arrest custodial interview was
incomplete and that they planned to rectify that in this interview.

    ANUEZ started working at the physical therapy clinic at 8260
W Flagler Street in Miami in August or September 2017.  When shown a
photograph of the building located at 8260 W Flagler Street,
ANUEZ positively identified it as the location of the clinic.  When ANUEZ
 arrived for her first day of work, she had no idea what she would be
doing.  She had received the job offer, but no job description.  The owner
of the clinic was JESUS PORRAS (PORRAS).  PORRAS instructed everyone on what
to do and liked to be there when the patients were coming in.

    PORRAS told her that he needed a medical assistant for the doctor who
could take the patient's vitals, but she reminded him that her license was
expired.  PORRAS told her not to worry; once he started paying her, she
could use the money to reactivate her license.  PORRAS paid her a salary of
$400 per week.  He later raised her salary to $500 per week.  She never did
reactivate her license.

    There was a short, blonde, overweight woman named DALIS [*ph*] Last Name
Unknown (LNU) who was the medical assistant. DALIS trained ANUEZ in how to

Investigation on  01/05/2022  at  Miramar, Florida, United States (In Person)

File #  ████████████                                          Date drafted  01/05/2022

by  PHILLIPPE LARA, Carlos H. Torres, MARK CLIFTON GEORGE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

PORRAS_0000075418

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of __(U) Anisley Gomez Anuez Proffer_____ , On _01/05/2022_ , Page _2 of 6_

be a medical assistant.  DALIS would handle the patients and instruct
ANUEZ on what to do with them.  However, ANUEZ did not work as the medical
assistant very often.  Rather, ANUEZ's job was to organize the patient files
that were a mess when she arrived in the office.

Another employee, JENNIFER VAZQUEZ PONCE DE LEON (JENNY), was the
receptionist at the clinic at 8260 W Flagler Street and handled most of the
paperwork.  When the office moved, JENNY worked at the new location for a
few days and then left.

Other employees who were at both clinics included Medical
Assistant JAROSLAVA RUIZ (RUIZ), Physical Therapy Assistant
KYRENIA MAQUEIRA, Biller MALVY DIAZ (DIAZ), and Doctor AURELIO ORTIZ
(ORTIZ).  ANUEZ never saw Doctor MANUEL FERNANDEZ GONZALEZ at the 8260
W Flagler Street clinic, but did see him once at the 8080 W Flagler Street
clinic.  LIDIA PEREZ (PEREZ) was not an employee but was always hanging
around the office.

At the end of September 2017, ANUEZ and her coworkers arrived at the
clinic to find that everything was locked down.  Her coworker, DIAZ, called
LIDIA RODRIGUEZ (LILI) and was told that PORRAS left for Cuba and that she
would contact her when he got back. ANUEZ did not work for a month and a
half.  PORRAS returned at the end of November and contacted ANUEZ and her
coworkers.  PORRAS told them that they could come back and resume operations
at 8080 W Flagler Street in Miami.

Once she started working at 8080 W Flagler Street, she took JENNY's place
as the receptionist.  Her job was to greet patients, make copies of
insurance and IDs, handle basic paperwork, and check to make sure that their
insurance was good.  PORRAS raised her salary to $600 per week.  PORRAS may
have paid her in cash once, but always paid her by check.

Prior to a patient coming in to the clinic, PORRAS would run their
insurance information on the computer to see if the insurance was good.  He
would give ANUEZ the information so that when the patients arrived, she had
everything she needed.  PORRAS eventually taught ANUEZ how to check the
patient's information on the computer.  He trained her to specifically go to
the section in their insurance about therapy to see if the patient qualified
for therapy and if so, how many sessions.  Once ANUEZ started checking the

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Anisley Gomez Anuez Proffer _____ , On 01/05/2022 , Page  3 of 6

insurance information of the patients, she would provide the information to PORRAS and also put it in the patient chart.

LILI would send patients to PORRAS' clinic.  ANUEZ knew this because the patients would tell her that LILI sent them.  These patients all came from the airport.

After ANUEZ checked a patient's insurance and had them fill out basic paperwork, the patient went to the back room to supposedly see the doctor. RUIZ coached her in telling the patient to sign each page of the paperwork and instructed her to tell the patients not to put dates.  ANUEZ witnessed RUIZ providing blank therapy forms for the patients to sign. ANUEZ sometimes did this as well.

Most of the time, RUIZ  handled the patients one-on-one.  RUIZ spoke English really well so she dealt with the patients who did not speak Spanish.  RUIZ also handled all of the paperwork and licenses for the clinic.  ANUEZ and RUIZ were at work every day so they talked every day. However, things did not end well and RUIZ later left the clinic in January 2019, prior to PORRAS leaving again for Cuba.  ANUEZ was not aware that RUIZ had moved out of Florida.

While RUIZ was still working at the clinic, RUIZ filled out the blank therapy forms with the modalities and locations of pain.  DIAZ would give the superbills to RUIZ to fill out and then either RUIZ or ANUZ would fax the information back to DIAZ so that DIAZ could submit the superbills for payment.

PORRAS gave ANUEZ white or yellow envelopes with cash for the patients. ANUEZ knew there was cash in the envelopes because she saw PORRAS put the money in them.  ANUEZ kept the envelopes at the front desk and placed a sticker with the patient's names on the envelopes so that she would know who to give the envelopes to when they arrived.  When PORRAS was not around, LILI would put together the envelopes.  ANUEZ never saw LILI put money in the envelopes, but the type of envelopes and the process were the same as when PORRAS did it.

ANUEZ once saw RUIZ give the same type of envelope to JEAN LAGO (LAGO). ANUEZ knew LAGO as a one-time patient turned recruiter.  LAGO spoke Spanish with ANUEZ but English with RUIZ.  RUIZ and LAGO were very close.  RUIZ

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Anisley Gomez Anuez Proffer _____ , On 01/05/2022 , Page 4 of 6

would tell ANUEZ how many patients LAGO would bring in, but LAGO did not accompany the patients to the clinic.  LAGO would come later that day or the next day to collect money.  One time, ANUEZ needed to get to the bank before closing to cash her check and asked LAGO to meet her there in order to give her one of the envelopes from PORRAS.  The envelopes for LAGO were thicker than average but ANUEZ never knew how much everyone was receiving.

ANUEZ never witnessed PORRAS, LILI or RUIZ pay patients or recruiters with anything but cash.  ANUEZ never saw PEREZ pay patients or recruiters at all.  ANUEZ did not have any firsthand knowledge, nor did she ever overhear anyone say why they were paying patients.  There was also a female who came in a few times to drop off money for PORRAS, but ANUEZ did not know who she was.

Patients who came to the clinics never received treatment.  ANUEZ knew this because she never saw patients come to the clinics more than once.  The PTA, MAQUEIRA, only came to the clinic once per week to sign patient forms and collect her paycheck - not to see patients.  Either RUIZ or ANUEZ would call MAQUEIRA to come in.

Additionally, PORRAS called ORTIZ two or three times a week to come in, but he was not there as often as the patients were there.  In fact, ANUEZ noticed that ORTIZ saw very few patients but spent a lot of time writing patient plans of care and signing papers when he came in.  ORTIZ was very old and did not drive, so either PORRAS would pick him up to come into the clinic or his wife, SONIA ORTIZ (SONIA), would drop him off.  When SONIA dropped off ORTIZ, ANUEZ would have to go down to help him up to the office.  SONIA did not come up to the clinic.  ANUEZ had ORTIZ's phone number as ████████████  and SONIA's phone number as ████████████.  ANUEZ saw PORRAS give both checks and cash to ORTIZ.

PORRAS also called OSVALDO ALVAREZ (ALVAREZ) to see come see patients.  ALVAREZ was not a doctor, and ANUEZ did not know if he had any other medical licenses or training, but he instructed the employees to take vitals of the patients.  ALVAREZ would come in the afternoon to fill out paperwork and then ORTIZ would sign the paperwork.  PORRAS paid ALVAREZ by check.

Since PORRAS and ANUEZ were at the clinic every day, their communication was almost entirely face-to-face.  ANUEZ did have his number saved in her

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Anisley Gomez Anuez Proffer _____ ,On 01/05/2022 , Page 5 of 6

phone as "JESUS TRABAJO MALVY" ███████████ and also "JESUS WORK NEW" ████
██████. ANUEZ has not heard from him recently and did not have any text
messages from him saved.

There was another recruiter and although ANUEZ did not know his name, she
knew that he was from the airport. He provided patients from the airport.
Other patients who came to the clinic worked at an insurance company
nearby.

When PORRAS left for Cuba the second time and did not come back, LILI
assumed responsibility of the clinic alongside JUAN LANDA (LANDA), who was
related to PORRAS. LILI told ANUEZ that they had to keep the clinic open
because closing it would trigger an inspection from insurance. However,
LILI was going to run everything from her own clinic located at 4790 NW 7th
Street in Miami. Since LILI had her own people to run the operations, ANUEZ
would still show up for work but did not have anything to do. ANUEZ never
worked at LILI's clinic. LILI lowered her salary to $500 per week since she
did not want to pay her for not doing work. LILI believed that PORRAS was
going to come back and when he did not come back, LILI let ANUEZ go.

ALVAREZ and ORTIZ went to LILI's clinic to do the patient paperwork and
when everything was ready, they would bring the paperwork to ANUEZ or DIAZ
to bill.

LANDA provided envelopes of money to recruiters and patients. He would
also tell ANUEZ which patients were going to come in to the clinic. Prior
to taking over operations with LILI, ANUEZ always saw LANDA with PORRAS.

ANUEZ was shown a series of Florida State driver's license photographs
and provided the following identifications and information:

- JENNIFER VAZQUEZ PONCE DE LEON - positive ID
- AURELIO ORTIZ SR - positive ID
- MANUEL GONZALEZ FERNANDEZ - positive ID
- OSVALDO ALVAREZ - positive ID
- JEAN LAGO - positive ID
- JUAN CARLOS LANDA - positive ID
- KENDRY MANUEL TURINO - identified as either the nephew or cousin of
  PORRAS; ANUEZ only saw him a few times
- DELVIS LOPEZ - identified as a girlfriend of PORRAS; she once brought a
  yellow envelope to PORRAS
- YANET LOPEZ - did not identify

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Anisley Gomez Anuez Proffer                    ,On  01/05/2022  ,Page  6 of 6

- LUIS LOPEZ - positive ID
- LETICIA HERNANDEZ - identified as LILI's sister who worked at LILI's clinic; ANUEZ did not know if she knew about the fraud
- PIERRE CLERMONT - did not identify
- RAFAEL VILLA - identified as "ABRAHAM," phone number 786-587-2666; ABRAHAM would bring the results of the patients tests to the clinic but the results were never given to the patients
- JESUS PORRAS ESPINOSA - identified as PORRAS' son
- AURELIO ORTIZ JR - did not identify

ANUEZ has not been contacted by anyone from the clinics since her arrest.

There was never any construction or remodeling on either of the offices belonging to PORRAS.

# COMPOSITE EXHIBIT 4(b)

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**OFFICIAL RECORD**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___06/18/2020___

CLARISSA LATIFE AZAR (AZAR), Social Security Number ▮▮▮▮▮▮▮ date of birth (▮▮▮▮▮▮▮▮, cellular phone number ▮▮▮▮▮▮▮, who resides at 3501 SW 4th Street, Miami, Florida 33135, was interviewed at her residence. Present for the interview were Federal Bureau of Investigation (FBI) Special Agents (SAs) Carlos H. Torres and Kristin Chandler. After being advised of the identities of the interviewing Agents and the nature of the interview, AZAR provided the following information:

AZAR is currently married with six children. Her husband's name is EDUARDO PASTRANO. She has been working for SIMPLY HEALTHCARE for three years as a Member Services Representative. Since the birth of her first child she has had problems with her back. She has received physical therapy (PT) at a clinic on Flagler street. She currently has no other medical conditions.

AZAR was once recruited by two co-workers named MICHAEL and ALBERTO to go to a clinic located near 57th Avenue and 7th street in exchange for $950.00 US dollars. She accepted the offer and visited the clinic once. She met MICHAEL at the clinic. While there, she saw a Dominican male doctor who conducted a medical background examination. MICHAEL and ALBERTO instructed her what to tell the doctor. She received no other medical treatment. AZAR stated that the male doctor was aware of the scheme as he pushed her to say that she had pain in certain areas of her body after she had previously told him she had no pain. MICHAEL paid her $950.00 in cash. She visited the clinic approximately three months after May 2017.

About six or seven months later, AZAR was once again recruited by MICHAEL and ALBERTO to go the same clinic on 7th street. This time she was offered $1,100 US dollars. As before, MICHAEL met her at the clinic and ALBERTO stayed inside the car. A male therapist provided her with forms to sign and instructed her not to put the date on the forms. She also met a female employee named LISSETTE who instructed her what to tell the doctor.

Investigation on ___06/17/2020___ at   Miami, Florida, United States (In Person)

File # ▮▮▮▮▮▮▮▮                                              Date drafted  06/18/2020

by  Carlos H. Torres, CHANDLER KRISTIN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_0000077742

FD-302a (Rev. 5-8-10)

████████████████

Continuation of FD-302 of  (U) Interview of CLARISSA LATIFE AZAR          , On  06/17/2020  , Page   2 of 2

MICHAEL paid her $950.00 in cash the day after her visit, while at work. ALBERTO was present when MICHAEL paid her. They provided no explanation as to why she received $150.00 less than the agreed upon amount.

AZAR reiterated that she visited the clinic a total of two times in a span of six to seven months and was paid after each visit. She met with the same Dominican doctor both times and received no PT. She also provided her insurance information via text to MICHAEL prior to her visits. (**According to medical data provided by Blue Cross Blue Shield, QUALITY PROFESSIONAL HEALTHCARE CORP. (QPHC) billed AZAR's insurance for a total of 95 PT sessions between 07/20/2017-10/26/2018**).

AZAR was shown surveillance exterior photos of the building where QPHC is located and she identified as the building as where the clinic she visited is located.

AZAR was shown the following Florida drivers licenses:

MICHAEL MARCELUS MOGOLLON, ███████████████████████. She identified him as her former co-worker, MICHAEL, who recruited and paid her both times for going to the clinic on 7th street. His phone number is ██████ ████████.

ALBERTO MARTINEZ, SSN ████████████████ She identified him as her former co-wormer, ALBERTO, who recruited her to go to the clinic on 7th street and was present when MICHAEL paid her the second time. His phone number is ███████████.

Dr. FAUSTO P. CASTILLO, ████████████████████. She identified him as the male doctor who saw her at the aforementioned clinic.

LISVET ALVAREZ RODRIGUEZ, ███████████████████. She identified her as an employee from the clinic named LISSETTE who instructed her what to tell the doctor during her second visit.

AZAR sent the writer a photo of MICHAEL and his wife which has been attached to this report.

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry ___09/14/2020___

    CLARISSA LATIFE AZAR (AZAR), social security account number ████████ ████ date of birth (████████████ cellular phone number ████ ████, home address ████████████████████████, email address c████████████, was interviewed at her residence. Present for the interview were Federal Bureau of Investigation (FBI) Special Agents Kristin Chandler and Kristin Mesa. After being advised of the identities of the interviewing Agents and the nature of the interview, AZAR provided the following information:

    AZAR was shown a photograph of the outside of the building in which LA O MEDICAL WELLNESS CENTER INC (LA O) is located. AZAR identified the clinic in the photograph as LA O, a physical therapy (PT) clinic at which she received treatment. She also recalled that the clinic was located on the second floor of the building. AZAR visited LA O in 2019 and 2020, approximately three or four times overall. AZAR stated that only one of those visits was in 2020. While at the clinic, AZAR received PT from a male physical therapist who she described as older, heavier, Hispanic, and black-haired. AZAR was then shown a Florida drivers license photograph of KARINA ANDREA ANTONIONE (ANTONIONE), ████████████████████████████. AZAR identified ANTONIONE as the female physical therapist who performed her PT evaluation. She only saw ANTONIONE once.

[Agent Note: According to medical data provided by BLUE CROSS BLUE SHIELD, LA O billed AZAR's medical insurance for 57 PT sessions between 06/12/2019-12/03/2019 and 43 PT sessions between 01/22/2020-06/12/2020.]

    AZAR stated that she did not visit the clinic 100 times. In fact, a female employee named DALGI called AZAR and told her that the clinic was "dismissing her case." AZAR believed that the last time she visited LA O was in April 2020. AZAR was shown a Florida drivers license photograph of DALGI OQUENDO (DALGI), ████████████████, DOB ████████ who she identified as

---

Investigation on ___09/09/2020___ at ___Miami, Florida, United States (In Person)___

File # ████████████    Date drafted ___09/09/2020___

by ___CHANDLER KRISTIN, MESA KRISTIN ELIZABETH___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of  (U) Interview of CLARISSA LATIFE AZAR            , On  09/09/2020    , Page   2 of 2

DALGI. DALGI provided AZAR with paperwork to sign and coordinated her office
visits. AZAR also signed paperwork with the male physical therapist
following each PT session. Additionally, AZAR recalled seeing a female
receptionist at the clinic who she described as overweight with a ponytail.

   AZAR explained that she found LA O through GOOGLE as it was located close
to her place of employment, SIMPLY HEALTHCARE (SIMPLY). AZAR also
recommended the clinic to her husband, EDUARDO PASTRANA (EDUARDO), and her
sister-in-law, JANY PASTRANA (JANY). EDUARDO is covered under AZAR's medical
insurance plan. AZAR believed that she and EDUARDO went to the clinic
together each time. Further, she stated that JANY may have accompanied her
to LA O one time. AZAR also recalled visiting the clinic with a co-worker,
HANNY.

   Once at the clinic, DALGI referred AZAR to DR. FERNANDEZ, whose office
was located in the first floor of the same building as LA O. AZAR was shown
a Florida drivers license photograph of MANUEL ANTONIO FERNANDEZ-GONZALEZ
(DR.FERNANDEZ), ██████████████████████████. AZAR identified the
individual in the photograph as DR. FERNANDEZ, who became her primary
doctor. AZAR described her visits with DR.FERNANDEZ as routine, involving
medical questions and exams. DR.FERNANDEZ then provided AZAR with a
prescription for PT at LA O.

   AZAR was shown a Florida drivers license photograph of JEAN LAGO (LAGO),
████████████████████. AZAR identified the individual in the
photograph as JEAN, her former manager at SIMPLY. AZAR stated that she has
never been recruited by LAGO to visit a clinic, nor has she ever received
money from LAGO. AZAR has, however, heard co-workers talk about LAGO in
regards to recruitment. AZAR provided Agents with her husband's cellular
telephone number, ████████████.

   All photographs shown to AZAR have been attached to this report.

FD-302 (Rev. 5-8-10)

- 1 of 8 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _08/27/2021_

CLARISSA AZAR (AZAR), Social Security Account Number (SSAN) ██████████, date of birth (DOB) ███████████, was interviewed at the Federal Bureau of Investigation (FBI) office located in Miramar, FL. Present for the interview were FBI Special Agents Kristin Chandler, Olivia Medlin, and Lara Phillippe. DOJ Attorney Emily Gurskis and AZAR's defense attorneys, Abigail Becker and Sogol Ghomeshi, were also present. After being advised of the identities of the interviewing Agents and the nature of the interview, AZAR provided the following information:

**LA O MEDICAL WELLNESS CENTER INC**

AZAR admitted to her role as a patient recruiter in the health care fraud scheme at LA O MEDICAL WELLNESS CENTER INC (LA O). AZAR was shown a photograph of the outside of the building in which LA O was located. AZAR recognized the building and stated that the clinic was located on the second floor. Additionally, she stated that LA O used to be located at another location originally, perhaps on 8th Street. AZAR visited LA O at both locations. AZAR first heard about the clinic from JEAN LAGO (LAGO). LAGO offered AZAR $1,500 to go to the clinic in exchange for providing her insurance information and signing paperwork. LAGO told AZAR that she needed a referral for physical therapy (PT) from a primary doctor. AZAR agreed and sent her insurance card and drivers license to LAGO via text message.

LAGO told AZAR what day and time to visit the clinic. She also provided AZAR with the address and told her to ask for DALGI when she arrived. LAGO instructed her to tell DALGI that JEAN sent her. AZAR spoke with a co-worker, HANNY LUGO (LUGO), about the fact that LAGO had recruited her as well, in exchange for $1,500. Thus, AZAR and LUGO went to get the PT referral from a doctor together. AZAR told LAGO that she could not get an appointment with her primary doctor and as a result, LAGO sent her to another doctor, MANUEL VALENTIN FEIJOO (FEIJOO). FEIJOO's office was located

Investigation on _08/19/2021_ at _Miramar, Florida, United States (In Person)_

File # ████████████████████████████████     Date drafted _08/19/2021_

by _CHANDLER KRISTIN, PHILLIPPE LARA, Olivia J. Medlin_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_00074263

FD-302a (Rev. 5-8-10)

█████████████████

Continuation of FD-302 of (U) Debrief of CLARISSA AZAR _____ , On 08/19/2021 , Page 2 of 8

at 8370 SW 8th Street, Miami, FL 33144. AZAR recalled that FEIJOO did a joint consultation with her and LUGO. He coerced her into saying that she experienced pain when performing certain activities. For example, FEIJOO would say "It hurts when you sit down right?" and AZAR would reply yes.

After a brief exam, AZAR received a prescription for PT and pain medication from FEIJOO. The following day she and LUGO visited LA O. When they arrived they met a receptionist who she described as heavy and older, with dark hair. The receptionist provided them with patient intake paperwork to fill out. DALGI asked who referred them and AZAR replied "JEAN." DALGI then told them that they had to see the Physical Therapist for an evaluation. AZAR and LUGO met with a female Physical Therapist separately. AZAR was shown a photograph of KARINA ANDREA ANTONIONE (ANTONIONE), SSAN ████████████, DOB ████████████, who she positively identified as the Physical Therapist. ANTONIONE asked her questions, which AZAR described as leading, similar to FEIJOO. ANTONIONE saw her multiple times for evaluations, yet never asked about her progress or the PT that she was supposedly receiving.

AZAR and LUGO then left the clinic. They did not receive any treatment that day. DALGI told them that they needed to come back the following day to sign paperwork. Thus, AZAR and LUGO returned the following day and signed the PT forms. AZAR recalled that it was about five or six forms, enough for the week. DALGI instructed them to return once a week just to sign the paperwork. DALGI explained that she had cameras in the office and therefore, they would capture that patients were at least coming to the clinic. After completing the paperwork, DALGI called LAGO in front of AZAR and LUGO to tell her that they had finished the process. DALGI also told AZAR and LUGO that LAGO should pay them that same day.

AZAR texted LAGO asking when they could meet for the payment. LAGO was upset that DALGI had called her to tell her that they were done. AZAR explained that they didn't tell DALGI to call, she just did it on her own. AZAR later met LAGO outside work and was paid $1,500 cash by LAGO. AZAR asked LUGO if she had received her money and LUGO replied affirmatively. While at the office, DALGI told AZAR and LUGO that she pays $2,000 if you come to her directly.

Approximately four months later, AZAR text messaged DALGI and asked if

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of  (U) Debrief of CLARISSA AZAR _____ , On  08/19/2021 , Page   3 of 8

she could return to the clinic. AZAR explained that she went to DALGI
instead of LAGO because she was offering more money. DALGI gave AZAR the new
address for the clinic, 9600 SW 8th Street. DALGI told AZAR that she would
have to repeat the same three step process: get a PT referral from a doctor,
see the Physical Therapist for an evaluation, and sign paperwork. Thus, AZAR
went with LUGO again to see FEIJOO. FEIJOO asked leading questions once
again. The following day, AZAR and LUGO went to LA O, filled out patient
forms given to them by the same receptionist, and saw the Physical Therapist
for an evaluation. AZAR and LUGO then returned the next day to complete the
PT paperwork. DALGI always provided them with the PT forms. DALGI paid AZAR
and LUGO, separately, $2,000 cash, in her back office. DALGI told them to
send her people as she pays $2,000 for each patient. The patients, however,
had to be PPO patients.

AZAR then began sending people to LA O. The first person she recruited
was JULIE TETE (TETE). She explained the process to TETE and sent her
insurance card and drivers license to DALGI. DALGI told AZAR that TETE
didn't qualify as her deductible was too high. AZAR stated that one day when
she went to sign paperwork at the clinic, she saw TETE and LUGO there. TETE
told her that LUGO texted DALGI on her behalf and she was now able to go to
the clinic because she lowered her deductible. AZAR did not pay TETE.

AZAR then recruited her sister-in-law, JANY PASTRANA (PASTRANA).
PASTRANA told AZAR that she was previously recruited by LAGO to visit
another clinic and asked if she knew of any clinics she could go to. AZAR
then sent PASTRANA's insurance card and drivers license to DALGI. AZAR told
PASTRANA when to go to the clinic and she went to the clinic alone. AZAR
recalled that a doctor examined PASTRANA at LA O, she didn't have to go
elsewhere for a referral. DALGI paid PASTRANA $2,000 cash. DALGI never told
AZAR that she needed to pay her own patients.

AZAR then recruited her husband, EDUARDO PASTRANA (EDUARDO). She told him
about the kickback and they went to the clinic together. EDUARDO was on
AZAR's medical insurance at this time. AZAR also went again as a patient.
DALGI paid AZAR and EDUARDO together in her back office. She had a safe
there. DALGI told AZAR to let her know if her husband goes away because he
was a Truck Driver. AZAR recalled telling her days that he was away. After
her husband, AZAR sent KIMBERLY to the clinic. PASTRANA told AZAR that
KIMBERLY was looking for somewhere to go and thus, she sent her insurance

PORRAS_00074265

FD-302a (Rev. 5-8-10)

██████████████

Continuation of FD-302 of  (U) Debrief of CLARISSA AZAR                           , On  08/19/2021 , Page  4 of 8

information and drivers license to DALGI. AZAR went with KIMBERLY to the clinic. DALGI instructed AZAR to tell KIMBERLY that she needed to tell the Physical Therapist that she experienced pain in her shoulder and lower back. AZAR attempted to coach KIMBERLY, but KIMBERLY stated that she already knew how it worked. DALGI paid AZAR the $2,000 for KIMBERLY. AZAR kept $500 for herself and paid KIMBERLY $1,500.

Additionally, AZAR stated that she recruited another co-worker named YAMEL. She received her insurance card and was going to forward it to DALGI, however, YAMEL told her not to because she and her sister got into a car accident and they were going to go somewhere else. AZAR deleted the information and was not aware that YAMEL went to the clinic. She did not pay YAMEL, but she offered her the $2,000.

AZAR advised that DALGI also approached her about recruiting Medicare patients. DALGI offered her $100 for the referral and the patient would receive $50. AZAR did not send anyone with Medicare. AZAR saw elderly people at the clinic often hanging out, eating, or listening to music. AZAR believed that DALGI was billing for services not provided as she overheard a conversation between ANTONIONE and DALGI. ANTONIONE asked what to bill for a specific patient and DALGI replied to just put down that they did an evaluation and that he had schizophrenia. DALGI told AZAR that her son drove the van that transported the elderly patients from their homes to the clinic and back. Further, DALGI asked if AZAR could help her get a provider number from SIMPLY HEALTHCARE because they wouldn't give her one. AZAR declined the request.

AZAR went to LA O for three cycles. For each cycle, she visited the clinic approximately four or five times just to complete DALGI's process and sign paperwork. She did not receive any treatment at the clinic. AZAR asked if she could receive PT, but to no avail. DALGI once introduced AZAR to a male named FRANK. AZAR described FRANK as tan, older, in his 40's or 50's, with dark hair, and always wearing a leather jacket. DALGI told AZAR that FRANK was the one who has been doing her PT, in case things go bad. AZAR believed that the last time she went to LA O was in May 2020. DALGI told her that she was not cooperating with the treatment and thus, she could not come to the clinic anymore.

[Agent Note: According to medical data provided by BLUE CROSS BLUE SHIELD,

PORRAS_00074266

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Debrief of CLARISSA AZAR _____, On 08/19/2021 , Page 5 of 8

LA O billed AZAR's medical insurance for 57 visits consisting of PT and a PT evaluation between 06/12/2019-12/03/2019 and 43 visits consisting of PT and a PT re-evaluation between 01/22/2020-06/12/2020.]

AZAR was shown the following DAVID photographs and made the below identifications:

JEAN LAGO, SSAN ████████, DOB: ████████: Identified as JEAN LAGO.

MANUEL FEIJOO, SSAN ████████, DOB ████████: Not identified.

OMAR SIMPSON, SSAN ████████, DOB ████████: Not identified.

HANNY LUGO, SSAN ████████, DOB ████████: Identified as HANNY LUGO.

KIMBERLY DE JESUS SEQUEDA, SSAN ████████, DOB ████████: Identified as KIMBERLY.

JULIE TETE, SSAN ████████, DOB ████████: Identified as JULIE TETE.

YAMEL TAVERAS, SSAN ████████, DOB ████████: Identified as YAMEL.

DALGI OQUENDO, SSAN ████████, DOB ████████: Identified as DALGI.

DINORAH CONDE, SSAN ████████, dOB ████████: Identified as the receptionist at work.

JANY PASTRANA, SSAN ████████, DOB ████████: Identified as her sister-in-law, JANY.

ISAEL OLANO, SSAN ████████, DOB ████████: Identified as DALGI's husband. He drove a white Mercedes. AZAR did not speak to him much but saw him lingering around the clinic, not doing anything. DALGI once told her that he was her husband. He was present one time when DALGI paid her.

EDUARDO PASTRANA JR, SSAN ████████, DOB ████████: Identified as her husband.

MANUEL FERNANDEZ-GONZALEZ, SSAN ████████, DOB ████████: Identified as a doctor she saw one time for a referral to LA O because FEIJOO wasn't available.

**RAMIREZ REHAB CENTER INC ET AL**

FD-302a (Rev. 5-8-10)

███████████

Continuation of FD-302 of  (U) Debrief of CLARISSA AZAR                          , On  08/19/2021 , Page   6 of 8

In approximately 2018, AZAR was approached by LAGO and offered $1,000 to go to a clinic. Although AZAR suffered from scoliosis, AZAR would not have sought out a place for physical therapy or treatment if LAGO had not approached her. AZAR did not feel that she had a medical need to go to the clinic.

AZAR provided LAGO with her insurance card and ID via text, and LAGO set up the appointment and gave her the address. When shown Google maps photographs of RAMIREZ REHAB CENTER INC (RRC)/LONG LIFE MEDICAL CENTER INC (LONG LIFE), AZAR recognized the building but indicated that it was not the location that LAGO gave her (photographs are maintained in the case file as 1D1). When shown Google maps photographs of AA ORTIZ MEDICAL CENTER INC (AA ORTIZ)/PEREZ MEDICAL CENTER INC (PMC) located at 8080 W Flagler Street in Miami, AZAR positively identified it as the clinic LAGO sent her to and indicated that the office was on the 2nd or 3rd floor.

When AZAR arrived at the clinic for her appointment, the door was locked. When she knocked, the individuals inside the clinic seemed freaked out that she was there until she told them that LAGO had sent her. At that point, they relaxed a little. A blonde Hispanic woman working at the front desk gave her a large pile of paperwork to sign and told her not to date the forms. When shown a Florida driver's license photograph of JAROSLAVA RUIZ (RUIZ), AZAR positively identified her as the blonde Hispanic woman.

There were no other patients at the clinic. There were two other female workers there, but no male employees. AZAR did not see or visit with a doctor or therapist and received no treatment. AZAR estimated that the entire visit took about seven minutes. AZAR only went to the clinic that one time.

[*Agent's Note: According to medical claims records for AZAR, RRC billed Blue Cross Blue Shield for 38 visits between 4/17/2018 – 6/29/2018. Claims included electrical stimulation, ultrasound, nerve conduction studies, physical therapy, x-ray, electrocardiogram, and a back brace.*]

LAGO paid AZAR in cash the next day at work. LAGO did not approach her about going back to the clinic or offer her a referral incentive. AZAR later overheard LAGO and another coworker, RENEE PRYOR, discussing AA ORTIZ/PMC at work. AZAR noted that they were talking about how the clinic

PORRAS_00074268

FD-302a (Rev. 5-8-10)

████████████████

Continuation of FD-302 of  (U) Debrief of CLARISSA AZAR _____ , On  08/19/2021 , Page  7 of 8

had closed down.

## OTHER CLINICS

LAGO approached AZAR later about going to an allergy clinic located on Okeechobee and Hialeah in exchange for $1,000. AZAR went through the same process for setting up an appointment through LAGO and went to the clinic one time. At the clinic, AZAR filled out the new patient paperwork and saw a doctor, Dr. FAUSTO. Dr. FAUSTO asked her leading questions about her allergies and drew a blood sample. AZAR then saw a female nurse who conducted the allergy test on her. AZAR never received the results of the test, even though she had minor allergic reactions to it. LAGO paid AZAR $1,000 cash the next day.

AZAR was also approached by a coworker, MICHAEL MOGOLLON (MOGOLLON), about going to a clinic located on 57th & 7th in exchange for $1,500. AZAR texted him her insurance and ID, and he set her up with an appointment. At the clinic, a male front desk employee gave her paperwork to sign. AZAR noticed a plaque indicated that the Medical Director was Dr. FAUSTO, but did not see the doctor there.

After leaving the clinic, AZAR texted MOGOLLON about getting paid. MOGOLLON indicated that there was a problem with paying her, but in the end, gave her $800 cash. AZAR referred her coworker, ANDRE GAUDIN (GAUDIN), to the clinic. The same sort of trouble occurred after GAUDIN went to the clinic, and MOGOLLON only paid GAUDIN $800 instead of the promised $1,500.

AZAR's coworker, ALBERTO LNU, worked closely with MOGOLLON. AZAR also knew that a man named ANDRES LNU, either owned the clinic or at least knew about the scheme.

In total, AZAR visited five fraudulent clinics:

1. Quality Professional (referred by MOGOLLON)
2. AA ORTIZ/PMC (referred by LAGO)
3. The allergy clinic on Okeechobee and Hialeah (referred by LAGO)
4. Clinic on 57th and 7th (referred by MOGOLLON)
5. La O (referred by LAGO)

AZAR was shown the following Florida driver's license photographs:

- JAROSLAVA RUIZ (SSN ██████████; DOB ██████████) - positively identified

PORRAS_00074269

FD-302a (Rev. 5-8-10)



Continuation of FD-302 of <u>(U) Debrief of CLARISSA AZAR</u>, On <u>08/19/2021</u>, Page <u>8 of 8</u>

- RENEE PRYOR (SSN ; DOB ) - positively identified
- MICHAEL MOGOLLON (SSN ; DOB ) - positively identified
- ANDRE GAUDIN (SSN ; DOB ) - positively identified

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _08/27/2021_

On August 25, 2021, the writer, without disclosing the identity of the individual depicted in the photograph, sent a photograph of FRANCISCO ANGULO (ANGULO), ██████████ DOB ████████, to CLARISSA AZAR (AZAR), via her attorney's, Abigail Becker, email.

AZAR did not positively identify ANGULO. AZAR stated that the individual in the photograph looked familiar, but she was not 100% sure that she knew him.

Investigation on  08/25/2021  at  Miramar, Florida, United States (Email)

File # ████████████████                                  Date drafted 08/26/2021

by  CHANDLER KRISTIN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_0000077734

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___07/25/2022___

        CLARISSA LATIFE AZAR (AZAR), social security account number
████████████████████████████, was interviewed virtually.
Present for the interview was Abigail Becker, Department of Justice (DOJ)
Attorneys Emily Gurskis and Patrick Queenan, and Federal Bureau of
Investigation (FBI) Special Agents (SAs) Lara Phillippe and Mark George.
After being advised of the identities of the interviewing Agents and the
nature of the interview, AZAR provided the following information:

        AZAR had six more months to serve, which she was serving at home on house
arrest, and was looking for work.  She needed to work because she had six
children, ages 16, 13, 11, 10, 9 and 7 for which she needed to provide.

        AZAR previously worked as a Member Services Representative for Simply
Healthcare.  Her duties included answering the phone and helping members
with requests regarding insurance, changing doctors, or billing issues. She
was considered "customer care."  AZAR made approximately $15 per hour.
While working for Simply Healthcare, her insurance provider was Blue Cross
Blue Shield.

        JEAN LAGO (LAGO) recruited AZAR to go to RAMIREZ REHAB CENTER INC (RRC)
first, then LA O MEDICAL WELLNESS CENTER INC, and one other clinic in
Hialeah.  AZAR also went to another clinic with MICHAEL MOGOLLON and ALBERTO
LNU but did not remember the name.  AZAR was not aware that anyone else at
Simply Healthcare was going to RRC as a patient. However, Simply Healthcare
had approximately 100+ employees and going to clinics in exchange for money
was a common conversation among the employees.

        LAGO was eventually AZAR's manager at Simply Healthcare but was not her
manager at the time that she recruited AZAR.  LAGO recruited AZAR to go to
RRC because she knew that AZAR needed money.  In addition to having six
children to care for, AZAR was having issues at the time with her oldest
daughter involving hospital visits and the Baker Act.

        LAGO called AZAR to her desk and offered payment to go to a physical
therapy clinic.  AZAR texted LAGO photographs of her insurance card and ID.
AZAR's insurance plan did not have a copay; rather AZAR had to pay out of

Investigation on ___07/14/2022___ at  Miami, Florida, United States (Phone)

File # ████████████████████                                    Date drafted ___07/15/2022___

by  PHILLIPPE LARA, MARK CLIFTON GEORGE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

████████████

Continuation of FD-302 of  (U) Interview of Clarissa Azar_____, On  07/14/2022 , Page  2 of 2

pocket.  However, AZAR did not pay anything when she went to RRC.

RRC's office was at 8080 West Flagler Street in Miami on the second floor.  When AZAR arrived , the door was locked and she had to knock.  When the door opened, the people inside looked shocked that she was there, and were "shady" about who she was and why she was there.  AZAR told them LAGO sent her and they let her in.

A blonde woman, who AZAR previously identified as JAROSLAVA RUIZ (RUIZ), sent her to a back room with a big stack of paperwork to sign.  RUIZ instructed her not to date the forms.  AZAR and RUIZ conversed in Spanish. RUIZ never asked for, nor did AZAR ever give RUIZ her insurance card or ID. AZAR did not fill out new patient forms, nor did she receive any treatment.

In addition to RUIZ, AZAR noticed a male and another female in the office.  AZAR felt that they all were in a rush and wanted her out of there as soon as possible.  AZAR estimated that she was in the office approximately seven minutes.

AZAR previously worked for a clinic and they never locked the door to the clinic, even for lunch.  Additionally, AZAR and her husband visited physical therapy clinics in the past to receive treatment.  The physical therapy clinics had machines and places for massages but RRC had none of those things.  Additionally, the staff was in plain clothes.

LAGO paid AZAR $1,000 cash, which LAGO left at AZAR's desk the day after she went to RRC.  AZAR was behind on her payments and so used the money to pay her rent.

# COMPOSITE EXHIBIT 4(c)

- 1 of 2 -

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    12/14/2020

    JILIANETTE GAVARRETE (GAVARRETE), date of birth (DOB) ████████,
Social Security Number ████████, cell phone number ████████,
residence of ████████████████████████, was
interviewed at her residence.  After being advised of the identities of the
interviewing Agents, Lara Phillippe and Kristin Chandler, and the nature of
the interview, GAVARRETE provided the following information:

    GAVARRETE worked for SIMPLY HEALTHCARE (SIMPLY) in Customer Service for
five years before working for ANTHEM HEALTH PLANS.  GAVARRETE was in an
accident in 2016 or 2017.  While working for SIMPLY, one of her coworkers,
CARLOS MONTERRO (MONTERRO), offered her $800-1,000 to go to a clinic for
physical therapy (PT).  GAVARRETE believed MONTERRO knew the Office Manager
at the clinic because he talked about her as if he knew her personally.
When shown photos of RAMIREZ REHAB CENTER INC (RRC) (maintained in the case
file as 1C1), GAVARRETE identified the location as the clinic that
MONTERRO offered her money to visit.

    GAVARRETE went to RRC two times.  On the first visit, a Hispanic woman in
her 30s-40s had her sign a lot of paperwork.  The woman, who
GAVARRETE believed was the Office Manager, instructed her not to put dates
on the forms.  Another Hispanic woman described as being in her mid-20s with
long dark hair took down GAVARRETE's insurance information.  On GAVARRETE's
second visit to RRC, the same two women were working in the office.
GAVARRETE signed additional paperwork and left.

    During one of her visits, GAVARRETE had blood drawn and also used the
office computer to sign into her Blue Cross Blue Shield (BCBS) insurance
account at the instruction of one of the women.  GAVARRETE did not give them
access to the account, but was told that logging in to the account would
allow her to see her benefits.

Investigation on  12/10/2020  at  Miami, Florida, United States (In Person)

File #  ████████                                       Date drafted  12/10/2020

by  PHILLIPPE LARA, CHANDLER KRISTIN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_00074329

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of ▮▮▮▮ (U) Interview of Jilianette Gavarrete ____ , On 12/10/2020 , Page 2 of 2

GAVARRETE did not see any other patients or employees at RRC on either of the visits.  GAVARRETE was not treated by a doctor or a physical therapist.  GAVARRETE did not receive any other type of treatment, other than the blood draw.

  *[Agent's Note: According to BCBS medical data for GAVARRETE, RRC billed BCBS for five visits from 08/01/2017-02/22/18.  The billing included charges for x-rays, blood work, urinalysis, ultrasound and ECG.]*

MONTERRO paid GAVARRETE $800-1000 dollars after she visited RRC the second time.  MONTERRO gave GAVARRETE the money in their office space at SIMPLY.  MONTERRO offered her a $150 referral fee for additional patients however, GAVARRETE did not go back to RRC or refer anyone to MONTERRO.

GAVARRETE was later approached by two other SIMPLY employees and each one offered GAVARRETE money to go to clinics.  STEPHAN LNU and APRIL JAMISON each offered GAVARRETE $1,200-1,500, but GAVARRETE refused. GAVARRETE was aware of other employees who recruited for fraudulent clinics as well, specifically JEAN LAGO and RAMSIC [ph] LNU, although they never approached GAVARRETE.

Without revealing the identity of the individuals, SA Phillippe showed GAVARRETE the following Florida state driver's license photographs:

- JEAN LAGO; identified as a Supervisor at SIMPLY who was recruiting employees to go to fraudulent clinics.
- APRIL JAMISON; identified as the coworker who offered her $1,200-1,500 to go to a clinic.

FD-302 (Rev. 5-8-10)

- 1 of 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/05/2021

 

On January 5, 2021, Special Agent (SA) Lara Phillippe followed up with JILIANETTE GAVARRETE (GAVARRETE), date of birth (DOB) ████████████, cell phone number ████████, via text message.  Without revealing the identity of the individual, SA Phillippe provided a Florida driver's license photo of RAMSET DOMINGUEZ (DOMINGUEZ) to GAVARRETE for review. GAVARRETE identified the photo as "RAMSET," the recruiter she mentioned in her previous interview (see reference document).  She was not sure whether DOMINGUEZ recruited for RAMIREZ REHAB CENTER, INC.

The entirety of the text conversation was captured and included as a  1A in the case file, along with the Florida driver's license photo of DOMINGUEZ that was shown to GAVARRETE.

---

Investigation on   01/05/2021   at   Miami, Florida, United States (Phone)

File # ████████████                                          Date drafted   01/05/2021

by   PHILLIPPE LARA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_00074331

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___07/20/2022___

JILIANETTE GAVARRETE (GAVARRETE), date of birth (DOB) ███
████████████████████████████ cell phone number ████████████ was
interviewed via telephone.  Present for the interview were Department of
Justice (DOJ) Attorneys Emily Gurskis and Patrick Queenan as well as Federal
Bureau of Investigation Special Agents (SAs) Lara Phillippe and Mark George.
After being advised of the identities of the interviewing Agents and the
nature of the interview, GAVARRETE provided the following information:

   GAVARRETE was let go from her job at Simply Healthcare in September 2019
due to an internal investigation regarding employees recruiting for and/or
receiving compensation for going to health clinics. In June 2022, GAVARRETE
was hired to work as a Grievance Specialist at Lumeris.  Her duties include
addressing customer complaints on quality of care that were passed to her
from the customer service representatives.

   GAVARRETE was originally from Miami and graduated from high school in the
Kendall area.  GAVARRETE had a son in December 2016 and was the sole
provider.  GAVARRETE started working at Simply Healthcare in 2015 as a
customer service representative and in her last year with the company, she
moved to the grievance specialist role.  GAVARRETE made approximately $16-17
per hour.

   GAVARRETE was approached by a coworker in 2017 about going to a clinic in
exchange for payment.  She was under the impression that she would get the
treatment at the clinic but that she would not have to go back for
additional treatment.

   GAVARRETE simply showed up at the clinic and the woman working there had
her create a login on the computer for her insurance.  The woman provided
her with a sticky note to write down her login information and GAVARRETE
took the sticky note with her when she left.

   GAVARRETE thought it was a "weird office," not like a regular doctors
office.  It was really small and they put her in a little room with a
regular-sized fridge.  The room was like a small kitchenette and the fridge
looked like it was used for food, and not for medical needs.

| | | |
|---|---|---|
| Investigation on | 07/19/2022 | at Miramar, Florida, United States (Phone) |
| File # | 209B-MM-3334372 | Date drafted 07/20/2022 |
| by | PHILLIPPE LARA, MARK CLIFTON GEORGE | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

PORRAS_0000078557

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Interview of Jilianette Gavarrete , On 07/19/2022 , Page 2 of 2

GAVARRETE only remembered one woman working at the clinic, and one person, who appeared to be a patient, in the waiting room.  The woman had her sign paperwork, and GAVARRETE remembers one page having a picture a human skeleton on it, but she was not sure that she signed that page. GAVARRETE received no treatment with the exception of a blood draw. GAVARRETE did not recall receiving or talking about the blood test results.

GAVARRETE received money for the visit.  It was given to her outside of the building where she worked for Simply Healthcare.

GAVARRETE previously had back surgery and had back pain.  She was a social smoker with sinus problems and occasional wheezing.  GAVARRETE did not have right side shoulder pain, an ankle strain or sprain, frequent dry cough, shortness of breath, chest pressure, or swelling of the ankles.

PORRAS_0000078558

# COMPOSITE EXHIBIT 4(d)

- 1 of 6 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    01/14/2022

DALGI OQUENDO (OQUENDO), Social Security Account Number (SSAN) ███, date of birth (DOB) ████████, was interviewed at the Wilkie Ferguson Courthouse in Miami, Florida. Present for the interview were FBI Special Agents Kristin Chandler and Olivia Medlin, FBI Linguist Fiorella Warger, and OQUENDO's defense attorney David Raben. After being advised of the identities of the interviewing Agents and the nature of the interview, OQUENDO provided the following information:

**JAROSLAVA RUIZ**

OQUENDO was introduced to JAROSLAVA RUIZ (RUIZ) by her former employee and Physical Therapist, FRANCISCO ANGULO (ANGULO), known to law enforcement as FRANCISCO ANGULO, SSAN ████, DOB ████. ANGULO knew that LA O MEDICAL WELLNESS CENTER INC (LA O) did not have many patients and thus, he asked OQUENDO if she wanted to meet RUIZ. ANGULO explained that RUIZ had a clinic that closed and thus, she was distributing patients. ANGULO introduced OQUENDO to RUIZ at the end of 2018 or beginning of 2019. ANGULO used to work for RUIZ, but she was not sure where the clinic was located. RUIZ told OQUENDO that she worked at various clinics and mentioned one on 72nd.

OQUENDO believed RUIZ to be the owner of the clinic as ANGULO told OQUENDO that she closed it. RUIZ charged OQUENDO a one time fee of $3,000 for providing private insurance patients. RUIZ then introduced OQUENDO to JEAN LAGO (LAGO). LAGO worked for SIMPLY HEALTHCARE and provided patients with BCBS insurance. OQUENDO estimated that LAGO provided approximately 10-12 patients. OQUENDO paid LAGO $1,500 cash per patient. OQUENDO told LAGO that the patients had to come to the clinic and do the therapy, however, not everyone did. OQUENDO stated that patients were billed for services not provided at LA O.

Further, RUIZ knew that the patients LAGO provided would be billed at LA O regardless of whether they received the treatment. RUIZ told OQUENDO that she had done this type of business with LAGO before. Finally, RUIZ came to LA O as a patient to receive therapy. ANGULO asked OQUENDO's permission to treat RUIZ and she agreed. RUIZ had AMBETTER medical insurance and was

Investigation on  01/12/2022  at  Miami, Florida, United States (In Person)

File # ████████████████████                                         Date drafted  01/12/2022

by  CHANDLER KRISTIN, Olivia J. Medlin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of (U) Debrief of DALGI OQUENDO _____ , On 01/12/2022 , Page 2 of 6

billed by LA O. OQUENDO has not seen RUIZ in approximately two years. OQUENDO was shown a photograph of JAROSLAVA RUIZ, SSAN ███████ , DOB ████████ , who she positively identified as RUIZ.

**YOYI COMMUNITY MENTAL HEALTH**

OQUENDO knew of an individual named JORGE LAST NAME UNKNOWN (JORGE) from a former Physical Therapist at LA O, LISSESKA ALVAREZ (ALVAREZ). ALVAREZ previously worked for JORGE. JORGE had two clinics, one located on 122 Avenue and 8th Street, and the other located in Hollywood, Florida. ALVAREZ told OQUENDO that JORGE had private insurance or PPO patients which he paid to come to the clinics. ALVAREZ also told OQUENDO that she did not provide treatment to patients at the Hollywood clinic because it was too far. Specifically, JORGE would bring the patient charts from the clinic in Hollywood to the clinic on 8th Street for her to complete.

ALVAREZ worked for OQUENDO at LA O in 2018. Similar to her work with JORGE, ALVAREZ completed patient charts regardless of whether the patients came for therapy. ALVAREZ told OQUENDO it was better this way because she was too busy and did not have time to do the therapy anyway. ALVAREZ brought employees from JORGE's clinic to LA O as patients as JORGE's clinics did not accept AMBETTER insurance. OQUENDO paid ALVAREZ $1,500 per patient. ALVAREZ, in turn, paid the patients. OQUENDO stated that the patients ALVAREZ provided always came for treatment. JORGE was not aware that ALVAREZ took his employees to LA O. OQUENDO has never met JORGE. OQUENDO believed that when JORGE left his clinic it was providing community mental health services. OQUENDO provided the following names and telephone numbers of patients that ALVAREZ brought to LA O:

BELKIS MEDIACEJAS, ████████████

FERNANDO CREMADES, ████████████

MAIKELEN CABRERA, ██████████

ZUNAMY RODRIGUEZ, ██████████

**SERGIO GARCIA or ORTEGA**

OQUENDO knew of SERGIO GARCIA or ORTEGA (she could not recall the last name exactly) as the owner of FIMS, a medical clinic located on 82nd Avenue and SW 9th Street. LA O was originally located in the same shopping center as FIMS. SERGIO's clinic provided MRI's and X-rays, and treated car accident and PPO patients. He also had a law firm located next to her clinic at the time. OQUENDO asked SERGIO if he knew of a Medical Director as she needed

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Debrief of DALGI OQUENDO                    , On  01/12/2022  , Page   3 of 6

one for LA O. SERGIO recommended MANUEL FERNANDEZ, who has since passed
away.

SERGIO asked OQUENDO if she knew of any patients in need of accident
therapy. He told OQUENDO to tell patients that he would pay them $2,000-
$2,500 for going to his clinic. OQUENDO referred a few patients to SERGIO.
She did not know if they went and received treatment at FIMS. SERGIO paid
the patients directly. OQUENDO also told ANGULO about FIMS. In 2021, ANGULO
brought his daughter and his son-in-law's grandmother to SERGIO. SERGIO paid
ANGULO $2,500 for each individual. ANGULO told OQUENDO that they did not
receive treatment at the clinic, even though they were in a car accident.
OQUENDO recalled that SERGIO didn't always pay patients and sometimes there
were people outside the clinic causing trouble.

**CMP MEDICAL CENTER/LA CARIDAD MEDICAL CENTER**

CELIDA CAMBER (CELIDA) is the owner of CMP MEDICAL CENTER (CMP), along
with her husband, JORGE PISARRO (PISARRO). CMP is located on 107th Avenue
and 16th Street. CELIDA worked for OQUENDO at LA O from 2017-2018. CELIDA
opened CMP initially as a car accident clinic and then began billing PPO. In
2019, CMP expanded to include community mental health. CELIDA also accepts
HMO patients and has an association with SIMPLY HEALTHCARE. CELIDA pays car
accident patients and seniors in community mental health. The seniors
receive $140 per week and CELIDA gives an additional $100 to those that
utilize her doctor as their primary physician. Car accident patients receive
$1,500-$2,500. CELIDA has the equipment to provide services at the clinic;
however, she told OQUENDO that the patients do not receive treatment.
ALVAREZ and FERNANDO CREMADES also worked for CELIDA in 2018. KARINA
ANTONIONE, a Physical Therapist at LA O, also worked for CELIDA in 2018 or
2019.

CELIDA and her husband then purchased LA CARIDAD MEDICAL CENTER (LA
CARIDAD). OQUENDO believed LA CARIDAD was under PISARRO's name. The
previous owner of LA CARIDAD was ALEXANDER ALARCON (ALARCON). OQUENDO was
introduced to ALARCON by CELIDA as she needed a psychiatrist. OQUENDO was
going to hire ALARCON and when she called him, he told her that he didn't
have a license but can do consultations and write prescriptions. ALARCON
carries a prescription pad with his cousin's name and signature, JESUS, who
is licensed. OQUENDO told ALARCON to bring her JESUS' license. JESUS is a
Nurse Practitioner and he told OQUENDO that he authorized ALARCON to do the
consultations.

OQUENDO utilized ALARCON approximately ten times for
consultations/evaluations of patients for community mental health at LA O.

PORRAS_0000075426

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of _(U) Debrief of DALGI OQUENDO_____, On _01/12/2022_, Page _4 of 6_

ALARCON would write prescriptions for these patients as needed. OQUENDO paid
ALARCON via checks to his name or to ABRA, a company owned by ALARCON and
JESUS. OQUENDO advised that ABRA was a company they created to receive
payments. OQUENDO paid ALARCON $80-$150 per evaluation. CELIDA utilized
ALARCON as well. ALARCON was a doctor in Cuba and was from Santa Clara,
Cuba.

## NEW HORIZON

NORMA CUTINO (CUTINO) is the owner of NEW HORIZON. When OQUENDO moved LA
O to its new location, CUTINO was the previous tenant of that suite.
CUTINO moved to Suite 47. CUTINO told OQUENDO that if she didn't do accident
therapy, to send patients seeking treatment her way. In the beginning of
2021, patients came to LA O looking for accident therapy. OQUENDO sent a few
patients with ANGULO to CUTINO's clinic. CUTINO paid ANGULO $500 for
bringing the patients and paid each patient $2,500. OQUENDO recalled the
name DENISE DELGADO as one of these patients.

ANGULO told OQUENDO that the patients did not receive treatment, they
just signed paperwork. CUTINO's clinic also does drug testing and remains
active. OQUENDO believed CUTINO had an Argentinean female partner, whose
name she could not recall.

## EAV MENTAL HEALTH

ESTHER VASQUEZ (VASQUEZ) was a previous mental therapist at LA O. In
2021, VASQUEZ left LA O and opened a community mental health clinic with her
daughter. When VASQUEZ left LA O, she took her patients with her. VASQUEZ
pays patients $140 per week to go to the clinic. OQUENDO stated that the
patients need treatment, but that VASQUEZ offers the money as an incentive.
OQUENDO did not know where the clinic was located. She believed that the
clinic was under VASQUEZ' name. She provided the following names and
telephone numbers as patients at VASQUEZ' clinic:

JOSEFA VALERA, ████████████

JUAN MEDINA, ███████████

ROSA CARRILLO, ████████████

MARISABEL ORIZONDO, █████████████

## GONZALO BASULTO

GONZALO BASULTO (BASULTO) worked at LA O, as a Mental Therapist, from the

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Debrief of DALGI OQUENDO                          , On  01/12/2022  , Page  5 of 6

end of 2020 to the beginning of 2021. He then left LA O and opened a clinic on top of EL GALLEGO restaurant, located on 8th Street and 72nd or 74th. OQUENDO believed that he had a partner with whom he opened the clinic. BASULTO contacted patients from LA O and offered them home appliances and $140 per week to come to his clinic. BASULTO offered community mental health and other consultations at the clinic.

**JUAN CARLOS ROYEROS**

JUAN CARLOS ROYEROS (ROYEROS) is the owner of DT ROYEROS, a community mental health clinic. ROYEROS also worked at LA O, in 2019. He then left, opened his own clinic, and took his patients. ROYEROS also offered patients $140 per week to come to his clinic. ROYEROS was a Physician in Cuba. OQUENDO offered patients $140 per week to go to LA O. Some of the patients taken by BASULTO and ROYEROS returned to LA O and told her what they were offered in exchange for going to BASULTO's and ROYEROS' clinics.

**OASIS MEDICAL**

ADRIAN LAST NAME UNKNOWN (ADRIAN), is the owner of OASIS MEDICAL, located on 8th Street and 82nd Avenue. OQUENDO met ADRIAN, in 2017, through JORGE RUIZ, a Therapist who used to work at LA O. OASIS offers MRI's, X-rays, and "electro." ADRIAN paid the owners of clinics $500 to send him patients. Thus, OQUENDO sent ADRIAN many accident patients who were prescribed various diagnostics by the doctor at her clinic. OQUENDO provided the following names and telephone numbers of patients she sent to ADRIAN:

SENIN LLANES, ██████████

PEDRO LUIS HERNANDEZ, ███████████████

FELIX GONZALEZ, ██████████████

NIURKA PEREZ, ████████████

MARIANNA D. FERNANDEZ, ████████████████

ANGEL CHAVEZ, ████████████

GEOVANY ANIZA, ██████████████

ADRIAN also had an accident clinic located in EL DORAL, located on 36th Street and 72 Avenue. OQUENDO described those eligible for community mental health as having Medicaid, Medicare, and registered as an HMO. OQUENDO heard that Medicaid is no longer paying for community mental health services.

PORRAS_0000075428

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of ___(U) Debrief of DALGI OQUENDO_____ , On _01/12/2022_ , Page _6 of 6_

**LEODON/REHABILITATION CENTER**

LEODON LAST NAME UNKNOWN (LEODON) is the owner of a rehabilitation center located on SW 9th Street and 80th Avenue. She met LEODON while at the original location of LA O as he had an accident clinic located in the same shopping plaza. JORGE RUIZ also worked with LEODON prior to working with OQUENDO. OQUENDO never spoke with LEODON directly, but was told by JORGE RUIZ that he prepared and planned staged accidents. Specifically, they would take a van filled with patients so that they would have many to bill at the clinic. OQUENDO did not know who drove the van. OQUENDO provided the telephone number of JORGE RUIZ as ▓▓▓▓▓▓▓▓. She believed that JORGE RUIZ would have more information on LEODON.

**CAMPILLO MEDICAL CENTER**

ERIC CAMPILLO (CAMPILLO) is the owner of CAMPILLO MEDICAL CENTER and a Psychiatrist. The clinic is located on 62nd Avenue and SW 8th Street and is managed by CAMPILLO's wife and father-in-law. VIOLETA LARGA-ESPADA (VIOLETA) recruited patients to CAMPILLO's clinic. VIOLETA worked in many different locations and knew a lot of elderly people. VIOLETA was also a patient herself at times. VIOLETA received $50 for each patient she referred to the clinic. The patients were paid $140 per week to go to CAMPILLO MEDICAL CENTER.

VIOLETA also worked at the front desk at LA O, approximately 20 to 30 hours per week. VIOLETA brought several patients for community mental health to LA O. OQUENDO paid VIOLETA $50 for each patient she referred. VIOLETA then paid the patients $140 per week. VIOLETA stopped working at LA O in 2020. OQUENDO also stated that VIOLETA recruited patients to research studies. OQUENDO provided the following names and telephone numbers of patients brought to LA O by VIOLETA:

JOSE PEREZ, ▓▓▓▓▓▓▓▓

JOSE CASANOVA, ▓▓▓▓▓▓▓▓

MAYRA VILAN, ▓▓▓▓▓▓▓▓

- 1 of 2 -

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   07/26/2022

    DALGI OQUENDO (OQUENDO), Social Security Account Number (SSAN) ████████, date of birth (DOB) ████████████, was interviewed at the Wilkie Ferguson Courthouse in Miami, Florida. Present for the interview was Department of Justice(DOJ) Attorney Emily Gurskis, Federal Bureau of Investigation(FBI) Special Agent(SA) Mark George, FBI SA Jonathan Bent, and OQUENDO's defense attorney David Raben. DOJ Attorney Patrick Queenan and FBI SA Lara Phillippe were present telephonically. OQUENDO speaks Spanish, the interview was conducted utilizing FBI Linguist Juana Tapanes to provide translation. After being advised of the identities of the people present and the nature of the interview, OQUENDO provided the following information:

    DALGI OQUENDO(OQUENDO) met JAROSLAVA RUIZ(RUIZ) in the end of 2018 or beginning of 2019 through FRANCISCO ANGULO(ANGULO). ANGULO worked for OQUENDO as a physical therapist. ANGULO told OQUENDO that he had a friend and could refer patients. RUIZ told OQUENDO that she had "very good" patients at her office. The "very good" patients meant that they had insurance that paid well. OQUENDO remembers this because that is when her clinic, LA O, began working with PPO patients. OQUENDO did see patients at LA O, and those patients were provided with therapy.

    RUIZ had just closed down a clinic and could recommend her patients to LA O through a patient recruiter, JEAN LAGO(LAGO). RUIZ told OQUENDO that $1500 was to be paid to LAGO for each patient, then LAGO would pay a portion of that money to the patients. OQUENDO agreed to pay the $1500. OQUENDO said that they would get medical treatments, but they were not done correctly. The medical treatments were not medically necessary. Sometimes patients would come with prescriptions for therapy. Sometimes patients would not get therapy.

    OQUENDO agreed to take patients from RUIZ. OQUENDO does not know anything about the clinic that RUIZ had. Patients included LAGO, CLARISSA AZAR(AZAR) and others. LAGO confirmed when she first arrived at the clinic, that RUIZ had referred her. OQUENDO agreed to pay RUIZ $3000, for introducing her to LAGO. OQUENDO did not have the cash on hand. Approximately one to two weeks later, RUIZ returned to LA O to collect the money and then leave. The visit

Investigation on   07/22/2022   at   Miami, Florida, United States (In Person, Phone)

File # ████████                 Date drafted  07/22/2022

by   MARK CLIFTON GEORGE, PHILLIPPE LARA, BENT JONATHAN L

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_0000078849

FD-302a (Rev. 5-8-10)

█████████████████

Continuation of FD-302 of    (U) Debrief of DAGLI OQUENDO_____ , On  07/22/2022 , Page   2 of 2


was very brief.

    OQUENDO saw RUIZ again in 2020 because RUIZ came in with ANGULO for
therapy. RUIZ came in for therapy because she had a problem with her leg.
RUIZ came in approximately 20 times in 2020. OQUENDO paid RUIZ $1500 for all
the therapy she received.

    Patients came in to LA O to sign papers and get paid. OQUENDO paid LAGO
for those patients. OQUENDO was asked if she knew the names of patients.
OQUENDO was able to provide additional information about the following
patient names:

April Jamison – The first patient brought to the clinic by LAGO.

Clarissa Azar – OQUENDO used to feel sorry for her because she had children.
AZAR also referred patients to OQUENDO.

Kimberly Sequeda – Remember as a patient, but had no treatment.

Michael Rodriguez – Visited the clinic a lot, but never had treatment.

Sara Larry – Never spoke, but OQUENDO knows who she is.

LAGO explained to OQUENDO that the patients she referred used to work
together at a medical insurance office.

PORRAS_0000078850

# **COMPOSITE EXHIBIT 4(e)**

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    08/10/2021

KYRENIA MAQUEIRA RODRIGUEZ (RODRIGUEZ), Social Security Account Number (SSAN) ███████, date of birth (DOB) ████████, cell phone number ███████, was interviewed at the Federal Bureau of Investigation (FBI) office located in Miramar, FL. Present for the interview were FBI Special Agents Kristin Chandler, Carlos H. Torres, Olivia Medlin, and Lara Phillippe. RODRIGUEZ' defense attorney, Juan de Jesus Gonzalez, was also present. After being advised of the identities of the interviewing Agents and the nature of the interview, RODRIGUEZ provided the following information:

MIAMI MEDICAL THERAPY AND RESEARCH CENTER CORP.

RODRIGUEZ is a licensed Physical Therapist Assistant (PTA). She also had a behavioral therapist certificate which lapsed. RODRIGUEZ was shown a photograph of the outside of the building in which MIAMI MEDICAL THERAPY AND RESEARCH CENTER, CORP. (MIAMI MEDICAL) was located. RODRIGUEZ identified the building as the clinic she was employed at as a PTA. She recalled that the clinic was located on Flagler Street and 100 something, on the second floor of the building. RODRIGUEZ was introduced to MIAMI MEDICAL through a friend, LISSESKA ALVAREZ (ALVAREZ). RODRIGUEZ was shown a photograph of ALVAREZ, SSAN ███████, DOB ████████, who she positively identified as ALVAREZ. RODRIGUEZ and ALVAREZ studied together in school.

ALVAREZ knew that RODRIGUEZ was unemployed and looking for a job; thus, she told her about a clinic that was looking for a PTA. ALVAREZ also told RODRIGUEZ that these were "serious people" and provided her with the phone number for KIAMY PEREZ (PEREZ). ALVAREZ did not work with PEREZ herself, but told RODRIGUEZ that she worked for a relative of his, perhaps his father-in-law. RODRIGUEZ called PEREZ and was later interviewed by him at MIAMI MEDICAL. RODRIGUEZ was shown a photograph of KIAMY PEREZ, SSAN ███████, DOB ████████, who she identified as KIAMY. PEREZ introduced himself as the

Investigation on   08/05/2021   at   Miramar, Florida, United States (In Person)

File # _____████████_____   Date drafted   08/06/2021

by   CHANDLER KRISTIN, PHILLIPPE LARA, Olivia J. Medlin, Carlos H. Torres

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

███████████████

Continuation of FD-302 of (U) Debrief of KYRENIA MAQUEIRA RODRIGUEZ ,On 08/05/2021 , Page 2 of 6

owner of the clinic. He also introduced RODRIGUEZ to his co-owner, a younger male. RODRIGUEZ was then shown a photograph of DAVID SACERIO (SACERIO), SSAN ██████████ , DOB ███████████ , who she identified as the co-owner of MIAMI MEDICAL.

During the interview with PEREZ, he told RODRIGUEZ that it would be a part-time job and that it would just be a few patients. PEREZ also told her that she did not have to provide any treatment, but rather just sign the physical therapy (PT) forms. RODRIGUEZ agreed and started working at the clinic in May 2020. In the beginning, RODRIGUEZ went to the clinic every morning in case a patient arrived. She then began going to the clinic once a week to sign PT notes. RODRIGUEZ received $500 weekly. RODRIGUEZ advised that she saw two or three patients during her time working at the clinic, just to meet them. She only provided treatment, which consisted of 30 PT sessions, to one patient who she described as a young male. RODRIGUEZ discussed what she was doing with ALVAREZ. ALVAREZ also knew that she had signed PT notes without seeing the patients at another clinic previously.

RODRIGUEZ stated that the receptionist at MIAMI MEDICAL, MELISSA CRUZ (CRUZ), would call her and tell her that there was a patient at the clinic. When she arrived, there was no patient. CRUZ then gave RODRIGUEZ the PT notes to sign. RODRIGUEZ advised that the PT forms were already filled out, she just signed them. RODRIGUEZ was unaware of who filled out the PT notes initially. After some time working at the clinic, CRUZ told RODRIGUEZ that PEREZ wanted her to start filling out the PT notes herself. RODRIGUEZ did just that. CRUZ provided RODRIGUEZ with another PT note to use as a template and some guidelines to follow when filling out the forms. RODRIGUEZ believed that she signed one or two charts per week in the beginning. It later increased to approximately ten charts per week. PEREZ introduced RODRIGUEZ to the doctor at MIAMI MEDICAL. She only saw him one time. RODRIGUEZ never met the clinic's physical therapist. RODRIGUEZ did not do PT evaluations as her license does not allow her to do so.

CRUZ or PEREZ usually provided RODRIGUEZ with the patient charts and called her to come in. She would only sign the PT notes. CRUZ was usually at the clinic every time RODRIGUEZ went. PEREZ was there less often than CRUZ. RODRIGUEZ saw SACERIO at the clinic two or three times. She observed him speaking to CRUZ. RODRIGUEZ did not hear or participate in any conversations related to paying patients. She also did not witness any payments as she

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Debrief of KYRENIA MAQUEIRA RODRIGUEZ    , On  08/05/2021  , Page  3 of 6

would often go to another room and sign the PT notes. RODRIGUEZ was shown a
photograph of MELISSA CRUZ, SSAN ▮▮▮▮, DOB ▮▮▮▮, who she
positively identified as MELISSA CRUZ. RODRIGUEZ advised that CRUZ worked at
the front desk, called her and told her when to come in, and provided her
with her checks.

RODRIGUEZ was shown checks written to K AND M THERAPY SERVICES by MIAMI
MEDICAL. RODRIGUEZ advised that she asked PEREZ to address the checks to her
company name. She also received payment from PEREZ via ZELLE. PEREZ
determined that he would send her the money. RODRIGUEZ worked at MIAMI
MEDICAL for approximately four months or until the end of 2020. PEREZ then
told her that they were closing the clinic as he and SACERIO were having
problems and disagreements. PEREZ continued paying RODRIGUEZ $300 after
MIAMI MEDICAL closed as he told her that he hoped to open another clinic.

PEREZ then brought RODRIGUEZ to a clinic located in Hollywood, FL. He
told her that he was the owner of this clinic as well. She saw two patients
at this clinic, but did not provide any treatment. RODRIGUEZ just signed the
PT notes. RODRIGUEZ also met a male massage therapist and his wife, who was
also a massage therapist. The male massage therapist would provide her with
the PT notes to sign. RODRIGUEZ did not want to continuing working and thus
stopped despite PEREZ' continued calls. RODRIGUEZ stated that PEREZ also
introduced her to another clinic in Hialeah. Here, she signed PT notes and
received $500 a week, via check. RODRIGUEZ believed patients received
treatment at this clinic.

Finally, RODRIGUEZ stated that she has not spoken to ALVAREZ recently.
ALVAREZ does not know that she has been arrested. ALVAREZ and RODRIGUEZ once
worked at two different clinics that were owned by the same person, named
ANA. On arrest day, RODRIGUEZ recognized PEREZ, SACERIO, and CRUZ, but did
not speak to them.

RAMIREZ REHAB CENTER INC ET AL

Prior to working at MIAMI MEDICAL, RODRIGUEZ worked at several clinics
that were doing the same type of fraud as MIAMI MEDICAL.  One was located in
Fontainebleau and the other was owned by CESAR LNU (CESAR) and was located
at 9700 SW 8th Street.  MALVY DIAZ (DIAZ) worked at the front desk of the
clinic owned by CESAR.

PORRAS_00074368

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of <u>(U) Debrief of KYRENIA MAQUEIRA RODRIGUEZ</u> , On <u>08/05/2021</u> , Page <u>4 of 6</u>

 

 

When RODRIGUEZ was in between jobs, DIAZ knew she was looking for a position and put her in touch with another clinic located on West Flagler and 82nd Street in Miami.  When shown Google maps photographs of RAMIREZ REHAB CENTER INC/LONG LIFE MEDICAL CENTER INC (RRC/LONG LIFE) located at 8260 W Flagler Street in Miami, RODRIGUEZ positively identified it as the clinic (the photographs are maintained in the case file as 1C1).

RODRIGUEZ did not remember whether she interviewed for the position with DIAZ or with the owner of the clinic.  When shown a Florida state driver's license photograph of JESUS PORRAS (PORRAS), RODRIGUEZ positively identified him as the owner, although she did not recall his name.  DIAZ told RODRIGUEZ that PORRAS was the owner, and PORRAS also introduced himself to RODRIGUEZ as the owner.

DIAZ's responsibility at the clinic was to do the billing. DIAZ also told RODRIGUEZ that she filled out the therapy forms.  RODRIGUEZ's responsibilities at the clinic were to sign physical therapy forms for patients.  RODRIGUEZ never had to fill out the forms; she did not know who filled them out.  RODRIGUEZ did not go to the clinic every day. Rather, DIAZ or one of the other women working at the clinic would call her in to sign the forms, which was usually about once a week.  RODRIGUEZ usually signed enough forms for about ten patients at a time.

RODRIGUEZ never provided therapy to anyone at the clinic and furthermore, never even met a patient at the clinic.  Although she was aware that the patients would sometimes return for therapy, she did not provide the therapy and never saw another therapist at the clinic.

Three other women worked at the clinic.  When shown Florida driver's license photographs of JAROSLAVA RUIZ (RUIZ), ANISLEY GOMEZ ANUEZ (ANUEZ), and LIDIA PEREZ (LIDIA), RODRIGUEZ positively identified them as having worked at the clinic, although she could not remember their names.  RUIZ and ANUEZ worked at the front desk, processed patients, and sometimes called RODRIGUEZ in to sign the therapy forms. ANUEZ also used to be a nurse in Cuba.  RODRIGUEZ did not spend enough time at the clinic to see RUIZ or ANUEZ do anything else, however she knew they were there every day. LIDIA was a massage therapist but RODRIGUEZ never saw her with patients.

RUIZ and ANUEZ introduced RODRIGUEZ to the doctor who worked at the

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Debrief of KYRENIA MAQUEIRA RODRIGUEZ  , On  08/05/2021  , Page  5 of 6

clinic as well.  Although RODRIGUEZ could not remember his name, when shown a Florida state driver's license photograph of AURELIO A. ORTIZ (ORTIZ), RODRIGUEZ positively identified him as the doctor. RODRIGUEZ observed ORTIZ on several occasions sitting at his desk writing notes.

RODRIGUEZ observed PORRAS several times in his office at the clinic. PORRAS was the one who paid her most often, always by check, but sometimes he would leave her check with RUIZ or ANUEZ. RODRIGUEZ requested that the checks be made out to her company, K AND M THERAPY SERVICES CORP, but PORRAS kept forgetting and made a majority of the checks out to her name.

RODRIGUEZ noticed that the therapy forms she was given to sign had the names of other clinics on them.  RODRIGUEZ knew that at one point in time, the clinic closed and another one opened at a different location.  When shown Google maps photographs of AA ORTIZ MEDICAL CENTER INC/PEREZ MEDICAL CENTER INC (AA ORTIZ/PEREZ MEDICAL) located at 8080 W Flagler Street in Miami, RODRIGUEZ positively identified it as the location of more clinics owned by PORRAS and operated by the same group of people conducting the same type of fraud.

DIAZ told RODRIGUEZ that PORRAS had been arrested in Cuba. RUIZ resigned/quit and RODRIGUEZ also eventually quit because an investigator showed up to her house.  DIAZ did not want her to quit and they had a falling out. This was not the first time that DIAZ and RODRIGUEZ had a disagreement. RODRIGUEZ also had problems with DIAZ when working for the clinic owned by CESAR.

ALL EMPLOYMENT ACTIVITY

RODRIGUEZ noted the order and number of clinics for which she worked in which she signed physical therapy forms but did not see patients:

1. Clinic located at Fontainebleau, owner unknown
2. Clinic located at 9700 SW 8th Street, owned by CESAR
3. RRC/LONG LIFE and AA ORTIZ/PEREZ MEDICAL, owned by PORRAS
4. MIAMI MEDICAL, owned by PEREZ
5. Clinic located in Hialeah, introduced to clinic by PEREZ (this clinic was providing treatment to patients)
6. Clinic located in Hollywood, owned by PEREZ

IDENTIFICATIONS

FD-302a (Rev. 5-8-10)



Continuation of FD-302 of  (U) Debrief of KYRENIA MAQUEIRA RODRIGUEZ    , On  08/05/2021  , Page  6 of 6

RODRIGUEZ was shown the following Florida state driver's license photographs:

- JORGE R GONZALEZ PEREZ, SSAN ████████, DOB ████████ - not identified.
- MALVY DIAZ, SSAN ████████, DOB ████████ - positively identified.
- JESUS PORRAS, SSAN ████████, DOB ████████ - positively identified.
- JAROSLAVA RUIZ, SSAN ████████, DOB ████████ - positively identified.
- ANISLEY GOMEZ ANUEZ, SSAN ████████, DOB ████████ - positively identified.
- LIDIA PEREZ, SSAN ████████, DOB ████████ - positively identified.
- AURELIO A. ORTIZ, SSAN ████████, DOB ████████ - positively identified.
- LIDIA RODRIGUEZ OVIEDO, SSAN ████████, DOB ████████ - seemed familiar but could not identify.
- MANUEL FERNANDEZ GONZALEZ, SSAN ████████, DOB ████████ - not identified.
- JUAN LANDA, SSAN ████████, DOB ████████ - recognized as a family member of PORRAS who she saw once or twice at PORRAS' clinics.
- RAFAEL VILLA, SSAN ████████, DOB ████████ - not identified.



FD-302 (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry ___09/10/2021___

    KYRENIA MAQUEIRA (MAQUEIRA), Social Security Account Number ████████, date of birth (████████████ cellular phone number████ ████, was interviewed via telephone. Present for the interview was FBI Special Agent Carlos H. Torres. After being advised of the identity of the interviewing Agent and the nature of the interview, MAQUEIRA provided the following information:

    MAQUEIRA stated that KIAMI PEREZ (PEREZ) got her a job at a clinic in Hialeah owned by AYMEE and EDGAR whom are married. MAQUEIRA was interviewed by both AYMEE and EDGAR and later hired to work as a Physical Therapist Assistant (PTA). The clinic was located in a house with parking lot in the back. During her tenure at the clinic, she worked side by side with a massage therapist named ROXANA. She would get a call from either AYMEE, EDGAR and/or ROXANA letting her know that there were patients at the clinic. MAQUEIRA never did a physical therapy (PT) session herself but rather witnessed ROXANA conduct the session. MAQUEIRA would provide assistance in terms of knowledge on how to better perform certain aspects of the PT sessions. Even though it was ROXANA who conducted the PT sessions, it was MAQUEIRA who signed the PT forms at the end of the sessions.

    However, there were times when she arrived at the clinic, no patients were present, and ROXANA was waiting with a stack of PT forms, already filled out, to sign even though she never witnessed the PT sessions. This happened throughout her tenure at the clinic which lasted months during the pandemic. During conversations with ROXANA, it was clear to MAQUEIRA that ROXANA was the one who filled out the PT forms. MAQUEIRA visited the clinic once or twice a week.

    ROXANA was always the one that provided her with her payment via check. During her time working at the clinic, she met AYMEE's mother who she typically saw in one of the back offices. AYMEE also introduced her to her

**UNCLASSIFIED//FOUO**

Investigation on ___09/07/2021___ at ___Miramar, Florida, United States (Phone)___

File # ███████████    Date drafted ___09/09/2021___

by ___Carlos H. Torres___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

**UNCLASSIFIED//FOUO**

███████████████
███████ ████████ of KYRENIA MAQUEIRA _____, On 09/07/2021 , Page  2 of 2

daughter who she always saw working with patient charts, brought by ROXANA, in one of the back offices.

MAQUEIRA was shown Florida Driver's license photograph #1 who she identified as AYMEE. (**Agent's note:** The woman depicted in the photograph is known to law enforcement as AYMEE CABALLERO, ████████████████ ██████████████████████████

MAQUEIRA was shown Florida Driver's license photograph #2 who she identified as EDGAR. (**Agent's note:** The man depicted in the photograph is known to law enforcement as EDGAR PEREZ ████████████████████ ███████████████████████████.

MAQUEIRA was shown Florida Driver's license photograph #3 who she identified as ROXANA. (**Agent's note:** The woman depicted in the photograph is known to law enforcement as ROXANA PERERA SANCHEZ, ███████████████ ██████████████████████

MAQUEIRA was shown Florida Driver's license photograph #4 who she identified as AYMEE's mother. (**Agent's note:** The woman depicted in the photograph is known to law enforcement as ROBERTA ASCENCION, S████████ ████████████████

MAQUEIRA was shown Florida Driver's license photograph #5 who she identified as AYMEE's daughter. (Agent's note: The woman depicted in the photograph is known to law enforcement as LILIBETH ALVAREZ, ████████████ ████████████████).

MAQUEIRA provided numerous text messages exchanges with AYMEE, EDGAR and ROXANA to investigators.

**UNCLASSIFIED//FOUO**

FD-302 (Rev. 5-8-10)

- 1 of 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____09/20/2021_____

KYRENIA MAQUEIRA (MAQUEIRA), Social Security Account Number ███████ ████████ date of ██████████████████████ ████████ was interviewed via telephone by FBI SA Carlos H. Torres. After being advised of the identity of the interviewing Agent and the nature of the interview, MAQUEIRA provided the following information:

MAQUEIRA advised that she stopped working as a Physical Therapist Assistant (PTA) for BETTER LIFE MEDICAL SERVICES CORP. (BETTER LIFE) once the clinic was moved to its new location. Sometime after, EDGAR, the owner of BETTER LIFE, contacted her and asked her if she could come by the clinic to sign some PT notes for some of his patients. MAQUEIRA said yes but she never went to the clinic.

Investigation on  09/20/2021  at  Miramar, Florida, United States (Phone)

File # ████████████████████████████  Date drafted  09/20/2021

by  Carlos H. Torres

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 3-

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    10/05/2021

     KYRENIA MAQUEIRA RODRIGUEZ (RODRIGUEZ), Social Security Account Number
(SSAN) ████████, date of birth (DOB) ████████, cell phone number
████████, was interviewed at the Federal Bureau of Investigation (FBI)
office located in Miramar, FL. Present for the interview were Department of
Justice Attorney Emily Gurskis and RODRIGUEZ' attorney, Gigi Gonzalez. After
being advised of the identities of the interviewing Agents, Lara Phillippe
and Kristin Chandler, and the nature of the interview, RODRIGUEZ provided
the following information:

     RODRIGUEZ knew that when she started working at RAMIREZ REHAB CENTER
INC/LONG LIFE MEDICAL SERVICES INC, located at 8260 W Flagler Street in
Miami, her only responsibility would be to sign physical therapy forms and
that she would not be seeing patients.  RODRIGUEZ generally went into the
office to sign forms when MALVY DIAZ (DIAZ) called her to come in.
Sometimes another woman who worked there, ANISLEY GOMEZ ANUEZ (ANUEZ), would
call her to come in as well.  To her recollection, they generally called her
rather than texted; they did start texting her to come in when they moved to
the other location at 8080 W Flagler Street in Miami (AA ORTIZ MEDICAL
CENTER INC/PEREZ MEDICAL CENTER INC).

     When RODRIGUEZ arrived at the office, it was usually locked even though
she went during working hours (9 A.M. to 5 P.M.), which she thought was
weird.  Sometimes RODRIGUEZ would call to say she was on her way and
ANUEZ would tell her to hurry because they would be closing soon.  Upon
knocking, either DIAZ or ANUEZ would let her in.  One of them would hand her
the forms to sign, which were sometimes in a folder and sometimes in a
stack.

     When RODRIGUEZ first started working, DIAZ instructed her on where to
sign the forms.  Both DIAZ and ANUEZ witnessed her signing the forms.
RODRIGUEZ strictly provided a signature and did not fill the forms out

Investigation on   09/28/2021   at   Miramar, Florida, United States (In Person)

File #  ████████                                          Date drafted   09/28/2021

by  PHILLIPPE LARA, CHANDLER KRISTIN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

(U) Interview of Kyrenia Maqueira
Continuation of FD-302 of Rodriguez _____ , On 09/28/2021 , Page 2 of 3

because they were generally already filled out.  RODRIGUEZ did not see who
filled out the forms, but DIAZ once mentioned that she filled some of the
forms out.  There were a few times when DIAZ called RODRIGUEZ to come back
because she had made a mistake on the forms and needed RODRIGUEZ to sign
them again.

   RODRIGUEZ knew that a massage therapist, LIDIA PEREZ (PEREZ), worked at
the clinic but did not know if PEREZ witnessed her signing the forms.
RODRIGUEZ never saw PEREZ with a patient.  DIAZ and ANUEZ worked at both
locations (8260 W Flagler Street and 8080 W Flagler Street) but RODRIGUEZ
only saw PEREZ working at the second location.  RODRIGUEZ assumed that they
were working every day because they told her they were there every day.
When the clinic moved to the second location, RODRIGUEZ saw DIAZ working
there less.

   DIAZ told RODRIGUEZ that she (DIAZ) was in charge of accounting.
RODRIGUEZ was not sure what ANUEZ's role was but knew that ANUEZ called her
to come in and also sat at the front desk.  None of the ladies working there
ever talked about paying patients to or in front of RODRIGUEZ.  However,
ANUEZ knew about the fraud because she paid RODRIGUEZ at the end of each
week when she came in to sign forms without seeing patients.  Another
coworker, JAROSLAVA RUIZ (RUIZ), as well as the owner, JESUS PORRAS (PORRAS)
also knew about the fraud because they witnessed RODRIGUEZ signing forms
without seeing patients.

   RODRIGUEZ received $500-600 each week, no matter how many patient forms
she signed.  ANUEZ, DIAZ and PORRAS, all gave her checks. RODRIGUEZ was not
sure whether PEREZ saw her receive checks. ANUEZ kept the book of checks in
a drawer at her desk.  Generally, PORRAS dropped off the checks with one of
the ladies to give to RODRIGUEZ.  The few times that PORRAS paid her,
RODRIGUEZ went into his office and he signed the checks in front of her.
RODRIGUEZ also picked up her checks from DIAZ at another clinic where DIAZ
worked a few times.  Sometimes the checks were not ready and they told her
that the boss (meaning PORRAS) had not been by with her payment so RODRIGUEZ
would have to come by another time to pick up her payment.

   PORRAS wore all white with gold necklaces.  RODRIGUEZ reached out to
PORRAS a few times via text message about taxes and PORRAS responded from
Cuba.  However, that was the extent of their text communication.

PORRAS_00074373

FD-302a (Rev. 5-8-10)

███████████████████

(U) Interview of Kyrenia Maqueira

Continuation of FD-302 of  Rodriguez _____ , On  09/28/2021 , Page   3 of 3

    RODRIGUEZ saw the doctor, AURELIO A ORTIZ (ORTIZ), once or twice at the clinic, but never saw him with patients.  When she did see ORTIZ, he was sitting at a desk filling out paperwork.  All of the employees shared the same desk so RODRIGUEZ was not sure that it was his desk.  ORTIZ did not witness her signing forms and RODRIGUEZ was not sure if he witnessed her getting paid.

    RODRIGUEZ never received any complaints via insurance or at the office about her lack of care.

    RODRIGUEZ was never instructed to do anything specific to avoid law enforcement detection.

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**OFFICIAL RECORD**
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry        10/18/2021

KYRENIA MAQUEIRA (MAQUEIRA), Social Security Account Number ████████████, cellular phone number ████████████ was interviewed via telephone. After being advised of the identity of the interviewing Agent and the nature of the interview, MAQUEIRA provided the following information:

MAQUEIRA was shown Florida driver's license photograph #1 who she said it looks like a female employee from BETTER LIFE SERVICES CORP (BETTER LIFE). (**Agent's note**: The woman depicted in the photograph is known to law enforcement as YISEL PARSON, ████████████████████. MAQUEIRA said she was skinnier and with tattoos. She saw her approximately three times always inside the room where the patient charts were located with two chairs and two computers. MAQUEIRA said it's the same room where she always saw AYMEE's daughter doing her work in the computer. She also saw her outside the clinic smoking.

MAQUEIRA was shown Florida driver's license photograph #2 who she said it looks very much like the lady who worked the front desk at BETTER LIFE. (**Agent's note**: The woman depicted in the photograph is known to law enforcement as MARIA DEL CARMEN GONZALEZ ASCENCION (GONZALEZ), ████████████████████ MAQUEIRA said GONZALEZ had black hair during the time she worked at BETTER LIFE. When MAQUEIRA went to the clinic, she was always sitting behind the receptionist desk. Sometimes, she would see her talking to the doctor inside his office located near the reception desk. One time, MAQUEIRA came by the clinic to sign paperwork and GONZALEZ contacted ROXANA to inquire about the whereabouts of the paperwork. GONZALEZ was able to locate the paperwork and provided it to MAQUEIRA for her signature.

UNCLASSIFIED//FOUO

Investigation on   10/15/2021   at   Miramar, Florida, United States (Phone)

File ██      ████████████████████████████████      ████████   ████████

██   ████████ H. Torres

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

-1 of 3-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___07/26/2022___

    KYRENIA MAQUEIRA (MAQUEIRA), date of birth ████████, Social Security Account Number ████████, was interviewed at the Federal Courthouse in Miami, Florida.  Present for the interview were Department of Justice (DOJ) Attorneys Emily Gurskis and Patrick Queenan, Federal Bureau of Investigation (FBI) Special Agents Lara Phillippe and Mark George, and Translator Michael Heggie.  After being advised of the identity of the interviewing Agent and the nature of the interview, MAQUEIRA provided the following information:

    MAQUEIRA was a Physical Therapy Assistant (PTA) from 2017-2019.  She worked at the clinics on West Flagler Street in Miami and received approximately $500-600 per week.  MAQUEIRA found out about the job from MALVY GONZALEZ (GONZALEZ), who worked there and introduced her to the owner.

    MAQUEIRA has worked at and treated people at other legitimate clinics in the past. At legitimate clinics, the doctor prescribes therapy and evaluates the patient.  Then the physical therapist/PTA conducts the therapy.  For example, the doctor may say that the patients need certain exercises, stretching or massage.  The PTA would then apply heating pads and conduct therapy.  MAQUEIRA never placed her hands on a patient for the entirety of her employment at the clinics on West Flagler Street.

    When shown a Florida driver's license photograph of JAROSLAVA RUIZ (RUIZ), MAQUEIRA positively identified her as the woman who worked at the clinics on West Flagler Street in Miami.  MAQUEIRA knew RUIZ's name at the time that they worked together.  RUIZ was a masseuse but always worked at the desk filling out papers.  RUIZ would give MAQUEIRA a folder with patient documents for MAQUEIRA to sign indicating that they had received physical therapy.  MAQUEIRA did not know how many forms she signed on each visit but indicated that there were many folders and each contained several therapy orders.  Additionally, RUIZ sometimes gave her batches of documents not in folders.  MAQUEIRA could see what was written on the forms but never paid much attention to it as she never filled out the forms, she just signed them.

---

Investigation on ___07/21/2022___ at ___Miami, Florida, United States (In Person, Phone)___

File # ████████      Date drafted ___07/22/2022___

by   PHILLIPPE LARA, MARK CLIFTON GEORGE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PORRAS_0000078846

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of ___(U) Interview of Kyrenia Maqueira___ ,On _07/21/2022_ ,Page __2 of 3__

 

 

The process was as follows: RUIZ, GONZALEZ, or another employee, ANISLEY GOMEZ ANUEZ (ANUEZ) called her to come in to sign paperwork and get her check.  Sometimes MAQUEIRA called the office but usually one of the ladies called her.  MAQUEIRA originally agreed to come in once a week to sign and pick up her check.  However,  GONZALEZ sometimes called her back in more frequently because there were errors on the forms and she needed to sign them again.

RUIZ was present whenever MAQUEIRA came to the clinic.  GONZALEZ gave MAQUEIRA her checks when the clinic was located at 8260 W Flagler Street but RUIZ gave MAQUEIRA her checks when the clinic was located at 8080 W Flagler Street.

MAQUEIRA asked GONZALEZ why she was signing forms for clinics other than the one where she was employed.  GONZALEZ told her that it was because they shut down one clinic and moved it and since it was in the process of moving, the forms still needed to be signed.  MAQUEIRA thought it was strange because even after the move, the documents for another clinic were still given to her to be signed.

When shown photographs of AA ORTIZ MEDICAL CENTER INC (AA ORTIZ), MAQUEIRA positively identified and indicated that RUIZ worked there as well.  JESUS PORRAS (PORRAS), the owner, was in charge but when he was not there, RUIZ and ANUEZ, or whoever was at the front desk, was in charge.  The doors were locked at both clinics, and MAQUEIRA sometimes wondered why they were locked.  In her experience at other legitimate clinics, the doors were never locked during business hours.  RUIZ let her into the clinic on at least one occasion.

MAQUEIRA did not know how they recruited patients.  One time at 8080 W Flagler Street, MAQUEIRA saw patients with RUIZ and ANUEZ, but she did not get a good look.  MAQUEIR still signed the documents but did not treat the patients.

MAQUEIRA developed a close relationship with RUIZ.  MAQUEIRA mostly talked with RUIZ on the phone, and stated that RUIZ's tone was usually very nice and friendly.  On one occasion, MAQUEIRA even went to RUIZ's condo. Their conversations were of a personal nature, not business.  RUIZ did not mention it but GONZALEZ told MAQUEIRA that RUIZ and PORRAS had a romantic relationship.

Everybody who worked at the clinic knew that they were committing fraud because there were no patients and yet they were giving her therapy forms to sign.  On one occasion, RUIZ told MAQUEIRA that she wanted to leave the job

FD-302a (Rev. 5-8-10)

209B-MM-3334372

Continuation of FD-302 of (U) Interview of Kyrenia Maqueira , On 07/21/2022 , Page 3 of 3

and suggested that MAQUEIRA do the same.  The conversation was not specific but made MAQUEIRA think that RUIZ was concerned because RUIZ knew fully well that what they were doing was wrong.  Although RUIZ never mentioned to MAQUEIRA that she wanted to leave Florida, MAQUEIRA does not think that she lives in Florida anymore.

MAQUEIRA was shown specific checks and provided the following information about each one:

- **Check 1014** from RAMIREZ REHAB CENTER INC – MAQUEIRA recalled the clinic name because of the address of 8260 W Flagler Street.  She remembered that either at the beginning or the end of her employment, they paid her $300 per week.

- **Check 1136** from LONG LIFE MEDICAL SERVICES INC – MAQUEIRA recognized the check and the clinic name.

- **Check 1006** from PEREZ MEDICAL CENTER INC (PMC) – MAQUEIRA remembered PMC and pointed out the signature as the one belonging to PORRAS' wife.  MAQUEIRA did not know that she was signing checks for the clinic.

MAQUEIRA was shown text messages between herself and RUIZ and provided the following information about each one:

- **Text message 003** – in this exchange, RUIZ wanted MAQUEIRA to go and sign the therapy orders for patients she never saw.  MAQUEIRA called RUIZ when she was in the parking lot to let her know she was at the clinic.

- **Text message 008** – MAQUEIRA did not remember exactly what the exchange was about but it seemed like MAQUEIRA agreed to go to the clinic the day before but did not go.  RUIZ was upset that MAQUEIRA stood her up.  MAQUEIRA called from the parking lot when she arrived.  In general, the exchange was about signing forms and picking up checks.

PORRAS_0000078848